```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF PUERTO RICO
 2

 3

      UNITED STATES OF AMERICA,        )
 4                                     )
                     Plaintiff,        )
 5                                     )
      vs.                              ) Case No: 07-290(PG)
 6                                     )
      JUAN CARLOS BODON-LESPIER,       )
 7                                     )
                     Defendant.        )
 8

 9    _____


10

         TRANSCRIPT OF REVOCATION OF SUPERVISED RELEASE HEARING
11                          HELD BEFORE
            THE HONORABLE JUDGE JUAN M. PEREZ-GIMENEZ
12                    Thursday, March 30, 2017

13    _____

14

15                     A P P E A R A N C E S

16

17    For the Plaintiff:

18            Myriam Fernandez-Gonzalez, AUSA

19

20    For the Defendant:

21            Andrew McCutcheon, AFPD
              Juan Michelen, AFPD
22

23

24

25
```

1                      I N D E X

2

3     WITNESS                                        PAGE

4
      WILFREDO PEREZ-RIVERA
5
      Direct Examination By Ms. Fernandez              6
6     Cross Examination By Mr. McCutcheon             19

7
      ANGEL ORTIZ-RODRIGUEZ
8
      Direct Examination By Ms. Fernandez             64
9     Cross Examination By Mr. McCutcheon             78

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (PROCEEDINGS COMMENCED AT 10:57 A.M.)

2

3          DEPUTY CLERK:  Criminal Case 07-290, United States

4    of America versus Juan Carlos Bodon-Lespier.  Case called

5    for revocation of supervised release.  On behalf of the

6    Government, Assistant U.S. Attorney Myriam Fernandez.  On

7    behalf of the defendant, Assistant Federal Public Defenders

8    Andrew McCutcheon and Juan Michelen.

9          Is the defendant present in court?

10          MR. McCUTCHEON:  He is.

11          DEPUTY CLERK:  The defendant is present and he

12    will be assisted by the official court interpreter.

13          MS. FERNANDEZ:  Myriam Fernandez-Gonzalez on

14    behalf of the United States.  We are ready to proceed.

15          MR. McCUTCHEON:  Good morning, Your Honor.  Andrew

16    McCutcheon on behalf of Mr. Bodon.  We are ready to proceed.

17          THE COURT:  The matter is before the Court for

18    final revocation hearing.  Mr. Bodon, at this hearing you

19    have a right to be present together with your attorney.  You

20    have a right to see and hear the witnesses who would testify

21    for the Government, and you would have a right under your --

22    you would have a right for your attorney to cross-examine

23    those witnesses, object to any evidence being presented by

24    the Government, and for you to present any evidence on your

25    own behalf, including your own testimony.  Otherwise, you

1    can waive said hearing, and then if you do, the Court will

2    dispose of this matter based on your waiver of the hearing.

3            So I ask you at this time, how are we going to

4    proceed in this case?

5            THE DEFENDANT:  The hearing.

6            MR. McCUTCHEON:  Your Honor, if I may.  I

7    understand the Court's position with regard to the pace of

8    the local court proceedings, however, we would be moving for

9    a continuance of this revocation hearing simply based on the

10   Fifth Amendment issues that having the revocation proceeding

11   before the State Court case is concluded presents.

12           Again, I do understand the Court's position with

13   regard to the pace of that case, however, Mr. Bodon is

14   simply following the recommendations of his local counsel in

15   filing a motion for reconsideration of the suppression

16   hearing that was held in that matter.  It's my understanding

17   the trial is set for May.  So Mr. Bodon would obviously like

18   to go to trial in that matter and is trying to have it as

19   expeditiously as possible while still pursuing every

20   opportunity to file relative motions and dispositive motions

21   and the like, Your Honor.

22           THE COURT:  All right.  The problem the Court has

23   is that he was originally arrested for violation of this

24   Court's supervised release imposed upon part of his sentence

25   back in -- I think it was in April of the year 2016.  We

1   have gone almost a year, and the matter has been pending.

2   And I do not consider that that is appropriate to have a

3   revocation hearing pending for a year just because a State

4   system doesn't want to move as quickly as it should.  And

5   therefore -- the case law in the federal system provides

6   that even if the State case has not been resolved,

7   nevertheless, the issue here is not one of guilty or not

8   guilty.  The issue here is one of whether he has committed a

9   violation of the conditions of supervised release, and that

10  is what precisely we are going to be hearing this morning.

11              MR. McCUTCHEON:  Yes, Your Honor.

12              THE COURT:  So your request is denied.

13              Call your first witness.

14              MS. FERNANDEZ:  Your Honor, the United States has

15  two witnesses that they intend to call today.  They are both

16  seated outside.

17              THE COURT:  Call your first witness.

18              MS. FERNANDEZ:  Yes, Your Honor, but as a

19  housekeeping matter, may we ask the Court -- we see there

20  are additional individuals in the courtroom.  We don't know

21  if they intend to testify or not, and we would inquire as to

22  that before calling our first witness.

23              THE COURT:  Any witnesses here in court?

24              MR. McCUTCHEON:  Yes, Your Honor.  I will have

25  them step out.

1          THE COURT:  Please.

2          MS. FERNANDEZ:  We call Wilfredo Perez-Rivera.

3               WILFREDO PEREZ-RIVERA,

4    called as a witness herein, having been first duly sworn,

5    was examined and testified as follows:

6                    DIRECT EXAMINATION

7    BY MS. FERNANDEZ:

8    Q.  Good morning, sir.  In a loud and clear voice, please

9    state your full name for the record.

10   A.  Yes.  Good morning.  My name is Agent Wilfredo

11   Perez-Rivera, Badge Number 2149.

12   Q.  And you are an agent for what entity?

13   A.  I work for the Police of Puerto Rico.

14   Q.  Since when have you been so employed?

15   A.  For 19 years.

16   Q.  And you are currently assigned to what unit?

17   A.  At present I am working at the Drugs and Narcotics

18   Division in Ponce.

19   Q.  Now, I direct your attention to April of 2016.  Now,

20   were you so employed at that time as a police officer?

21   A.  Yes, that is so.

22   Q.  And were you assigned to the same drug unit?

23   A.  Yes, that is so.

24   Q.  Now, specifically April 8th of 2016, were you working on

25   that date?

1     A.  Yes.

2     Q.  And were you working during the afternoon hours?

3     A.  Yes.

4     Q.  Now, during the afternoon hours, where -- what location

5     did you go to comply with your duties around 4:00 o'clock in

6     the afternoon?

7     A.  I was at the Ponce Area Drugs and Narcotics Division, in

8     my office.

9     Q.  And did you have occasion to leave your office?

10    A.  Yes.

11    Q.  And why was that?

12    A.  I went out to do an investigation together with

13    Agent Angel Ortiz.

14    Q.  And towards what area did you go to conduct this

15    investigation?

16    A.  After Agent Angel Ortiz notified the supervisor, we went

17    to La Cantera sector in Ponce; specifically to Street Pete

18    El Conde.

19    Q.  Okay.  Now, was this your first time going to Pete El

20    Conde in Ponce?

21    A.  No.

22    Q.  And had you had occasion to go there previously?

23    A.  I go by there every day.

24    Q.  And as part of your duties as a police officer, have you

25    had a task or duties that you have carried out in La Cantera

1      in Ponce?

2      A.  Yes.

3      Q.  Okay.  Now, you went there to investigate what?

4      A.  I went there in the company of Agent Ortiz to

5      investigate and corroborate some information related to the

6      sale of some controlled substances, specifically in front of

7      residence 223 of Street Pete El Conde.

8      Q.  Okay.  And let me ask you -- you said specifically

9      residence 223.  At the time that you received that

10     information, did you have any knowledge about who resided at

11     that residence?

12     A.  Yes.

13     Q.  How did you know?

14     A.  It would be of my own personal knowledge, because I know

15     the persons who live there.

16     Q.  Okay.  So on April 8, 2016, you go with your partner or

17     with the other agent, Angel Ortiz, toward that area, and

18     what happens?

19     A.  When I arrived at Pete El Conde Street, Agent Angel

20     Ortiz was driving in a confidential vehicle, and he located

21     it on that street in a position where you can clearly see

22     the location of residence 223.

23              When we were at that site, I observed Juan Carlos

24     Bodon-Lespier in front of residence 223.  He was with

25     another young man who was dressed in a gray hat and shirt

1    and long blue pants and beige boots.

2    Q.  Now, I ask you, sir -- I ask you, on that day, you say

3    you saw Juan Carlos Bodon, and you also saw another

4    individual that you have just described how that individual

5    was dressed.  Now I ask you, at the moment that you observed

6    Juan Carlos Bodon, did you know his name was Juan Carlos

7    Bodon?

8    A.  Yes.

9    Q.  And you knew him how?

10    A.  I arrested him in 2007 with a firearm.

11    Q.  Now let me ask you, you said that you knew the

12    individuals who lived at the residence 223.  Now, who were

13    those individuals?

14    A.  The father of Juan Carlos Bodon-Lespier lives there and,

15    as far as I know, Juan Carlos Bodon-Lespier.

16    Q.  Now, the person that you identified on April 8, 2016 as

17    Juan Carlos Bodon in front of residence 223 La Cantera, is

18    that -- do you see that person here today?

19    A.  The person that I saw on April 18, 2016, yes.

20    Q.  Will you describe what he is wearing.

21    A.  He is seated over there (Indicating), and he has a gray

22    long-sleeve shirt.

23         MS. FERNANDEZ:  Your Honor, we ask that the record

24    reflect that the witness has identified the defendant Juan

25    Carlos Bodon.

1              THE COURT:  The record will so reflect.

2    BY MS. FERNANDEZ:

3    Q.  Now, going back to April 8th of 2016.  Now, you

4    indicated that you were able to observe Juan Carlos Bodon

5    and another individual, correct?

6    A.  Yes.

7    Q.  Now, when you first saw Juan Carlos Bodon, what did he

8    have, if anything, on his person?

9    A.  In the front part of the area of his chest, he had a

10   backpack, a black backpack, bag.

11   Q.  Now, these observations, did you -- were these

12   observations that you made with your own eyes or did you use

13   binoculars or any other equipment?

14   A.  With my own eyes.  I did with my own eyes.

15   Q.  So what happened next?

16   A.  After that, at 4:48 in the afternoon, I observed a

17   Toyota Corolla vehicle arrive.  It was quite new.  It was

18   around -- it was approximately, like, a model of 2014.  And

19   it parked facing a red jeep vehicle that was in front of

20   house 223.  Inside the Toyota Corolla vehicle, I observed

21   two young individuals, light-skinned with black hair, thin.

22   The driver had a blue shirt on, and the passenger had a red

23   t-shirt on.  At that point in time, these two individuals

24   that I have just described --

25              MR. McCUTCHEON:  Your Honor, I am going to object

```
1       to the narrative testimony.  If we could have a question.
2                    THE COURT:  Grounds.
3                    MR. McCUTCHEON:  I'm sorry, Your Honor?
4                    THE COURT:  What's the grounds?
5                    MR. McCUTCHEON:  To the narrative, Your Honor.
6                    THE COURT:  Denied.  Go ahead.
7       BY THE WITNESS:
8       A.  Well, they got out of the vehicle, and they started
9       walking toward the lateral rear part -- to the lateral rear
10      left side of the Toyota Corolla vehicle.  The young man,
11      Juan Carlos Bodon, and the other young man who had a gray
12      cap, a gray shirt, blue pants and beige boots, approached
13      these two young men.
14      BY MS. FERNANDEZ:
15      Q.  So what did you see next?
16      A.  Agent Angel Ortiz stopped using the binoculars.  He
17      drops them where the gearshift is at, in the console in the
18      middle, and says to me that he is going to be moving from
19      that place to look for a better location, since there was a
20      Mirage vehicle that was partially obstructing his vision.
21      Q.  And so what happened?
22      A.  We start moving the vehicle from south to north along
23      Pete El Conde Street.  And when he went by these
24      individuals, Juan Carlos Bodon-Lespier and the individuals
25      in the Toyota Corolla, Agent Angel Ortiz said that Juan
```

1    Carlos Bodon-Lespier was handing a transparent plastic bag,

2    purple in color, with marijuana shredding; he was making

3    that delivery to the young man with the blue shirt.  He

4    continued to repeat the same thing to me.  And he came to

5    the point where he asked me, What are we going to do?

6    Q.  And what did you do?

7    A.  I made the comment that Juan Carlos was on federal

8    probation; that according to the instructions that we have,

9    we had to communicate with a supervisor and inform him about

10    his observations.  So then the supervisor would plan how all

11    those persons who were there would be arrested.

12    Q.  So what was done next?

13    A.  We continued on our way, and we went up to La Lula

14    urbanization in Ponce.

15    Q.  Now let me ask you, La Lula urbanization in Ponce,

16    how -- what is the distance between that urbanization or

17    neighborhood and La Cantera ward?

18    A.  As far as distance goes, I could mention it based on

19    time.  Basically, it would be an approximate of 30 to

20    40 seconds.

21    Q.  Okay.  So what happens when you are at La Lula?

22    A.  When we arrived at that location, I communicated through

23    my mobile phone with Agent Ariel Miranda, one of the agents

24    that was working that day in the area of the division, out

25    on the street.  At the same time, I was able to hear Agent

1      Angel Ortiz who was communicating with Sergeant Martin

2      Perez, to let him know what was going on.

3               Once they arrived at La Lula urbanization -- that

4      would be the sergeant and other drug division agents -- we

5      decided to go to Pete El Conde Street, specifically in front

6      of residence 223, to proceed with the arrest of Juan Carlos

7      Bodon-Lespier and the other individuals who were with him at

8      the time that the marijuana was delivered.

9      Q.  Now, did you get to go back in front -- to the front of

10     this residence 223?

11     A.  When we arrived at a location a bit before -- a little

12     bit ahead of the residence, so before the residence, I got

13     out of the confidential vehicle.  I started walking along

14     the sidewalk that is located specifically in front of

15     residence 223.  And at that point in time, I observed that

16     Juan Carlos Bodon-Lespier was walking over, and he still had

17     possession, control and domination of the black backpack

18     type bag on his chest.

19     Q.  So to be clear, when you saw Bodon-Lespier again, he

20     still had on his body, on his person, the black bag?

21     A.  Correct.

22     Q.  What happened?

23     A.  He ran into me face to face.  I identified myself.  I

24     had identifications around my neck.  And I told him that he

25     was under arrest.  What he proceeded to do is, with his

1    hands -- he started to climb with his hands from the area of

2    the sidewalk to the balcony of residence 223.  The only

3    opportunity that I had was to grab him by one of his legs

4    and the bag from the -- the strap of the bag that went along

5    his back.  And also using the assistance of other

6    colleagues, I managed to prevent him from going into the

7    balcony of residence 223.  And while he was now in the area

8    of the sidewalk, I put the restrictions on him and at the

9    same time giving him the legal warnings.  I looked at the

10   bag --

11                MR. McCUTCHEON:  Your Honor, I am going to object

12   to narrative again.  He's been testifying for several

13   minutes now without a question.

14   BY MS. FERNANDEZ:

15   Q.  You observed the bag.  What happened next?

16   A.  And I was able to have visibility and see that there was

17   cocaine, marijuana, and money.

18   Q.  Now, were you able to examine the substances that were

19   found inside the bag?

20   A.  Yes.

21   Q.  And were you able to determine how much money was inside

22   the bag?

23   A.  Yes.

24   Q.  How much money was inside the bag?

25   A.  $459.

1    Q.  Now, in what type of denominations, if you remember, was

2    that money?

3    A.  Different denominations.

4    Q.  Now, as to the substances that were inside the bag,

5    what, if anything, was done to them to determine what they

6    were?

7    A.  I did a field test on them.

8    Q.  And the results of the field test were?

9    A.  Positive for marijuana and cocaine.

10   Q.  Now, let me ask you, when you went back to 223 and you

11   saw Juan Carlos Bodon, did you see other individuals?

12   A.  One more.

13   Q.  And that individual, was he placed under arrest?

14   A.  Yes.

15   Q.  And do you know the name of that individual?

16   A.  Yes.

17   Q.  And how did you learn the name of that individual?

18   A.  When I took down his general information.

19   Q.  And that was upon his arrest?

20   A.  No.

21   Q.  When was it?

22   A.  Subsequent -- at the Division, subsequent to the arrest

23   and the legal warnings.

24   Q.  Okay.  You took his personal information after the

25   arrest and giving him the legal warnings?

1     A.  Yes.

2     Q.  Now, this individual, his name was?

3     A.  The name of that young man is Milford Martinez-Martinez.

4     Q.  Now, had you seen Milford Martinez-Martinez when you

5     first approached residence 223 when you started -- when you

6     arrived at that street?

7     A.  Yes.

8     Q.  Okay.  And when you first saw him, was this when you

9     first saw Bodon-Lespier as well?

10    A.  Yes.

11    Q.  Now, at any point during the time that you saw Milford

12    with Juan Carlos Bodon, did you see Milford with the black

13    backpack in his possession?

14    A.  No.

15    Q.  Now, when you came back and are walking, and you see

16    Juan Carlos Bodon, and you proceed to arrest him, at that

17    point, where had you seen the bag?

18    A.  In the possession of Juan Carlos Bodon-Lespier.

19    Q.  Now, what did Milford say, if anything, regarding the

20    black bag upon his arrest?

21    A.  When I was carrying out the arrest of Juan Carlos

22    Bodon-Lespier, Milford Martinez-Martinez alleged that the

23    black backpack belonged to him.

24    Q.  But you had not seen Milford in possession of the bag?

25    A.  At no time.

1    Q.  Now, inside the bag, beyond money, cocaine and

2    marijuana, was there anything else, if you remember?

3    A.  Yes.

4    Q.  What else?

5    A.  A digital weigh scale, gray in color, and a transparent

6    plastic bag with white powder inside.

7    Q.  Was that the white powder that tested positive for

8    cocaine?

9    A.  No.

10   Q.  Was that in addition to the cocaine, that other white

11   powder?

12   A.  Correct.

13   Q.  Were you able to determine what that other white powder

14   was?

15   A.  When I did the field test of the substance, that white

16   powder, that specific substance, did not give a positive for

17   cocaine nor heroin.

18   Q.  Now, let me ask you, inside the black bag, was there any

19   identification belonging to Milford Martinez-Martinez?

20   A.  No identification belonging to Milford

21   Martinez-Martinez.

22   Q.  And any identification belonging to any other person?

23   A.  No.

24          MS. FERNANDEZ:  With the Court's indulgence.

25          THE COURT:  Go ahead.

 1                    MS. FERNANDEZ:  No further questions, Your Honor.

 2                    THE COURT:  You may cross.

 3                    MR. McCUTCHEON:  Your Honor, before I begin, I ask

 4     for any sort of Jencks, 46(j) material that I am entitled to

 5     at this point, if it hasn't already been turned over.

 6                    MS. FERNANDEZ:  Your Honor, we understand that

 7     defense counsel already has that.  We actually spoke to him

 8     at the previous hearing, and we advised that there is a

 9     statement of Wilfredo Perez-Rivera, and that we understood

10     at that point that he already had that.

11                    MR. McCUTCHEON:  Yes, I have that.  If that's the

12     only statement, then I do have it.

13                    MS. FERNANDEZ:  That's the only statement that the

14     United States has identified or that is in the possession of

15     the United States, Your Honor.

16                    MR. McCUTCHEON:  Your Honor, I would like to use

17     the elmo at some point just to show some photographs to the

18     witness.

19                    THE COURT:  Go ahead.

20                    MR. McCUTCHEON:  Thank you.

21                    MS. FERNANDEZ:  Your Honor, as a housekeeping

22     matter, can we have a copy of those photographs?

23                    THE COURT:  Have you seen them?

24                    MS. FERNANDEZ:  No, Your Honor, I have not.

25                    MR. McCUTCHEON:  I will show them before they are

1    introduced, Your Honor.

2              THE COURT:  Go ahead.  Show them to the

3    Government.  Okay.

4                    CROSS EXAMINATION

5    BY MR. McCUTCHEON:

6    Q.  Good morning, sir.  What hours were you working on

7    April 8, 2016?

8    A.  From 9:00 a.m. on.

9    Q.  What time was your shift due to end?

10   A.  5:00, 6:00.  9:00 to 5:00, 9:00 to 6:00.

11   Q.  All right.  And you testified towards the end of your

12   shift, at approximately 4:10 p.m., Agent Julio Gotay arrived

13   at your office at the Drugs Division in Ponce.

14   A.  Yes.

15   Q.  And just to be clear, that was at 4:10 p.m. that Agent

16   Gotay arrived at your office?

17   A.  Yes.

18   Q.  And your office is located on Avenida Los Caobos in

19   Ponce; is that true?

20   A.  True.

21   Q.  And according to you, Agent Gotay brought you

22   information that he had supposedly received from an

23   anonymous caller?

24   A.  Yes.

25   Q.  And he told you that this was an anonymous caller with a

1    female voice?

2    A.  Yes.

3    Q.  Do you know what a PPR-785 or a PPR-65 Report of

4    Confidential Call is?

5    A.  Yes.

6    Q.  You do?  What is that document?

7    A.  If -- are you referring to the Special Complaint?

8    Q.  Among other terms for it, yes.

9    A.  If that is the document, yes, I do know which one it is.

10   Q.  Explain what that document is.  What is a "querella

11   especial"?

12   A.  That document is filled in when you or any agent of the

13   division receive information, be it in person, via

14   telephone, related to any type of complaint that is worked

15   on confidentially.

16   Q.  Including when an anonymous call is received, right?

17   A.  Yes.

18   Q.  Now, you didn't complete a querella especial or a report

19   of confidential call in this case, did you?

20   A.  Not me.

21   Q.  And Agent Ortiz didn't complete a querella especial?

22        MS. FERNANDEZ:  Objection, Your Honor; why would

23   this witness know what another witness has done?  He can ask

24   Agent Ortiz himself.

25        THE COURT:  If he knows.

1     BY MR. McCUTCHEON:

2     Q.  To your knowledge, did Agent Ortiz complete a querella

3     especial?

4     A.  I have no knowledge about that.  I don't know.

5     Q.  And to your knowledge, did Agent Gotay complete a

6     querella especial?

7     A.  I have no knowledge of that fact.

8     Q.  And just to be clear, you are the case agent in this

9     matter, right, in the arrest of Mr. Bodon?

10    A.  I am the arresting agent.

11    Q.  And you are in charge of the case moving forward once

12    the arrest has been made?

13    A.  With the investigating agent, yes.

14    Q.  And the only other investigating agent in this case is

15    Agent Ortiz, right?

16    A.  The initial one, yes.

17    Q.  Okay.  Now, the purpose of a querella especial is to

18    memorialize the information received from an anonymous

19    tipster using a standardized form?

20         MS. FERNANDEZ:  Objection, Your Honor; I don't see

21    the question here.  It seems to be a statement by defense

22    counsel.

23         THE COURT:  Go ahead.  You may answer.

24    BY THE WITNESS:

25    A.  Yes.

1    BY MR. McCUTCHEON:

2    Q.  Okay.  In fact, you are required to prepare a querella

3    especial under a specific order entered by the Police of

4    Puerto Rico; isn't that correct?

5    A.  Yes.

6    Q.  Now, nobody that you are aware of completed that

7    document in this case?

8    A.  I don't remember.

9    Q.  Well, did Agent Gotay give you a querella especial?

10   A.  Both of us verbally.

11           THE COURT:  Agent Perez, the fact that the -- you

12   or Agent Ortiz or Agent Gotay did not comply fully with the

13   protocol for special complaints, did that in any way affect

14   the fact that charges were filed in the local court against

15   Mr. Bodon?

16           THE WITNESS:  No.

17   BY MR. McCUTCHEON:

18   Q.  But this investigation began with a breach of protocol;

19   is that fair to say?

20           MS. FERNANDEZ:  Objection, Your Honor; that's a

21   misstatement of what the witness has testified.

22           THE COURT:  Sustained.

23   BY MR. McCUTCHEON:

24   Q.  Now, that you are aware of, did Agent Gotay memorialize

25   the tip in any fashion?

 1          THE COURT:  It's irrelevant, Counsel, based on his

 2     answer to my question.  It's irrelevant because the criminal

 3     complaint was filed and the criminal charges were filed

 4     against Mr. Bodon.  So whatever happened to that complaint,

 5     it's really irrelevant for purposes of what we are here

 6     today for.

 7          MR. McCUTCHEON:  Yes, Your Honor.  Respectfully,

 8     Your Honor, the only reason why I am bringing that up is to

 9     demonstrate that the case originated on a flawed basis and

10     to attack the credibility of this agent, Your Honor.

11          THE COURT:  No -- but you have to attack that in

12     the state court, not in this case, because there is no case

13     here against Mr. Bodon for selling drugs.  It's in Ponce.

14     If his attorney wants to challenge it there because of the

15     fact that the investigation started on the wrong foot,

16     that's for them to decide in the state court, not here.

17          MR. McCUTCHEON:  Your Honor, respectfully, it also

18     goes to whether or not there was a knowing possession of the

19     narcotics, because if they are going to allege that they had

20     this tip saying that Mr. Bodon was selling drugs in front of

21     the house, and this tip doesn't exist, then that undercuts,

22     you know, their argument that he did have knowledge of what

23     was inside the bag itself.

24          So that's why I am attacking the tip and the

25     information that, allegedly, Mr. Bodon was selling drugs in

1   front of the residence, when we have absolutely nothing to

2   corroborate that, in violation of their own rules.

3           MS. FERNANDEZ:  Your Honor --

4           THE COURT:  But you have a criminal case that was

5   filed in the Ponce District Court or Superior Court against

6   Mr. Bodon for selling drugs, and the case is up for trial.

7   So that's for somebody to challenge in Ponce, not here.

8           MR. McCUTCHEON:  Just to be clear, the Court is

9   not permitting me to go into any information relating to --

10  or any questioning relating to the information that they

11  supposedly received regarding the tip?

12          My follow-up question is going to be what

13  information was supplied by Agent Gotay to these agents that

14  caused them to then travel to 223.

15          THE COURT:  I have no problem with that.

16          MR. McCUTCHEON:  Okay.

17  BY MR. McCUTCHEON:

18  Q.  Did you speak with Agent Gotay in person?

19  A.  When?

20  Q.  When he came to your office.

21  A.  He came in.  I was seated at my desk.  He gave the

22  information, and -- he gave that information, and Agent

23  Angel Ortiz and myself, we were both in the office.

24  Q.  Did you take notes when you were having that

25  conversation with Agent Gotay?

1      A.  No.

2      Q.  He didn't tell you that the anonymous caller identified

3      herself, right?

4      A.  No.  She did not identify herself.

5      Q.  And he didn't recognize her voice?

6      A.  No.  He didn't say that.

7      Q.  And she didn't leave a phone number?

8      A.  No.

9      Q.  And you are not aware of what time that call was placed

10     to Agent Gotay?

11     A.  Not the specific time.

12     Q.  It could have occurred significantly earlier in the day

13     or even in the week, correct?

14              MS. FERNANDEZ:  Your Honor, he already --

15     objection; the witness already stated he doesn't know when

16     the call came in.

17              THE COURT:  Sustained.

18     BY MR. McCUTCHEON:

19     Q.  And Agent Gotay and yourself are not aware of how that

20     woman came by the information that she gave, right?

21     A.  No.

22     Q.  And in the information that you received, she didn't

23     identify what types of drugs were being sold?

24     A.  No.

25     Q.  And she didn't identify what clothing Mr. Bodon was

 1    wearing?

 2    A.  No.

 3    Q.  And she definitely didn't identify a backpack or a

 4    "bulto" that Mr. Bodon was supposedly wearing, right?

 5    A.  No.

 6    Q.  Now, are you aware if Agent Gotay asked her those

 7    questions?

 8    A.  I have no knowledge about that.

 9    Q.  So you had absolutely no way to hold this tipster

10    accountable if the information she supplied turned out to be

11    false?

12              MS. FERNANDEZ:  Objection, Your Honor; relevance.

13              THE COURT:  Sustained.

14    BY MR. McCUTCHEON:

15    Q.  And you also had no way to speak to this individual in

16    the future if you needed to, right?

17              MS. FERNANDEZ:  Objection, Your Honor.

18              THE COURT:  It's irrelevant.

19    BY MR. McCUTCHEON:

20    Q.  Now, once you received the information, you said that

21    you and Agent Ortiz went to speak with your sergeant?

22    A.  Agent Angel Ortiz communicated with Sergeant Martin

23    Perez.

24    Q.  Was that in person or over the phone?

25    A.  Via telephone.

1    Q.  Okay.  And what time did that communication occur, that

2    you are aware of?

3    A.  Agent Gotay was given the information, and right then

4    Agent Ortiz communicated with Sergeant Martin Perez, who is

5    a supervisor.

6    Q.  Okay.  And what happens at that point?

7    A.  Agent Angel Ortiz made a request to investigate that

8    complaint.

9              THE COURT:  Actually, it was not a complaint; it

10   was information received.

11             THE WITNESS:  Correct.

12             THE COURT:  So they were going to investigate the

13   information that was received, but no complaint had been

14   filed.

15             THE WITNESS:  Correct.

16   BY MR. McCUTCHEON:

17   Q.  Now, I assume at that point, you had your vehicle.

18   Right?  Is that correct?

19   A.  Yes, we did have a vehicle.

20   Q.  Okay.  And did you check out any equipment before you

21   went to your vehicle?

22   A.  Since the morning hours, I, myself, had some equipment

23   assigned to me.

24   Q.  So you didn't check out any equipment?

25   A.  During the morning hours I checked out some equipment,

 1    and it was binoculars.

 2    Q.  Did Agent Ortiz check out any equipment, if you are

 3    aware, before you went to your car to conduct the

 4    surveillance?

 5    A.  The vehicle he was driving; the confidential vehicle.

 6    Q.  Anything else that you are aware of?

 7    A.  Not that I know about, no.

 8    Q.  Okay.  And were you with him the entire time?

 9    A.  When, Counsel?

10    Q.  From the moment you received the tip until the moment

11    you went to the vehicle.

12    A.  Yes.

13    Q.  Now, once you get to the vehicle, where are you headed?

14    A.  Directly to La Cantera, Pete El Conde Street.

15    Q.  And what type of vehicle do you check out?  What type of

16    vehicle do you sign out?

17    A.  Agent Angel Ortiz checked out a Toyota Corolla.

18    Q.  What color was that vehicle?

19    A.  White.

20    Q.  And what year is that vehicle?

21          MS. FERNANDEZ:  Your Honor, I am going to object

22    as to relevance.

23          THE COURT:  Sustained.

24          MR. McCUTCHEON:  If I may have a little leeway,

25    Your Honor.

1                THE COURT:  No.  You have had plenty of leeway.

2                MR. McCUTCHEON:  Yes, Judge.

3                THE COURT:  Let's get down to business because I

4     am going to start interrupting you.  All these questions are

5     really out of the -- they are all irrelevant.

6     BY MR. McCUTCHEON:

7     Q.  Now, you said you headed up to Calle Pete El Conde,

8     correct?

9     A.  Yes.

10    Q.  And this is at almost 5:00 p.m. on a Friday, right?

11    A.  Before 5:00 p.m.

12    Q.  Okay.  What time, approximately, do you arrive at that

13    location?

14    A.  Approximately around 4:30 in the afternoon.

15    Q.  And you parked on Calle Pete El Conde, right?

16    A.  Yes.

17    Q.  And Agent Ortiz was driving the vehicle, right?

18    A.  Yes.

19    Q.  How would you describe the traffic that afternoon?

20    A.  It was normal traffic.

21    Q.  Were there pedestrians on the sidewalk?

22                THE COURT:  Sustained.

23    BY MR. McCUTCHEON:

24    Q.  Can you describe exactly where you parked in relation to

25    the Bodon residence?

```
 1     A.  Yes.

 2     Q.  And where was that?

 3     A.  Exactly on Pete El Conde Street.  We parked on the left

 4     side, on that same road in the direction -- in the

 5     south-to-north direction.

 6     Q.  And you parked approximately 150 feet away from the

 7     Bodon residence -- excuse me, the residence of Mr. Bodon?

 8               MS. FERNANDEZ:  Objection, Your Honor.

 9               MR. McCUTCHEON:  Grounds, Your Honor.

10               MS. FERNANDEZ:  He hasn't testified the amount of

11     meters they were --

12               MR. McCUTCHEON:  This is cross-examination, Your

13     Honor.

14               THE COURT:  I know.  Counsel, I am aware of that.

15     You don't have to remind me.

16               You may answer.

17     BY THE WITNESS:

18     A.  At a distance of about 40 to 50 meters.

19               MR. McCUTCHEON:  Your Honor, if I could hand this

20     to the witness.

21               THE COURT:  Go ahead.

22               MS. FERNANDEZ:  Your Honor, there is no jury.  We

23     have no problem that it be placed on the elmo.

24               THE COURT:  It doesn't work.

25               MS. FERNANDEZ:  I'm sorry, Your Honor.
```

 1                    THE COURT:  It shall be marked Identification A.

 2                    DEPUTY CLERK:  Yes, Judge.

 3      BY MR. McCUTCHEON:

 4      Q.  I am showing you, sir, what's been marked for

 5      identification as Defense Exhibit A.  Do you recognize that

 6      street -- or, excuse me -- do you recognize what's depicted

 7      in that photograph?

 8      A.  This is a road.

 9      Q.  Are you aware of what road is depicted there?

10      A.  I would not be able to tell you specifically.

11                    MR. McCUTCHEON:  May I approach again, Your Honor?

12                    THE COURT:  Go ahead.  B?

13                    MR. McCUTCHEON:  Yes, Your Honor.

14      BY MR. McCUTCHEON:

15      Q.  Sir, I am showing you now what's been previously marked

16      for identification as Defendant Exhibit B.  Do you recognize

17      what's depicted in that photograph?

18      A.  Yes.

19      Q.  And what's depicted in that photograph?

20      A.  It looks like Pete El Conde Street in La Cantera in

21      Ponce.

22      Q.  Okay.  And is that a fair and accurate depiction of the

23      street itself and how it looked on April 8, 2016?

24      A.  No, I don't know about that either.

25      Q.  The street itself, sir.

1    A.  The street, yes.

2              MR. McCUTCHEON:  Your Honor, we move what's been

3    previously marked for identification as Defense Exhibit B

4    into evidence.

5              THE COURT:  It shall be marked.

6              MR. McCUTCHEON:  Thank you, Your Honor.

7    BY MR. MCCUTCHEON:

8    Q.  Now, sir, referring to Defense Exhibit B.  Can you mark

9    on Defense Exhibit B where you and Agent Ortiz parked on

10   April 8, 2016?

11             MS. FERNANDEZ:  Your Honor, we are going to ask

12   that the question be rephrased so that -- if the location

13   where he parked is, in fact, shown in the photograph.

14             THE COURT:  You may answer.

15   BY THE WITNESS:

16   A.  The side where we parked, the sidewalk, yes,

17   approximately.

18   BY MR. MCCUTCHEON:

19   Q.  And can you mark on that photograph where,

20   approximately, you parked on April 8, 2016.

21   A.  I could do so as an approximate.

22   Q.  Please do so.

23   A.  But to be really specific as to where we parked, not so.

24   Q.  Please mark approximately where you parked --

25             MS. FERNANDEZ:  Your Honor, I will object to

1     giving the witness an instruction to mark.  He already said

2     it would be an approximate.

3              THE COURT:  Sustained.

4     BY MR. McCUTCHEON:

5     Q.  So your testimony is you are not able to recall exactly

6     where you parked on Calle Pete --

7              THE COURT:  No, no.  His answer is he is not -- he

8     cannot recognize the area in that photo where he parked.

9              MR. McCUTCHEON:  Yes, Your Honor.

10             THE COURT:  From the photo.

11             MR. McCUTCHEON:  Yes, Your Honor.

12             May I approach the witness, Your Honor?

13             THE COURT:  Go ahead.

14    BY MR. McCUTCHEON:

15    Q.  Sir, I am showing you now what's been previously marked

16    for identification as Defense Exhibit C.  Do you recognize

17    that photograph in conjunction with what's depicted in

18    Defense Exhibit B?

19    A.  Yes.

20    Q.  Okay.  And what does that photograph depict?

21    A.  Pete El Conde Street in La Cantera in Ponce.

22             MR. McCUTCHEON:  We move what's been previously

23    marked for identification as Defense Exhibit C into

24    evidence.

25             THE COURT:  It will be marked.

1    BY MR. McCUTCHEON:

2    Q.  Now, sir, referencing Defense Exhibit C, can you mark

3    where you parked on Pete El Conde on April 8, 2016, in

4    reference to that photograph?

5    A.  As an approximate, yes, I can tell you, but not

6    specifically.

7    Q.  With that qualification in mind, please mark the

8    location where you were parked.

9            MS. FERNANDEZ:  Objection.

10           THE COURT:  Sustained.

11   BY MR. McCUTCHEON:

12   Q.  Sir, is there a viewpoint with relation to Pete El Conde

13   that would allow you to describe where you were parked on

14   April 8, 2016?

15   A.  I say again, very respectfully, I can indeed tell you as

16   an approximate, but not so specifically.  That I cannot do.

17   Q.  And sir, why are you only able to give an approximation?

18   A.  Because at this point in time -- let's say I look at the

19   house on the left.  I cannot tell you specifically, I parked

20   here.

21   Q.  Do you recall any identifying markers where you parked

22   on April 8, 2016?

23   A.  Not really.

24   Q.  Now, what were you able to observe from approximately 40

25   to 50 meters away from the house?

1    A.  I observed residence 223, the front part of it.  And in

2    front of it, I observed Juan Carlos Bodon-Lespier, the young

3    man who was accompanying him wearing a gray shirt and a gray

4    cap, and a jeep vehicle in front of the residence, that it

5    was red.

6    Q.  Now, you were seated in a vehicle when you were making

7    these observations, right?

8    A.  Yes.

9    Q.  Were there any other vehicles between you and the front

10   portion of Mr. Bodon Senior's residence?

11   A.  In the same direction, there was a white Mirage vehicle.

12   Q.  And that vehicle was parked in front of you?

13   A.  Yes, farther up to the front from where we were parked.

14   Q.  Okay.  And was that white vehicle partially obstructing

15   your view?

16   A.  Partially, as far as it goes -- my position.  Mine, yes.

17   Q.  Just to be clear, you weren't using binoculars, were

18   you?

19        MS. FERNANDEZ:  Your Honor, objection to this line

20   of questioning.  He is asking questions already asked and

21   answered during direct.

22        THE COURT:  He can answer again.

23        Were you using binoculars?

24   BY THE WITNESS:

25   A.  No.

1    BY MR. McCUTCHEON:

2    Q.  And you had arrived from the south, correct?

3    A.  Yes.

4    Q.  So you hadn't driven past the residence of Mr. Bodon

5    Senior in order to reach your surveillance point?

6    A.  No.

7    Q.  And it's your testimony, from 40 to 50 meters away, you

8    were able to see, without the use of binoculars, Mr. Bodon?

9            THE COURT:  Mr. Bodon personally?

10           MR. McCUTCHEON:  Yes.

11           THE COURT:  Okay.

12   BY THE WITNESS:

13   A.  Of course, yes.

14   BY MR. McCUTCHEON:

15   Q.  Now, you mentioned a red jeep.  There was somebody

16   working on this red jeep, correct?

17   A.  Yes.

18   Q.  He was conducting repairs or mechanic type installations

19   on the jeep, right?

20   A.  When I was doing my observation, the hood lid was open,

21   and the person was on the side of the wheel, in front.

22   Q.  And you mentioned this person, right?

23   A.  I mentioned a person who at that point in time was

24   accompanying Juan Carlos Bodon-Lespier.

25   Q.  And this person was later identified as Milford

1    Martinez-Martinez, right?

2    A.  That is correct.

3    Q.  And that's the person that was working on the red jeep?

4    A.  Allegedly, yes.

5    Q.  Just to be clear, that was the person -- Milford

6    Martinez-Martinez was the person you saw -- or you described

7    just now as being right next to the red jeep, correct?

8    A.  Correct.

9    Q.  Now, your testimony today is that he was allegedly or

10   supposedly working on the jeep?

11   A.  Correct.

12   Q.  Did you give a prior statement where you specifically

13   identified him as working on the jeep; "mecanicano" on the

14   jeep?

15   A.  No.

16   Q.  Now, sir, you gave a sworn statement in connection with

17   Mr. Bodon's local court matter, right?

18   A.  Yes.

19   Q.  And the purpose of that statement was to describe the

20   events that led to the arrest of Mr. Bodon?

21   A.  Yes.

22   Q.  And you described, to the best of your ability, what you

23   observed on April 8th of 2016?

24   A.  Yes.

25   Q.  Including what Mr. Milford Martinez-Martinez was doing?

1    A.  Yes.

2    Q.  And in that statement --

3             THE COURT:  Is that in Spanish, Counsel?

4             MR. McCUTCHEON:  Yes, Your Honor.

5             THE COURT:  Can't use it.  Sorry.

6             MR. McCUTCHEON:  Your Honor, may I use it for

7    impeachment purposes?

8             THE COURT:  No.  You are using it for impeachment.

9    BY MR. McCUTCHEON:

10   Q.  Now, was there anyone else around the red jeep?

11   A.  Initially, Juan Carlos Bodon and Milford.

12   Q.  You didn't see anyone else on the street?

13            THE COURT:  Is that on the street or next to the

14   jeep?

15            MR. McCUTCHEON:  On the sidewalk next to the jeep.

16            THE COURT:  Okay.

17   BY THE WITNESS:

18   A.  No.

19   BY MR. McCUTCHEON:

20   Q.  And your testimony was that you saw Mr. Bodon-Lespier

21   with a black bag?

22   A.  Yes.

23   Q.  And you are familiar, you testified earlier, with the

24   Bodon residence, right?

25   A.  Yes.  I do know where it is.

1    Q.  In fact, you said you drove by it every day, right?

2    A.  Yes.

3    Q.  And why is it that you drive by the Bodon residence

4    every day?

5    A.  I am 42 years of age.  My family lives near that

6    location, and my father still lives there in that location.

7    Q.  Now, when you observed what you say is Mr. Bodon with

8    this bag, was it open or closed?

9    A.  At the moment of the arrest or --

10   Q.  No, when you observed initially Mr. Bodon with the bag.

11   A.  No, I don't know if it was open or closed.

12   Q.  Okay.  And you didn't see him reach into the bag at

13   anytime while you were observing?

14   A.  No.

15   Q.  And you didn't see him talking on a cell phone, correct?

16   A.  I don't remember that.  I don't have a recollection of

17   that.

18   Q.  Now, were you taking photographs while you were

19   conducting your surveillance of Mr. Bodon?

20   A.  During the surveillance?

21   Q.  Yes.

22   A.  Not me.

23   Q.  Was anybody else?

24   A.  I have no knowledge as to the specific moment, but Agent

25   Angel Ortiz did take some photographs.

1    Q.  So he had a camera with him?

2    A.  No.

3    Q.  How was he taking the photographs?

4    A.  From his mobile phone.

5    Q.  Have you given those photographs to Mr. Bodon's

6    probation officer?

7    A.  I didn't take any photographs.

8    Q.  Did Agent Ortiz, to the best of your knowledge, turn

9    over those photographs to Mr. Bodon's probation officer?

10   A.  I have no knowledge about that.

11   Q.  Are you aware of what moment Agent Ortiz took the

12   photograph with his cell phone?

13   A.  No.

14   Q.  Did he tell you what he was taking a photograph of?

15   A.  The residence.

16   Q.  And Mr. Juan Carlos Bodon?  Was he taking a picture of

17   Mr. Juan Carlos Bodon?

18   A.  My understanding about that is no.

19   Q.  How was he taking a picture of the residence and not

20   Mr. Bodon?

21          THE COURT:  You are going to have to ask him.  You

22   are going to have to ask him, Counsel.

23          MR. McCUTCHEON:  Yes, Your Honor.

24   BY MR. McCUTCHEON:

25   Q.  Now, were you taking notes of any kind when you were

1    making these observations?

2    A.  No.

3    Q.  How long had you been in front of the residence when

4    Agent Ortiz was taking photographs?

5    A.  As I said before, I don't know when was it that Agent

6    Ortiz took photographs of the residence.  I don't know if it

7    was before or after.

8    Q.  Okay.  Now, what was Mr. Bodon doing during the period

9    of time that you were observing him before the Corolla

10   arrived?

11   A.  Which Corolla?

12   Q.  Excuse me, the Corolla that arrives at 4:48 p.m.

13   A.  He was in the sidewalk area, in front of the residence

14   223, next to the person who turned out to be Milford

15   Martinez-Martinez.

16   Q.  Did you see him walk to the rear of the residence at any

17   point?

18   A.  Never.

19   Q.  Okay.  Did you get the license plate of the red jeep

20   that Mr. Martinez was working on?

21          MS. FERNANDEZ:  Objection, Your Honor; relevance.

22          THE COURT:  Sustained.

23   BY MR. McCUTCHEON:

24   Q.  All right.  So we mentioned a Toyota Corolla

25   that arrives at 4:48 p.m.  How did that black Corolla

1    arrive?  Which direction did it arrive from?

2              THE COURT:  We will get to that after lunch.

3              MR. McCUTCHEON:  Yes, Your Honor.

4              THE COURT:  We are going to recess now until

5    2:00 o'clock.

6              MR. McCUTCHEON:  Your Honor, I would ask that the

7    witness be instructed not to speak to other witnesses that

8    may be testifying for the Government at the lunch break.

9              THE COURT:  You are under the rules, which means

10   you are not to discuss your testimony with any other witness

11   or even with the Government.

12             (WHEREUPON, proceedings were recessed until

13             2:23 p.m., this date.)

14             DEPUTY CLERK:  Criminal Case 07-290, United States

15   of America versus Juan Carlos Bodon-Lespier.  Case is

16   recalled for the afternoon session of the revocation of

17   supervised release.

18             THE COURT:  Mr. Perez, you will continue

19   testifying under the same oath that you took this morning.

20   Your witness.

21             MR. McCUTCHEON:  Thank you, Your Honor.

22                     WILFREDO PEREZ-RIVERA

23   called as a witness herein, having been previously duly

24   sworn and having testified, was examined and testified

25   further as follows:

```
 1                    CROSS EXAMINATION (Resumed)

 2   BY MR. McCUTCHEON:

 3   Q.  Sir, when we left off, you were talking about the black

 4   Corolla that arrived at 4:48 p.m. on April 8th.  You

 5   testified that that Corolla was black in color, correct?

 6   A.  Yes.

 7   Q.  How did that park in relation to the red jeep?

 8   A.  The black Toyota went in reverse, parked in the

 9   direction of south-to-north, facing -- in front of the red

10   jeep.

11   Q.  In which direction had the Corolla come from?

12   A.  The Corolla was traveling in the direction north to

13   south.

14   Q.  You didn't get the license plate number of that vehicle,

15   did you?

16            MS. FERNANDEZ:  Objection, Your Honor; relevance.

17            THE COURT:  Sustained.

18   BY MR. McCUTCHEON:

19   Q.  Now, according to you, two individuals get out of that

20   vehicle.

21   A.  That is correct.

22   Q.  What did they do at that point?

23   A.  Both got out of the vehicle, and as I mentioned before,

24   both of them walked towards the rear part, left lateral side

25   of the black Toyota.
```

1    Q.  And when you say "left lateral side" of the Toyota, are

2    you talking about the portion closest to the residence of

3    Mr. Bodon's father?

4    A.  No.

5    Q.  So your testimony is that the two men went on the side

6    of the vehicle located closest to the street?

7              MR. McCUTCHEON:  No, Your Honor; the street.  I

8    will clarify.

9    BY MR. McCUTCHEON:

10   Q.  The vehicle is faced southbound, correct, sir?

11   A.  Yes.

12   Q.  And it's parked in reverse.  And it's your testimony

13   that if we are looking at the car facing southbound, the two

14   individuals were on the left rear portion of the vehicle?

15   A.  On the left lateral side, at the rear of the Toyota

16   Corolla vehicle.

17   Q.  So they were pretty much in the street that's Pete El

18   Conde, right?

19             MS. FERNANDEZ:  Objection, Your Honor; he is

20   stating in another manner the witness' testimony.  The

21   witness has answered.

22             THE COURT:  You may answer.

23   BY THE WITNESS:

24   A.  On the rear left lateral side of the vehicle, yes.

25             THE COURT:  At that time, they were standing on

```
 1    the street; is that correct?

 2              THE WITNESS:  Yes, that is correct.

 3    BY MR. McCUTCHEON:

 4    Q.  Okay.  Now, what does Mr. Bodon and Milford

 5    Martinez-Martinez do at that point?

 6    A.  They walked from the front part of the 223 residence

 7    towards where the two young men who got out of the black

 8    Toyota were at.

 9    Q.  So all four men at that point are at the left rear side

10    of the black Toyota Corolla?

11    A.  On the rear left lateral side of the black Toyota

12    Corolla.

13    Q.  Okay.  Now, how were the four men positioned?

14    A.  Juan Carlos Bodon-Lespier was on the left lateral rear

15    side.  Close to him, facing, was the young man with the blue

16    shirt.  And on the rear left side of the Toyota, there was

17    Milford and the young man with the red shirt.

18    Q.  Okay.  So just to clarify -- and correct me if I am

19    wrong -- was Bodon facing southbound or was he facing

20    northbound or was he facing in an eastern or western

21    direction?

22    A.  When I observed him in a position, which I did, it was

23    southbound.

24    Q.  Okay.  And what about Milford Martinez; was he facing

25    southbound as well or in a different direction?
```

1    A.  At that time he was in the rear part -- left rear part

2    of the vehicle, close to Juan Carlos and the one with the

3    red shirt, like I said.

4    Q.  Was he facing southbound as well?

5    A.  They were several directions, because they were having a

6    conversation.

7    Q.  How close were they to one another?

8              THE COURT:  Come on, Counsel, let's move on.  This

9    is totally unnecessary.  Move on.

10   BY MR. McCUTCHEON:

11   Q.  Now, around this same time, Agent Ortiz tells you he

12   can't see and he needs to move because of the white Mirage,

13   right?

14   A.  What he told me was that he was going to move to get a

15   better location because there was a white Mirage vehicle

16   that was partially obstructing his view of where they were

17   at.

18   Q.  Okay.  Did he tell you where he was heading to?

19   A.  As such?  He moved to the north.

20   Q.  He didn't tell you another location that he was planning

21   on stopping?

22             MS. FERNANDEZ:  Objection, Your Honor; it's been

23   asked and answered.

24             THE COURT:  Sustained.

25   BY MR. McCUTCHEON:

1   Q.  Now, according to you, when Agent Ortiz drives by this
2   group of men, he sees what?
3   A.  He said that he had seen Juan Carlos handing over a
4   small plastic, purple bag with marijuana.
5   Q.  How did he do that?  Did he describe to you?
6   A.  He said it with his voice; that he had delivered to the
7   young man in the blue shirt the bag that I just described to
8   you.
9   Q.  Did he describe to you how the delivery unfolded,
10  though?  Did he use his left hand, his right hand?
11  A.  No, he didn't say that to me at that point in time.
12  Q.  Okay.  And he told you that he saw him when he was
13  directly perpendicular to the group of men, right?
14  A.  He started saying that inside the vehicle, saying the
15  same thing.  He repeated it several times.  He said it
16  several times.
17  Q.  And the first time he said it to you, though, according
18  to you, was when he was perpendicular with the group of men.
19  So they were immediately to his right; he was to their left?
20  A.  When we went by the side of the group of young men, yes.
21  Q.  Now, you weren't driving, right?
22  A.  No.
23  Q.  You were seated in the passenger -- the front passenger
24  seat of the vehicle, right?
25  A.  Yes.

1    Q.  And you were watching the same group of men, right?

2    A.  When?

3    Q.  The whole time.

4    A.  No.

5    Q.  Did you look away?

6    A.  What happened is that as soon as he got on his way, that

7    he is going specifically -- just going right next to them,

8    by them, I tried not to face them, that is, not to face

9    toward that group because I could be identified by Juan

10   Carlos, because him and I know each other.

11   Q.  So you specifically avoided looking in that direction;

12   is that your testimony?

13   A.  Of course.

14   Q.  So you didn't say anything confirming to Ortiz that you

15   had seen what he had supposedly seen as well, right?

16          MS. FERNANDEZ:  Objection, Your Honor.

17          THE COURT:  Sustained.

18   BY MR. McCUTCHEON:

19   Q.  And Ortiz didn't slam on the brakes of the vehicle once

20   he observed what he believed to be a drug transaction,

21   right?

22   A.  No.

23   Q.  And he didn't immediately put a be-on-the-lookout out

24   for that black Corolla, did he?

25          THE COURT:  It's irrelevant, Counsel.  Next

1    question.

2    BY MR. McCUTCHEON:

3    Q.  He didn't stop the vehicle once he observed the alleged

4    transaction, did he?

5              THE COURT:  Sustained.  He didn't.

6              MR. McCUTCHEON:  No, he didn't.  That's correct.

7    BY MR. McCUTCHEON:

8    Q.  So once he observed the vehicle and he passes the Bodon

9    residence, and he sees, allegedly, this drug transaction, he

10   doesn't pull to the side of the road a hundred feet away,

11   does he?

12             MS. FERNANDEZ:  Objection, Your Honor; this has

13   been asked and answered of this witness who has testified

14   what happened --

15             THE COURT:  You may answer.

16   BY THE WITNESS:

17   A.  No.

18   BY MR. McCUTCHEON:

19   Q.  He didn't make any attempt to continue the surveillance

20   of this alleged drug transaction or the black Corolla, did

21   he?

22   A.  He continued on his way.

23   Q.  And this was despite the fact that you were in an

24   unmarked police vehicle, right?

25   A.  Yes.

1    Q.  And none of you were wearing police uniforms, right?

2    A.  No.

3    Q.  In fact, he traveled to an urbanization called La Lula,

4    right?

5    A.  Yes.

6    Q.  Now, you mentioned the unmarked police vehicle.  Was

7    that vehicle tinted?

8    A.  It has a percentage, yes.

9    Q.  And what percentage is that?

10              THE COURT:  Irrelevant.

11   BY MR. McCUTCHEON:

12   Q.  Now, you traveled up to La Lula, you mentioned, right?

13              THE COURT:  Asked and answered.

14   BY MR. McCUTCHEON:

15   Q.  And your plan at that point, according to you, was to

16   wait to speak with other agents before you went back to try

17   to make an arrest or --

18   A.  With the supervisor.

19   Q.  And your hope was that they would still be there, and

20   the bag would still be there?

21              MS. FERNANDEZ:  Objection.

22              THE COURT:  Sustained; speculative.

23   BY MR. McCUTCHEON:

24   Q.  What was your plan at that point?

25              THE COURT:  Wait for the supervisor to tell them.

1    BY MR. McCUTCHEON:

2    Q.  Why did you not maintain surveillance over the black

3    Corolla and what you perceived to be a transaction?

4    A.  My colleague Agent Ortiz was traveling from south to

5    north, as I said before, on Road Pete El Conde, when he

6    observed the handing over of the substance, and started to

7    speak and say what he was observing.

8           A conversation between him and I took place, that

9    what -- we had to intervene with and arrest the group of

10   persons, but that we first had to speak to the supervisor so

11   he would give us some specific orders as to how --

12   specifically how that intervention was going to be carried

13   out.

14   Q.  And did you meet with your supervisor?

15   A.  My colleague Angel Ortiz spoke with the supervisor, with

16   Sergeant Martin Perez.

17   Q.  You didn't meet with him in person?

18   A.  At La Lula urbanization.

19   Q.  You did meet with him at La Lula?

20   A.  Agent Angel Ortiz.

21   Q.  You were with Agent Ortiz because you were in the same

22   vehicle, right?

23   A.  That is correct.

24   Q.  How long did you have to wait until your supervisor

25   arrived on the scene?

1   A.  The supervisor arrived quickly.  Not too much time went

2   by.  He arrived quickly.

3   Q.  But it was at least 12 minutes before you were able to

4   return back to the Bodon residence?

5   A.  Right.

6   Q.  And according to you, the black Corolla is no longer

7   there?

8   A.  When we arrived, the vehicle was no longer there at that

9   location.

10  Q.  And that vehicle was never stopped, right; never

11  detained by the police?

12  A.  No.

13  Q.  Now, when you arrived back at the residence of

14  Mr. Bodon's father, according to you, Milford and Juan

15  Carlos Bodon are in front of the residence?

16  A.  Yes.

17  Q.  And Milford is working on the jeep, right?

18  A.  The jeep had its hood cover open, and Milford was next

19  to it.

20  Q.  Now, according to you, when you go and make the arrest

21  of Mr. Bodon, the strap on the bag breaks?

22          I will repeat the question.

23          When you go to conduct the arrest of Mr. Bodon,

24  the strap of the black bag that he is supposedly wearing

25  breaks?

1   A.  When he tried to go up along the area of the balcony,

2   yes.

3   Q.  Okay.  And just to clarify, the red jeep that you keep

4   mentioning, that's in front of the Bodon residence, right?

5   A.  If you were to look at the house, facing it, and that's

6   residence 223, the vehicle was parked on the left front side

7   of the residence, if you are looking at it, facing it.

8   Q.  Okay.  Now, at some point you see the violet bag of

9   marijuana that Agent Ortiz supposedly saw, right?

10  A.  Where?

11  Q.  Sure.

12          You see in the bag, when it opens up,

13  violet-colored bags of suspected marijuana, right?

14  A.  You could see the plastic transparent bag, and inside,

15  several baggies -- several transparent violet baggies with

16  marijuana.

17  Q.  Okay.  And those bags were dime bags, right; what are

18  referred to as dime bags?

19  A.  What do you mean, "dime"?

20  Q.  They were approximately 1.5 inches by 1.5 inches large,

21  right?

22  A.  More or less.  I don't have the exact measurements, but

23  more or less.

24  Q.  Sure.  They are small, right?

25  A.  Not that small.

1    Q.  They are not Ziploc size, right?

2    A.  Not the violet ones.  The other one, yes.

3    Q.  Okay.  Now, when you -- well, after Bodon was arrested,

4    you conducted a search of his person, I assume.  Right?

5    A.  Of course.

6    Q.  What did you find on his person?

7    A.  Nothing.

8    Q.  You didn't find any of those violet-colored bags, did

9    you?

10             MS. FERNANDEZ:  Objection, Your Honor; asked and

11   answered.

12             THE COURT:  You may answer.

13   BY THE WITNESS:

14   A.  No.

15   BY MR. McCUTCHEON:

16   Q.  You didn't recover a wad of cash, did you?

17   A.  Yes.

18   Q.  From inside his pockets, on his person?

19   A.  No.

20   Q.  Did you find anything illegal in his pockets, directly

21   on his person?

22             MS. FERNANDEZ:  Objection.

23   BY THE WITNESS:

24   A.  No.

25   BY MR. McCUTCHEON:

1    Q.   Now, you also inspected this black bag, right?

2    A.   Yes.

3    Q.   Now, you can't see inside the bag from the outside, can

4    you?

5    A.   No.

6    Q.   It's not transparent, is it?

7    A.   No.

8    Q.   And if it's closed, one would have no idea what's

9    inside, right?

10   A.   That is so.

11   Q.   Now, what did you do with the bag once the arrest was

12   made?

13   A.   Well, I transported it to the division.  I pulled out

14   the material that was inside.  The substance was counted,

15   the money.  There was a digital weight scale, and what I

16   understand to be paraphernalia, because at that point in

17   time, that did not give a positive result to any substance

18   when I did the field test.

19   Q.   What did you do with that bag?

20   A.   At present that bag is in the evidence room of the Drugs

21   and Narcotics Division, Ponce.

22   Q.   Do you have any photos of it with you now?

23   A.   No.

24   Q.   Can you describe it for us?

25   A.   It is a backpack type bag that can be used across the

1    chest or across the back, and it only has one strap.

2    Q.   Okay.   Now, there was nothing in the bag connecting it

3    directly to Mr. Bodon, was there?

4    A.   Yes.

5    Q.   What was in it, inside it, that directly identified it

6    as Mr. Bodon's?

7    A.   No identification, but he had possession, control and

8    dominion of it.

9    Q.   Now, his wallet wasn't in the bag, was it?

10   A.   Which bag --

11   Q.   Was Mr. Bodon's wallet inside the black "bulto"?

12   A.   No.

13   Q.   And his phone wasn't inside the bag, was it?

14   A.   No.

15   Q.   And you didn't find a receipt or a name tag or anything

16   else inside the bag identifying it or connecting it to

17   Mr. Bodon?

18   A.   No.

19   Q.   Now, when you all arrived to make the arrest, Milford

20   Martinez-Martinez comes up to you and says, That black bag

21   is mine?

22   A.   As soon as Juan Carlos was arrested and he was given the

23   legal warnings, the bag was seized from him.   That is when

24   Milford Martinez-Martinez alleges that that bag belonged to

25   him.

1    Q.  And he says to you, That bag belongs to me; its content

2    belongs to me, right?

3    A.  He told me that that bag belonged to him.  Basically, he

4    alleged, well, that that bag belonged to him.

5    Q.  And you immediately arrest Milford, right?

6    A.  It didn't matter.  He was going to be arrested anyway

7    because he was present when the substance was delivered, as

8    observed by Agent Ortiz.

9    Q.  That wasn't my question.

10        My question was, when he tells you that that bag

11   is his, you immediately take him into custody, right?

12   A.  Yes.

13   Q.  Do you question him any further at that point?

14   A.  The warnings.

15   Q.  Did you ask any other questions to him at that point?

16   A.  No.

17   Q.  Did you ask him whether Mr. Bodon knew that there were

18   drugs inside the bag?

19   A.  No.

20   Q.  Did you ask him how long Mr. Bodon had had the bag?

21        MS. FERNANDEZ:  Objection, Your Honor; the witness

22   has already said he did not ask him questions.

23        THE COURT:  Go ahead.

24   BY MR. McCUTCHEON:

25   Q.  Now, did you ask Milford Martinez-Martinez how long

1      Mr. Bodon had had the bag?

2      A.  Well, when we were already at the Drugs and Narcotics

3      Division, alleging that the bag belonged to Milford

4      Martinez-Martinez, he alleged that he threw it to Juan

5      Carlos Bodon-Lespier, just like he said, for him to hold

6      onto it for him while he was doing mechanical work.

7      Q.  Did you question him any further?

8      A.  To be honest with you, I did not -- I didn't believe him

9      because at no time did I see Milford Martinez-Martinez with

10     that bag.

11     Q.  Now, you had Milford Martinez-Martinez write out a

12     statement for you, right?

13     A.  After -- since he made those admissions and allegations,

14     I said to him to do it in writing, and he agreed to do it in

15     writing.

16     Q.  And you signed his written statement, did you not?

17     A.  Yes, I did sign those admissions.

18              THE COURT:  In Spanish, Counsel?

19              MR. McCUTCHEON:  No, Your Honor.

20              THE COURT:  It's not in Spanish?

21              MR. McCUTCHEON:  Well, it is, but I have a

22     translation.

23              MS. FERNANDEZ:  Your Honor, we are going to object

24     anyway at this point in terms of relevance.  The witness has

25     stated what Milford alleged at the point of arrest and at

1    the precinct, so there is nothing to be added by the

2    statement in writing.

3              THE COURT:  You may show it to him.

4    BY MR. McCUTCHEON:

5    Q.  I am showing you what's been marked for identification

6    as Defense Exhibit D.  Do you recognize that document?

7    A.  Yes.

8    Q.  And is that your signature on that document as a

9    witness?

10   A.  Yes.

11             MR. McCUTCHEON:  Your Honor, I move what's been

12   previously marked as Defense Identification D into evidence.

13             THE COURT:  What is that?

14             MR. McCUTCHEON:  This is the statement of Milford

15   Martinez-Martinez, witnessed by Agent Wilfredo --

16             THE COURT:  May I see it?

17             MR. McCUTCHEON:  Yes, Your Honor.  The translation

18   is behind it, Your Honor.

19             (WHEREUPON, the document was tendered to the

20             Court.)

21             MR. McCUTCHEON:  Is it admitted into evidence?

22             THE COURT:  Yes.

23             MR. McCUTCHEON:  Thank you, Judge.

24   BY MR. McCUTCHEON:

25   Q.  And in that statement, Milford Martinez-Martinez

1    specifically indicates, one, he was working on the jeep, and

2    two, the bag that was there belongs to him, right?

3    A.  According to what he alleges, yes.

4    Q.  Now, did you question Mr. Bodon about the bag?

5    A.  Bodon didn't make any admissions.

6    Q.  That's not my question.

7         My question is whether or not you asked him

8    whether the bag was his.

9         MS. FERNANDEZ:  I object to this line of

10   questioning because if he is asking the witness to relay

11   statements of the defendant, and the defendant is choosing

12   not to take the stand, which we understand, then he is

13   trying to get in what the defendant himself wouldn't be

14   available to testify and, thus, be subject to

15   cross-examination.

16        THE COURT:  You may answer.  His testimony is that

17   Mr. Bodon did not say anything.

18        MR. McCUTCHEON:  I am asking the questions he

19   asked, not whether Mr. Bodon responded in any sort of

20   manner.

21        THE COURT:  He stated before that he did not ask

22   him any questions.

23        MR. McCUTCHEON:  Can I clarify that, Your Honor?

24        THE COURT:  Go ahead.

25   BY MR. McCUTCHEON:

1    Q.  Did you ask Mr. Bodon any questions once he was at the

2    station in relation to ownership of the bag?

3    A.  Well, as far as asking him whose bag was that, no,

4    because he had it in his possession.

5    Q.  Did you ask any other questions?

6         You said not in relation to the bag.  Did you ask

7    any other questions?

8    A.  Well, after the warnings, I asked him -- as I said

9    before, I didn't ask him about the bag as such because, as I

10   said before, he had it on him.  But to the other young man,

11   Milford Martinez-Martinez, when he alleged that that bag

12   belonged to him, I asked him, but he didn't say anything to

13   me; that I should talk to the other person.  That was

14   Milford.  But he said nothing to me about where that bag

15   came from.

16   Q.  Did you transport Mr. Bodon in your white Corolla to the

17   station?

18   A.  No.

19   Q.  How did he get to the station?

20   A.  In a marked Puerto Rico Police vehicle.

21   Q.  Now, you never heard Mr. Bodon threaten or tell Milford

22   Martinez-Martinez to take the blame for the black bag, did

23   you?

24              MS. FERNANDEZ:  Objection, Your Honor.

25              THE COURT:  Sustained.

 1     BY MR. McCUTCHEON:

 2     Q.  Did you ever conduct a search of the residence of

 3     Mr. Bodon's father?

 4             THE COURT:  Irrelevant.

 5     BY MR. McCUTCHEON:

 6     Q.  Now, did you see Mr. Bodon's common law wife at the

 7     scene on the day of the incident?

 8             THE COURT:  Irrelevant.

 9             MR. McCUTCHEON:  Your Honor, may I have one

10     moment?

11             THE COURT:  Yes.

12             MR. McCUTCHEON:  Your Honor, may I approach the

13     witness?

14             THE COURT:  Go ahead.

15     BY MR. McCUTCHEON:

16     Q.  I am showing you what's been previously marked for

17     identification as Defense Exhibit E.  Do you recognize the

18     vehicle depicted in that photo?

19     A.  Which one?

20     Q.  The white Toyota Corolla.

21     A.  That is a white Toyota Corolla.

22     Q.  Is that the white Toyota Corolla that you were driving

23     in April 2016 --

24             THE COURT:  He wasn't driving it.

25     BY MR. McCUTCHEON:

1    Q.  -- excuse me -- that Agent Ortiz was?

2    A.  I don't know about that.  That's just a white Toyota

3    Corolla.

4    Q.  Very well.

5            Do you see a red jeep in that photo as well?

6    A.  Yes.

7    Q.  Was that the location of the red jeep on April 8, 2016?

8    A.  Yes.

9            MR. McCUTCHEON:  I move to have what's previously

10   been marked as Defense Identification E into evidence.

11           THE COURT:  For what purpose?

12           MR. McCUTCHEON:  Showing the location of the red

13   jeep on April 8, 2016, which he just testified to.

14           THE COURT:  Just the red jeep.

15           MR. McCUTCHEON:  Yes, Your Honor; not the white

16   Corolla.  Correct.

17   BY MR. McCUTCHEON:

18   Q.  Now, when you left from the location of Mr. Bodon's

19   father's house, did you leave in the white Corolla?

20   A.  Yes.

21   Q.  Were the marked patrol cars still there?

22   A.  I don't think so.

23   Q.  Did you conduct any search of Mr. Bodon's father's

24   residence that day?

25           MS. FERNANDEZ:  Objection, Your Honor; asked and

1    answered.  And it was actually not permitted.

2              THE COURT:  Sustained.

3              MR. McCUTCHEON:  Your Honor, I don't believe I

4    have anything further.  If I could just confer with my

5    colleague.

6              (WHEREUPON, there was a conference between

7              counsel.)

8              MR. McCUTCHEON:  Nothing further at this time,

9    Your Honor.

10             THE COURT:  Any redirect?

11             MS. FERNANDEZ:  No, Your Honor.

12             THE COURT:  Thank you.  You may step down.

13             Any other witness?

14             MS. FERNANDEZ:  Yes, Your Honor.  We have Angel

15   Ortiz.

16                       ANGEL ORTIZ-RODRIGUEZ,

17   called as a witness herein, having been first duly sworn,

18   was examined and testified as follows:

19                       DIRECT EXAMINATION

20   BY MS. FERNANDEZ:

21   Q.  Sir, in a loud and clear voice, state your name for the

22   record.

23   A.  Yes.  My name is Angel Miguel Ortiz-Rodriguez, Badge

24   Number 22565.

25   Q.  And by what entity are you employed as an agent?

1    A.  At present I am working for the Drugs and Narcotics

2    and -- Weapons, Drugs, and Vice Control Division of the

3    Police in Ponce.

4    Q.  And that would be for the Police of Puerto Rico?

5    A.  That is correct, for the Police of Puerto Rico.

6    Q.  Now, were you so employed on April 8th of 2016?

7    A.  I was working for the same division.

8    Q.  How many years have you been a police officer?

9    A.  21 and a half years.

10   Q.  Now, on April 8th of 2016, were you working that day?

11   Did you have a shift?

12   A.  Yes, correct.

13   Q.  And around 4:00 o'clock in the afternoon, where were

14   you?

15   A.  That day I was in our office at the Ponce Drugs

16   Division.

17   Q.  And did you have a reason or at anytime did you leave

18   your office?

19   A.  Yes, correct.

20   Q.  And why was that?

21   A.  Because while I was at the office at the Ponce Drugs

22   Division, the duty officer at that point in time, Agent

23   Julio Gotay, came in.

24   Q.  And what happened?

25   A.  My colleague gave us some information received by him

1    via telephone.  He told us that a woman's voice had called

2    the division and had stated that at barrio La Cantera of

3    Ponce, in front of residence number 223, there was an

4    individual who she knows, a person known as Juan Carlos

5    Bodon who was there, and he was at that location selling

6    drugs, selling controlled substances.  Those were the words.

7          She also stated that he had the drug on him; that

8    that person had had some previous cases; that the residence

9    that he was in front of was the residence of his father, and

10   on the side that they were at, there was a vehicle; a gray

11   Ford pickup truck.

12   Q.  Now, having received that information, what did you do,

13   if anything?

14   A.  Once I received that information -- and also Agent

15   Wilfredo Perez was with me at the office -- I immediately

16   communicated with my supervisor via telephone, with Sergeant

17   Martin Rodriguez, and I informed him about the complaint

18   that Julio Gotay had informed us about.  And I asked him for

19   authorization to go to that location, since I know the

20   location, I know the place that they had informed us about,

21   to verify whether that information was correct, and then

22   decide how we could work it, be it a search or be it an

23   arrest.

24   Q.  Now, did you get that authorization?

25   A.  Yes, that is correct.

1    Q.  And what did you do?

2    A.  I immediately got in an unmarked official vehicle

3    belonging to the Police of Puerto Rico.

4    Q.  And where were you taking the car?

5    A.  And together with my colleague Wilfredo Perez, I went to

6    the location where my colleague Julio Gotay had told us

7    about.

8    Q.  Now, sir, did you take any equipment with you in the

9    unmarked police car?

10   A.  Well, we took some binoculars that my colleague Wilfredo

11   Perez had.  The vehicle has a portable radio installed

12   inside the glove box.

13   Q.  Now, who was driving the vehicle?

14   A.  I was.

15   Q.  And the other agent?

16   A.  He was a passenger in the front.

17   Q.  And that would be Wilfredo Perez-Rivera?

18   A.  That is correct.

19   Q.  So did you arrive to Cantera ward?

20   A.  Yes.

21   Q.  What specific area?

22   A.  We went up the Pete El Conde Street and located

23   ourselves at a location where I had visibility toward the

24   residence that had been informed and which we knew.

25   Q.  Why did you know that residence?

1    A.  Because my colleague Wilfredo Perez had already -- he

2    had intervened with this person, with Juan Carlos Bodon, and

3    he knew where the residence was as well as I.

4    Q.  Now, when you reached that location and you could

5    observe the residence, what did you observe?

6    A.  Once we parked, I observed directly in front of the

7    residence two individuals.  One of them was Juan Carlos

8    Bodon-Lespier, the gentleman seated over there with the gray

9    shirt on.

10          MS. FERNANDEZ:  Let the record reflect that the

11   witness has identified the defendant.

12          THE COURT:  It shall reflect.

13   BY MS. FERNANDEZ:

14   Q.  Continue, please.

15   A.  And at that point in time, he was dressed in a

16   sleeveless t-shirt with stripes to the side, white, gray

17   colored.  He had a black bag in the area of the chest.  He

18   was dressed using pants that go to his knees, more or less,

19   with multi-colored stripes.

20   Q.  Did you observe -- I'm sorry, sir.

21   A.  He had a cap.

22          The other individual was dressed in a gray

23   t-shirt, was wearing blue jeans, dark blue jeans.  He had

24   sort of, like, a grayish cap.  And at the moment that I

25   arrived there, they were at that location talking.

1    Q.  Was there any vehicle at that location when you arrived,

2    that you observed?

3    A.  Well, yes, there were vehicles.  In front of the

4    residence that we were doing a stakeout on, there was a

5    vehicle.  It was a jeep style vehicle, but the brand is

6    Suzuki, red in color.  It had the hood up, and there was a

7    gray pickup truck in front of the Suzuki.

8    Q.  And what did you continue to observe, if anything?

9    A.  Well, as we were doing the stakeout, I observed that the

10   young man in the gray t-shirt, he was sort of doing

11   mechanical work on the jeep, because he would move towards

12   the jeep, toward the front of the jeep and to one side of

13   the front of the jeep.

14   Q.  What else did you observe, if anything?

15   A.  While we were at that location, at around 4:48 in the

16   afternoon I observed that a Toyota Corolla vehicle, late

17   model, 2014 maybe, arrived, and it parked going in reverse

18   at the rear of the jeep.  The small alley there, right next

19   to the residence, it parked right there, and two individuals

20   got out of it.

21   Q.  What did the individuals do?

22           The question is, what did the two individuals --

23   allow me, please.

24           The two individuals that disembarked from the

25   Toyota Corolla, what did they do?

1    A.  Once they parked and they got out, I was able to observe

2    that its driver was dressed with a blue t-shirt, blue jeans.

3    He was thin and with dark skin, with low-cut black hair.

4         The passenger was another young individual,

5    dark-skinned, thin, dressed in a red t-shirt and long blue

6    jeans, and his hair was also short, black.

7    Q.  What did the two individuals that you just described do?

8    A.  Once they got out, they walked in the direction of the

9    rear of the vehicle, along the driver's side.  And Juan

10   Carlos Bodon and the other person who was there walked

11   toward them.

12   Q.  And what happened?

13   A.  They talked about something.  And that's when I told my

14   colleague Wilfredo Perez that I was going to move from the

15   location that I was at, because they had stopped -- that

16   where they had come to a stop, I did not have much

17   visibility, and I was going to move to another location.

18        THE COURT:  Where they were standing.

19        THE INTERPRETER:  I'm sorry, where they were

20   standing.

21   BY THE WITNESS:

22   A.  I did not have much visibility of where they were

23   standing, and I was going to move to another location.

24   BY MS. FERNANDEZ:

25   Q.  And what --

1    A.  I did that.  I took off the binoculars, I put them to

2    the side, and I start moving the vehicle.

3    Q.  Let me ask you a question here.  You just mentioned that

4    you put binoculars to the side.  Had you been using

5    binoculars?

6    A.  Yes, I was at that point in time.  Yes.

7    Q.  And the things that you have described to the Court,

8    were you observing them through the binoculars?

9    A.  Yes.  Correct.  Yes.

10   Q.  Okay.  So you put the binoculars to the side.  What

11   happens?

12   A.  I started on my way in the direction of La Lula

13   urbanization.  As I am moving, I observed Juan Carlos Bodon,

14   using his right hand -- he sort of pulled the bag that he

15   had under his chest towards the front and placed his left

16   hand inside it, and he took out a small bag, a small violet,

17   transparent -- plastic transparent bag, which had inside

18   shreddings of alleged marijuana, and handed it to the

19   individual with the blue t-shirt who arrived there driving

20   the Toyota Corolla, and he took it with his right hand.

21          I observed that at a distance of ten to 15 feet

22   from where they were, because by then I was practically

23   going by them, next to them.

24   Q.  So what happened then?

25   A.  That's when immediately I told my colleague Wilfredo

1     Perez that I observed the delivery of the marijuana baggie.

2     I asked him, did you see the delivery of that marijuana,

3     while I continued driving toward the La Lula urbanization,

4     talking about the situation, referring to Juan Carlos Bodon.

5     Q.  What happened then?

6     A.  I continued on my way to La Lula urbanization, talking

7     to him.  And once we arrived there, we took steps with my

8     supervisor and the agents that were working.

9     Q.  What steps did you take?

10            You said, We took steps with my supervisor and the

11     other agents.

12     A.  Well, we communicated via radio, both agents, and

13     Sergeant Martin Perez was informed, as well as the units

14     that were copying over the radio, about what had been

15     observed, and we coordinated to come to the location and

16     place under arrest the persons that we had seen in the

17     transaction.

18     Q.  What was done then?

19     A.  Well, once we parked on the corner of the La Lula park,

20     that's when Agent Ariel Miranda arrived there and Jorge

21     Rodriguez in another vehicle.  I observed that Sergeant

22     Martin Perez had also arrived.  And immediately we left for

23     that location to do the intervention.

24     Q.  And what happened during the intervention, if anything?

25     A.  Once we left for the location, and I am driving the

```
 1    vehicle, going from La Lula to barrio Cantera, I was the
 2    first vehicle.  That's when I parked on the right side.  My
 3    colleagues that were driving behind me parked behind me.
 4           My colleague Wilfredo Perez got out of the vehicle
 5    immediately and went towards the two persons that were
 6    there.  That was Juan Carlos Bodon-Lespier and the other
 7    one -- the other individual with the gray t-shirt whose name
 8    we did not know at that point in time.  I then observed the
 9    units arrive also in the direction opposite ours, and they
10    also got out as support in order to arrest the persons.
11    Q.  Do you know if Juan Carlos Bodon was arrested?
12    A.  Yes, correct.
13    Q.  Did you observe his arrest?
14    A.  Yes, correct.
15    Q.  Did he still have the black bag on his person when he
16    was arrested?
17    A.  That is so.
18    Q.  And after he was -- did you see how he was arrested,
19    where he was when he was arrested?
20    A.  Yes.  My colleague Wilfredo Perez approached him.  When
21    he is near Juan Carlos Bodon, I observed that he tried to
22    climb up on the balcony towards the residence.  That's when
23    Wilfredo Perez went to him, and my colleague Samer Collazo,
24    who was also there, went to him also, attempting to grab
25    him, and in that manner preventing him from going to the
```

1    balcony.  I observed that other colleagues also helped out.

2    That's when he was placed under arrest, as well as the other

3    person who was also put under arrest.

4    Q.  Do you know the name of the other person arrested?

5    A.  Yes.  It turned out that the other person was called

6    Milford Martinez-Martinez.

7    Q.  And was that the person that had been seen originally

8    with Juan Carlos Bodon?

9    A.  Yes, correct.

10   Q.  And upon the arrest, do you know if that person made any

11   statements?

12   A.  I'm sorry?

13   Q.  The person that you identified as Milford, upon his

14   arrest, do you know if he made any statements?

15   A.  He made some manifestations at the place of the arrest,

16   saying -- in a way, saying that what had been seized from

17   Juan Carlos Bodon belonged to him.

18   Q.  And let me ask you, had you seen Milford with the black

19   bag at anytime during your surveillance?

20   A.  No.  Juan Carlos Bodon always had the bag since I

21   arrived there.

22   Q.  Did you come to find out what was inside the bag?

23   A.  Yes, correct.

24   Q.  How did you find out?

25   A.  Because at the location, what was inside it was

1    observed.  And afterwards, when we went to the Ponce Drugs

2    Division and the field test was done to what was inside,

3    there was controlled substances, marijuana and cocaine,

4    there.

5    Q.  Do you remember what else, if anything, was inside the

6    bag?

7    A.  Well, I believe there was also money in there.  There

8    were some balls, more or less like this size

9    (Demonstrating), that also contained alleged marijuana

10   shreddings.  Really, there were three of them, but one was a

11   bit smaller.

12   Q.  And aside from the money and the controlled substances,

13   anything else that you remember?

14   A.  No.  Right off my head, no.

15   Q.  Now I ask you, during the time that you were conducting

16   this surveillance, until the end of the -- at the time of

17   the arrest, did you take any photographs?

18   A.  I took photographs with my mobile phone, but that was

19   after the whole intervention was finished.

20   Q.  Now, those photographs that you took -- were photographs

21   taken of Juan Carlos Bodon-Lespier?

22   A.  No.  Those were photographs that I took of the location.

23   I almost always do that because there have been previous

24   occasions in other cases that the residence can be repainted

25   or remodeled.  And I took them for myself to have the

1    perfect recollection.

2    Q.  Now, have you provided those photographs to anyone?

3    A.  Well, those photographs were handed over to the

4    prosecutor of the case.

5    Q.  And did you keep any hard copy of those photographs?

6    A.  No, not on hard copy.

7    Q.  Okay.  Did you keep any digital version of those

8    photographs?

9    A.  Yes, correct.

10   Q.  Now, in those photographs, did Milford appear or were

11   any photographs taken of Milford?

12   A.  No, just of the location and the street that we arrived

13   on to do the arrest.

14   Q.  Now, inside the bag -- do you remember what color were

15   the baggies that were found inside the bag?

16   A.  Offhand, right now I can remember that they were baggies

17   violent in color, transparent, with shreddings -- marijuana

18   shreddings inside.  I believe that there was one of the

19   smaller ones.  I believe that one was yellow.  There were

20   also some with cocaine, but I don't remember the color of

21   the ones with the cocaine.  And there were some that were

22   transparent, both sides, with shreddings of alleged

23   marijuana.

24   Q.  Now, you have -- the digital photographs that you still

25   have that were taken of the house at 223, do you have those

1    digitals readily accessible to you today?

2    A.  I have photographs of part of the house and the street

3    to which we arrived at to do the arrest.  And I also have a

4    photograph, and I took that one at the division of the

5    evidence that was seized.

6    Q.  Now, is that readily accessible to you today?

7    A.  I have them in my mobile phone.  The thing is that they

8    took the phone from me at the gate.

9              MS. FERNANDEZ:  Very well.

10             Your Honor, no further questions as to this

11   witness.  We do have a housekeeping matter in terms of the

12   phone.  The United States will not be presenting those

13   photographs.  It is our position that they are not relevant

14   to the matter at hand.  However, the reason we asked if the

15   phone was readily accessible is so that we can inform the

16   Court that they are readily accessible.

17             However, this is his personal phone, and the

18   United States would object because we understand that given

19   they were of the house, they are not relevant to this

20   matter.

21             THE COURT:  Let's take a short break.

22             (WHEREUPON, a recess was had.)

23             MR. MICHELEN:  Before I begin, I ask the

24   Government for any Jencks material that applies to this

25   witness.

1        MS. FERNANDEZ:  The sworn statement of Agent Ortiz

2   had already been given to counsel at a previous hearing.

3        MR. MICHELEN:  Anything other?

4        MS. FERNANDEZ:  No, Your Honor.

5        MR. MICHELEN:  Secondly, Your Honor, as to what

6   was raised right before we went on break, we would like

7   production of the pictures inside the agent's cell phone.

8        THE COURT:  No.  Let's get on with the cross.  We

9   will see about that later.

10                    CROSS EXAMINATION

11   BY MR. MICHELEN:

12   Q.  Agent, you mentioned you have been doing this for 21 and

13   a half years?

14   A.  Yes.  Good afternoon, Counsel.  I have been with the

15   police for 21 and a half years, and I have been at the Ponce

16   Drugs Division for around 12 years.

17   Q.  And the Ponce Drug Division, that's a specialized unit,

18   correct?

19   A.  Yes, correct.

20   Q.  And you received training at the Police Academy?

21   A.  Yes, correct.

22   Q.  You received throughout your career multiple trainings

23   on collection of evidence, for example, right?

24   A.  Yes.

25   Q.  You were taught how to write police reports?

1    A.  Yes, correct.

2    Q.  You were taught how to process a crime scene?

3    A.  Yes, correct.

4    Q.  You were taught how to collect evidence in a crime

5    scene?

6            MS. FERNANDEZ:  Objection, Your Honor.

7            THE COURT:  Counsel, let's move on.

8    BY MR. MICHELEN:

9    Q.  You were also taught why these things are important,

10   correct?

11           THE COURT:  Yes.  Next question.

12           MR. MICHELEN:  I apologize, Your Honor; I don't

13   believe the witness --

14           THE COURT:  I am answering for him.  Yes.  Next

15   question.

16   BY MR. MICHELEN:

17   Q.  Agent --

18           THE COURT:  They are important.  Otherwise, they

19   wouldn't be taught.  Next question.

20   BY MR. MICHELEN:

21   Q.  Agent, you understand that your work is going to be

22   reviewed at some point by, maybe, a judge in a search

23   warrant application?

24           THE COURT:  That's right.

25           MR. MICHELEN:  Your Honor, I apologize, but I

1      would like for the agent to acknowledge if he understands

2      that.

3              THE COURT:  Counsel, I mean, I allowed

4      Mr. McCutcheon a lot of leeway, but I am not going to allow

5      you a lot of leeway because it's really -- most of it is

6      irrelevant, if you ask me.

7              MR. MICHELEN:  Well --

8              THE COURT:  This is not a trial, okay.  This is

9      just a hearing for revocation of supervised release.  It is

10     not a trial.  So go ahead.

11             MR. MICHELEN:  Your Honor, with all due respect, I

12     would just say the reason -- I want to make sure the Court

13     understands.  The reason why I would like to go down that

14     line of questioning is because if it is so important for an

15     officer to know these different things, it begs the question

16     why some of them weren't done in this case, and --

17             THE COURT:  It's irrelevant why they weren't done,

18     because the end result was that there were charges filed

19     against Mr. Bodon in state court, and once those charges

20     were filed, a motion was filed by the probation officer,

21     advising the Court that your client had violated conditions

22     of supervised release by -- "shall not illegally possess a

23     controlled substance."  And there was probable cause found.

24             A motion for suppression was heard by a local

25     judge, it was denied by that judge, and trial is set for

1    May.  So all this other stuff, that would be discovery to be

2    done in the state court, not here.  Go ahead.

3    BY MR. MICHELEN:

4    Q.  Agent Ortiz, you are the lead investigator in this case?

5    A.  I am not the lead investigator, but I am the person who

6    did the stakeout.

7    Q.  And you are the only person who says they saw a drug

8    transaction take place, right?

9    A.  That is so.

10   Q.  In fact, if you hadn't seen what you say you saw,

11   Mr. Bodon wouldn't have been arrested that day?

12           MS. FERNANDEZ:  Your Honor, we are going to object

13   as argumentative.

14           THE COURT:  Sustained.  It's argumentative.

15   Sustained.

16   BY MR. MICHELEN:

17   Q.  Aside from saying -- or watching a hand-to-hand drug

18   transaction take place, did you see any other crimes occur

19   that day on that street?

20   A.  No.

21   Q.  And you didn't write a report in this case, right?

22   A.  No.  The arresting colleague is the one that writes the

23   report.  I prepared a sworn statement at the Ponce

24   prosecutor's office.

25   Q.  But not a report, right?

1    A.  Not a report; a sworn statement.

2    Q.  And you also didn't do, as was mentioned earlier, a

3    querella especial?

4    A.  No, I did not generate that special complaint because I

5    did not receive the information.  That information was

6    received by another colleague.

7    Q.  Right.  So Gotay did the special complaint?

8               MS. FERNANDEZ:  Objection, Your Honor; relevance.

9               THE COURT:  Sustained.

10   BY MR. MICHELEN:

11   Q.  It is current department policy every time there is an

12   anonymous call placed or a tip placed for a confidential

13   call log to be filled out?

14               MS. FERNANDEZ:  Objection.

15               THE COURT:  Sustained.

16               MR. MICHELEN:  What is the objection?

17               THE COURT:  The objection is irrelevant.

18   BY MR. MICHELEN:

19   Q.  You mentioned earlier that Agent Gotay came into the

20   area where you were and said a call had just come in, right?

21               THE INTERPRETER:  I can't understand what he is

22   saying.

23               THE COURT:  I know.

24   BY MR. MICHELEN:

25   Q.  You mentioned earlier that Agent Gotay came into the

1    room you were in and said that a tip had just come in,

2    correct?

3    A.  Yes, that is so.

4    Q.  And the tip was that specifically Juan Bodon was selling

5    drugs?

6    A.  That is correct.

7    Q.  And Gotay didn't tell you -- strike that.  I apologize.

8         Better yet, the caller didn't mention the clothing

9    that the person she saw selling drugs was wearing?

10   A.  At least he did not offer that information.  No.

11   Q.  And he didn't say there were two people seen?

12   A.  No, she only mentioned Juan Carlos Bodon.

13   Q.  And there was no mention of a bag?

14        MS. FERNANDEZ:  Again, Your Honor, objection to

15   the relevance of this line of questioning.

16        THE COURT:  Sustained.

17   BY MR. MICHELEN:

18   Q.  In terms of the caller, you don't know who the caller

19   was?

20   A.  No, I have no knowledge of that.

21   Q.  You don't know if that person -- you don't know what

22   their age was?

23        MS. FERNANDEZ:  Objection, Your Honor.

24        THE COURT:  Sustained.

25   BY MR. MICHELEN:

1    Q.  You didn't know if that person had a criminal record?

2              THE COURT:  Sustained.

3              MS. FERNANDEZ:  Objection.

4    BY MR. MICHELEN:

5    Q.  You don't know where that person lived?

6              MS. FERNANDEZ:  Objection.

7              THE COURT:  Sustained.

8              MR. MICHELEN:  I just want to confirm for the

9    record, these objections are as to relevance.

10             THE COURT:  Yes.

11             MS. FERNANDEZ:  All of these objections are as to

12   relevance of this line of questioning.

13   BY MR. MICHELEN:

14   Q.  And that person who made the phone call, they are not

15   coming in today, right?

16             MS. FERNANDEZ:  Objection; relevance.

17             THE COURT:  Sustained.  Besides, he wouldn't know.

18             MR. MICHELEN:  He hasn't said that.

19             THE COURT:  It's the Government's witnesses.  It's

20   not him who decides who comes to testify or not.  So he

21   doesn't know anyway.  That's a question that he can't

22   answer.

23   BY MR. MICHELEN:

24   Q.  Did you ever speak with the person?

25   A.  Which person?

1    Q.  The caller.  Did you ever speak with the caller?

2    A.  No.  The person who spoke with that caller was Agent

3    Julio Gotay, who was the person who informed us about it.

4    Q.  And when Agent Gotay told you what the caller said, did

5    Agent Gotay also say, And I know this person myself?

6             MS. FERNANDEZ:  Objection, Your Honor; relevance.

7             THE COURT:  He may answer.

8    BY THE WITNESS:

9    A.  Julio Gotay doesn't know that person.

10   BY MR. MICHELEN:

11   Q.  So he doesn't know that person's reliability?

12            MS. FERNANDEZ:  Objection, Your Honor.

13            THE COURT:  Sustained; relevance.

14   BY MR. MICHELEN:

15   Q.  So as soon as you hear this call, you make a call to

16   your supervisor, and you get approval to go do surveillance,

17   right?

18   A.  As soon as I am given the information, yes, that is

19   correct.

20   Q.  We are talking about, maybe, 4 -- after 4:00 o'clock?

21   A.  Yes.

22   Q.  And your shift that day was 9:00 to 5:00 p.m., right?

23   A.  Well, that shift is not a fixed shift because we can go

24   on working if there is an ongoing case.  We can continue

25   working.  Normally the shift goes from 9:00 to 5:00, but if

1    some information comes up about the commission -- a crime

2    being committed, we then request authorization from the

3    supervisor, and if we are authorized, we continue to

4    investigate.

5    Q.  And that day, you started your shift at 9:00 a.m.,

6    right?

7    A.  I don't remember if I went on duty at 9:00, but I do

8    know that I went on duty during the morning hours shift.

9    Q.  And a regular shift would be an eight-hour shift, right?

10   A.  Yes, correct.

11   Q.  So whenever you work over eight hours, that's overtime,

12   right?

13              THE COURT:  Sustained.  It's irrelevant.

14              MR. MICHELEN:  Motive and bias, Your Honor, by the

15   witness.

16              THE COURT:  Denied.  Sustained; it's irrelevant.

17              MR. MICHELEN:  I don't believe the Government

18   objected.

19              MS. FERNANDEZ:  Objection, Your Honor; it is

20   irrelevant.

21              THE COURT:  That's all right.  Even if the

22   Government doesn't object, I still have a right to say that

23   that is irrelevant; move on to something else.  I don't have

24   to wait for the Government to tell me what the objection is.

25   BY MR. MICHELEN:

1    Q.  Now, you knew Juan Carlos Bodon was on federal

2    probation, right?

3              THE COURT:  Which he was not.

4    BY THE WITNESS:

5    A.  Yes, I -- I was aware that he was on probation.

6    BY MR. MICHELEN:

7    Q.  You were aware that he was on supervised release,

8    correct; federal supervised release?

9    A.  Yes, I was aware.

10   Q.  You are aware that if he is caught committing a crime,

11   that would violate his supervised release --

12             MS. FERNANDEZ:  Objection, Your Honor.

13             MR. MICHELEN:  I haven't even finished asking the

14   question.

15             THE COURT:  Are you finished?

16             MR. MICHELEN:  Now I am.

17             THE COURT:  Sustained.

18             MR. MICHELEN:  What is the objection, for the

19   record?

20             MS. FERNANDEZ:  Your Honor, the objection is it

21   doesn't matter what he thinks about conditions of supervised

22   release.

23             THE COURT:  It has nothing to do with it.

24             MR. MICHELEN:  Motive and bias.

25             THE COURT:  Yep.

1   BY MR. MICHELEN:

2   Q.  You knew that if he got arrested, that could entail you

3   having to testify in both local and federal proceedings,

4   correct?

5   A.  Yes, you have to testify in all cases that involve

6   persons who have been arrested.

7   Q.  And in this case, it may have been in two different

8   court systems?

9   A.  Well, the controlled substances case was submitted at

10  the Commonwealth level.  Immediately after that case, that

11  is when the federal system is activated.

12  Q.  I understand.  I am not asking if you filed any cases.

13           What I am saying is, you understood that was a

14  possibility, that you would be called into two different

15  courts?

16  A.  Yes.

17  Q.  You would have to -- you may have to deal with two

18  different prosecutors; a local prosecutor and a federal

19  prosecutor?

20  A.  Yes, correct.

21  Q.  Two different judges?

22           MS. FERNANDEZ:  Objection, Your Honor; relevance.

23           THE COURT:  Yes, Counsel.  It shall be stricken.

24  BY MR. MICHELEN:

25  Q.  You understood that you may have to speak with a

1    probation officer about what you saw that day?

2              MS. FERNANDEZ:  Objection; relevance.

3              THE COURT:  You may answer.

4    BY THE WITNESS:

5    A.  Yes, I understood that, yes, that a probation officer

6    could interview us at some point in time.

7    BY MR. MICHELEN:

8    Q.  So as you prepare to leave for the surveillance, you

9    take a white unmarked police vehicle, correct?

10   A.  Correct.

11   Q.  But you didn't grab a camera?

12   A.  No, not a camera as such.

13   Q.  But that wasn't necessary because you had your phone?

14             MS. FERNANDEZ:  Objection, Your Honor; what's --

15   it presumes an answer that the witness hasn't given.

16             THE COURT:  He may answer.

17   BY THE WITNESS:

18   A.  No, I did not use my telephone to do this stakeout.

19   BY MR. MICHELEN:

20   Q.  Okay.  And earlier on direct, you mentioned that you

21   took pictures that day.

22   A.  Yes, correct, I did take photographs.

23   Q.  You said you took pictures after the surveillance.

24   A.  After the intervention was finished.

25   Q.  But you did have your phone on you while you were doing

1      the surveillance, right?

2      A.  Yes.

3      Q.  You didn't use it to take any pictures?

4      A.  As I told you before, I used it to take photographs

5      after the intervention was finished.

6      Q.  Right, but not while you were doing the surveillance?

7      A.  No.  For that I used binoculars.

8      Q.  And Agent Wilfredo Perez did not have binoculars?

9      A.  I'm sorry?

10     Q.  Agent Wilfredo Perez did not have binoculars?

11     A.  Well, I used the binoculars that he had since the

12     morning hours because he was already doing something else.

13     Q.  And there was only one pair of binoculars in the car?

14     A.  Yes.

15     Q.  And you were using them?

16     A.  At that point in time, I was.

17     Q.  Agent Perez was not using binoculars?

18     A.  No, not Agent Perez.

19            THE COURT:  At least not while you were using

20     them, right?

21            THE WITNESS:  Right.  Correct.

22     BY MR. MICHELEN:

23     Q.  Did he use them at any point?

24     A.  Well, while I was there I did not become aware that he

25     was using them.

1    Q.  And that's because he was using your phone to take

2    pictures?

3              MS. FERNANDEZ:  Objection, Your Honor.

4              THE COURT:  Sustained.

5              MR. MICHELEN:  What is the objection?

6              MS. FERNANDEZ:  The objection is he is asking a

7    question for which he has no --

8              THE COURT:  First of all, you are testifying, to

9    start off with.  Secondly, Counsel, you are going extremely

10   out of the way.  I mean -- anyway, sustained.

11   BY MR. MICHELEN:

12   Q.  At some point, you gave Agent Perez your phone to use to

13   take pictures?

14   A.  No.

15   Q.  What was he doing with his hands during the

16   surveillance?

17   A.  With his hands?

18   Q.  Right.

19   A.  Well, I can't tell you what Perez was doing with his

20   hands because I was doing a stakeout, and I was looking to

21   the front.  He was there as a partner, in support, because

22   that location has a somewhat high criminal incidence.

23   Q.  Just to be clear, your phone was in the car with you

24   while you were doing the surveillance?

25   A.  Yes.

1    Q.  Not in the trunk?

2              THE COURT:  Counsel, see what I mean?  This is a

3    waste of time.

4              MR. MICHELEN:  Your Honor --

5              THE COURT:  That's a waste of time, Counsel.  I am

6    telling you.  He's told you that he had it.  He told you he

7    took photos.  Now you are asking him if it was in the trunk.

8    That's a waste of time and a waste of my time and the

9    court's time.

10             MR. MICHELEN:  Your Honor, at this point we would

11   move to have the agent produce the photos he did take.

12             THE COURT:  Denied.  You won't have them.

13             MR. MICHELEN:  Just for the record, because they

14   would tend to either corroborate or contradict all the

15   testimony that's been given today about where they were

16   standing or where they were not --

17             THE COURT:  The statement that he made was that

18   they were taken after the incident occurred, so it will not

19   show anything that happened during the whole stakeout and

20   the arrest.  The request is denied.

21   BY MR. MICHELEN:

22   Q.  Agent, why didn't you think it was important -- let me

23   back that up.  Strike that.

24             Earlier you mentioned that the reason you took

25   pictures after the surveillance was to memorialize the way

1    the house looked.

2            MS. FERNANDEZ:  Objection, Your Honor, to the

3    translation.  I believe Counsel asked how did the house

4    look, not where the house was.

5            MR. MICHELEN:  Yes, what the house looked like.

6    BY THE WITNESS:

7    A.  Yes, how the house looked at the time of the

8    intervention.

9    BY MR. MICHELEN:

10   Q.  And you mentioned because it would help you remember in

11   case someone, for example -- it happens that they paint a

12   house, or something like that.

13   A.  Yes, that was one of the reasons.

14   Q.  Because you make dozens of arrests a week, maybe?

15   A.  Not in one week, but I do arrest quite a few persons.

16   Q.  How many people would you say you arrest in a week?

17           MS. FERNANDEZ:  Objection, Your Honor.

18           THE COURT:  Sustained.  It's irrelevant.

19   BY MR. MICHELEN:

20   Q.  So having a picture would help you remember something if

21   you have to testify about it maybe a year later?

22   A.  At least verify that the facade of the house had not

23   been altered or modified, because that happened to me

24   previously in a case in barrio La Plena when we did an

25   intervention in front of a residence.  I testified as to how

1     that residence looked the day of the intervention, and some

2     weeks after, they brought to me the same residence that had

3     been remodeled, and they managed to prevail in the case, and

4     the case fell through in court.

5     Q.  And was that because they said that since you mentioned

6     a different color, that what you were saying wasn't true?

7              MS. FERNANDEZ:  Objection, Your Honor.

8              THE COURT:  Sustained.  Whatever happened in that

9     case is irrelevant in this case.

10    BY MR. MICHELEN:

11    Q.  So Agent, using that same rationale, can you please tell

12    us why you didn't think it was equally important to take

13    pictures during the surveillance.

14    A.  No, because at the moment of the stakeout, I was using

15    another instrument, and I could not do two things at once

16    and get distracted because that would affect the stakeout

17    somewhat -- I'm sorry, because that location is a high

18    criminal incidence location.

19    Q.  And you didn't ask Agent Perez to do it, to take the

20    pictures?

21    A.  No.

22    Q.  So getting to the actual arrival, when you arrive and

23    park to start the surveillance, you said you were -- let me

24    back up for a second.

25              You have testified regarding this case at least

1     two prior -- on at least two prior occasions, right?

2     A.  Yes.

3     Q.  You testified at the local court suppression hearing?

4     A.  Yes.

5     Q.  And you testified at the local court preliminary

6     hearing?

7     A.  Yes.

8     Q.  How far away did you say you were today?  Today, how far

9     away did you say you were on that day when you parked for

10    the surveillance?

11    A.  Well, a specific distance as such I could not give

12    because I did not have an instrument to precisely measure

13    it.  I testified as to an estimate.  That could be around

14    40 meters, maybe less.  But no, really, I would not be able

15    to give you an exact distance.

16    Q.  Now, you were also asked the same question at the

17    preliminary hearing, right?

18    A.  Yes, correct, and I answered the same thing.

19    Q.  In the preliminary hearing, did you say it was 75 meters

20    away?

21    A.  No, I don't think I mentioned 75 meters as a distance.

22    Q.  Do you remember at the suppression hearing going back

23    and forth for awhile --

24              MS. FERNANDEZ:  Objection, Your Honor; testimony

25    as to the suppression hearing.

1              THE COURT:  You may ask.

2     BY MR. MICHELEN:

3     Q.  Do you remember at the suppression hearing going back

4     and forth for awhile with Mr. Bodon's state defense attorney

5     about the inconsistencies in the distance you were

6     mentioning?

7     A.  I do remember that we had a debate about the facts.  And

8     I let him know and I let the honorable judge know that

9     because I didn't have a measuring instrument, I did an

10    estimate of the distance, and I was giving an approximate

11    because I did not want to misspeak by giving a distance.  We

12    did debate.

13    Q.  But today you are saying you were about 40 meters away?

14             MS. FERNANDEZ:  Objection, Your Honor; the witness

15    has said that it is an estimate.

16             THE COURT:  That is what?

17             MS. FERNANDEZ:  He said in his answers to brother

18    counsel's questions that he is estimating.

19             THE COURT:  And your question, you said 40 to 50.

20    Go ahead.

21    BY MR. MICHELEN:

22    Q.  I am just confirming.  You said today, you were

23    approximately 40 meters away?

24             THE COURT:  40 to 50.  He said that today also.

25    BY MR. MICHELEN:

1    Q.  Today you said you were approximately 40 to 50 meters

2    away, right?

3    A.  Yes.  I gave you an approximate.

4    Q.  And that's about --

5    A.  As I said before, that could be more -- could be a

6    little more, a little less.  I am just giving you an

7    estimate.

8    Q.  That's fine.  I understand that.  An estimate.  In the

9    range of 40 to 50 meters away; is that fair?

10   A.  Or, like I am saying, that could also have been less

11   than 40.

12   Q.  How much less?

13   A.  It could have been 35.  The thing is that I really don't

14   want to give you an exact measurement because I really

15   cannot do so.

16   Q.  That's fine.  I am not asking for an exact measurement.

17   Go ahead.  Tell me whatever range you feel comfortable with.

18          THE COURT:  It's not an issue of feeling

19   comfortable or not with the distance, Counsel.  It's what he

20   perceives or what he thought it was.  I mean --

21   BY MR. MICHELEN:

22   Q.  Agent, I don't want to mischaracterize what you are

23   saying.

24          Would it be fair to say you were about anywhere

25   from 35 meters to 50 meters?

1    A.   Yes, probably.

2    Q.   And that's about 35 to 50 yards, right?

3    A.   In meters, in yards -- there is a difference of three

4    inches between meters and yards.  But it is an approximate.

5    Q.   Okay.  Which is -- for example, if it's 50 yards, that's

6    half of a football field, right?

7              MS. FERNANDEZ:  Objection, Your Honor; this is

8    calling for the witness to testify about something -- we

9    don't know if he knows what an American football field is

10   like.

11             THE COURT:  Sustained.

12   BY MR. MICHELEN:

13   Q.   Do you watch American football?

14             THE COURT:  Sustained, Counsel.  We are not going

15   to get into stadium measurements.

16             MR. MICHELEN:  I think the Court could take

17   judicial notice of the size of an American football field.

18             THE COURT:  I am not going to take judicial

19   notice.

20             MR. MICHELEN:  One second, Your Honor.

21             If I may have Exhibit E, I believe, please.

22   BY MR. MICHELEN:

23   Q.   Now, Agent, you took out a white unmarked vehicle,

24   right?

25             THE COURT:  Asked and answered.

1    BY MR. MICHELEN:

2    Q.  And the vehicle had tints?

3    A.  It had tints, but they weren't that dark.

4    Q.  Now, when you parked, on which side of the street did

5    you park?

6    A.  If I am going in the direction of barrio La Lula, I

7    parked to the left.

8               THE COURT:  But I don't know where the barrio is.

9    Where the house is located, the 223 residence, on which side

10   of that street did you park?

11              THE WITNESS:  I'm sorry, Your Honor.  I parked on

12   the left side.

13              THE COURT:  On the other side of the street?

14              THE WITNESS:  Yes, correct.  If I am going this

15   direction, I parked over on this side (Demonstrating).

16   BY MR. MICHELEN:

17   Q.  Just to be clear, did you park on the same side of the

18   street where the house is on or across the street?

19   A.  On the same side as the residence.

20   Q.  Facing north?

21   A.  Yes, facing north.

22              THE COURT:  I thought you parked on the other side

23   of the street.

24              THE WITNESS:  No, I parked on the left side.

25   That's a really thin road.

```
 1                    THE COURT:  Okay.  Let's assume that the house is
 2       here (Demonstrating).  This is the street, okay.  Did you
 3       park on this side of the street or on this side of the
 4       street?
 5                    THE WITNESS:  I parked on the same side where the
 6       residence is located, looking at an angle towards the
 7       residence.  And we already know where the residence were
 8       located.
 9                    THE COURT:  You parked further up from the alley
10       that's next to the house?
11                    THE WITNESS:  Before the alley.  Before the
12       residence.  Before the alley.
13                    THE COURT:  All right.
14       BY MR. MICHELEN:
15       Q.  So Agent, what I want to do now is show you what's been
16       marked as Defense Exhibit I -- Defense Exhibit A.  I
17       apologize, Identification A.
18                    Do you recognize this, Agent?  Do you recognize
19       this street?
20       A.  It is a bit blurry, but I believe that is the street,
21       yes.
22       Q.  This is Street Pete El Conde?
23       A.  Yes, I believe that it is Pete El Conde Street.
24       Q.  And this view is facing north?
25       A.  Yes.
```

1    Q.  Does this picture fairly and accurately depict what the

2    street looked like that day?

3    A.  It looks somewhat as it looked that day, but it's been a

4    year now.

5    Q.  What I am going to ask you, Agent, is, from this view,

6    can you see where your car was parked while you were doing

7    the surveillance?

8    A.  For me to indicate the exact point, I don't know.  I do

9    know that I was parked over on this side (Indicating).

10           THE COURT:  Where is the 223 residence on that

11   photo?

12           THE WITNESS:  No, residence 223 is somewhat

13   farther up.  It's farther up, yes.

14           THE COURT:  So this is not a true and accurate

15   production of how it was that day, because there was a red

16   jeep there.

17           MR. MICHELEN:  It's just of the street in general.

18           THE WITNESS:  No, the jeep -- you can't find the

19   red jeep there; not in that photograph.

20   BY MR. MICHELEN:

21   Q.  Just to be clear, obviously, there is -- the cars are

22   not all going to be there.

23           The question is, that view facing north,

24   generally, that's a fair and accurate depiction of what that

25   street looks like?

1    A.  How it looks right now?

2    Q.  No, what the street looked like that day, regardless of

3    whether the same cars are there or not; just the street

4    itself.

5              THE COURT:  It's not the same thing.

6              MS. FERNANDEZ:  Objection, Your Honor.

7              THE COURT:  It's not the same thing that was seen

8    that day, Counsel.  And I am not going to look at it because

9    it doesn't show what the scene was on that day.

10             MR. MICHELEN:  Your Honor, my question is --

11             THE COURT:  So it's irrelevant how it looks.

12             MR. MICHELEN:  Your Honor, he mentioned that he

13   could see the spot, approximately, where he was parked.  So

14   I just wanted him to point out, if he could see it, where

15   that spot is in this picture.

16             MS. FERNANDEZ:  Your Honor, we object.  The

17   question --

18             THE COURT:  He had a Mirage also in front of him.

19   He had the red jeep.  No.

20   BY MR. MICHELEN:

21   Q.  Agent, when you look at this picture, do you see -- you

22   can answer yes or no -- the spot, more or less, where you

23   parked that day?  Do you see that on the street in this

24   picture?

25             MS. FERNANDEZ:  Objection, Your Honor; he is being

1     asked for a more or less in a picture that we are already

2     seeing does not depict the scene.

3                  THE COURT:  Sustained.

4                  MR. MICHELEN:  Your Honor, he can answer whether

5     or not he was parked around there.

6                  THE COURT:  No, he can't, not on that picture,

7     because it doesn't show what the situation was on that day.

8     BY MR. MICHELEN:

9     Q.  Agent, I am going to show you what's already been marked

10    as Defense Exhibit B.

11                 THE COURT:  You are going to have the same problem

12    with that photo.

13    BY MR. MICHELEN:

14    Q.  Do you recognize this picture, Agent?

15    A.  Yes.

16    Q.  Do you recognize that house?

17    A.  Yes, correct.

18    Q.  Is that a fair and accurate depiction of what Mr. Bodon

19    Senior's house looked like on that day?

20    A.  Well, its appearance, yes, but the colors, no.  I can

21    see that the columns there are white.  At the time of the

22    stakeout and the intervention, I believe that the columns

23    were painted in a different color.  And I believe that the

24    house was also painted in a different color, according to

25    my --

1    Q.  And your pictures would show that, right?

2    A.  Yes.  I did not take a direct picture of the house, but

3    they would show part of the house.  They would show the jeep

4    that was there that day.  They would show the pickup truck

5    that was mentioned in the tip by the person who called, and

6    they would show the street, but in the direction that we

7    came to do the arrest.

8    Q.  Okay.  Regardless of the color, do you have any doubt

9    that is the actual house?

10   A.  My understanding is that, yes, that is the house.

11   Q.  And when you look at this picture, do you see the place

12   you were parked at while you were conducting surveillance?

13   A.  It could have been at a point between the van and the

14   blue car, but the exact location is very difficult to

15   pinpoint for you, looking at photographs just like that one.

16   Q.  Agent, I am going to ask you to do me a favor; if you

17   can use the monitor to mark -- so we all know what you are

18   talking about, if you can mark where you are saying you

19   were.

20          MS. FERNANDEZ:  Your Honor, I am going to object

21   to that instruction given to the witness because the witness

22   just indicated that he couldn't really indicate where he was

23   at.

24          THE COURT:  More or less, where were you?  You

25   said between the blue car and the red car?

1          THE WITNESS:  Practically so, yes, but I would not

2     be able to pinpoint the exact location.

3     BY MR. MICHELEN:

4     Q.  Can you please mark -- you can use your finger -- mark

5     on the screen where you are saying.

6     A.  It was more or less in between this vehicle and this

7     other vehicle (Indicating), more or less.

8          THE COURT:  Between that vehicle and what?

9          THE WITNESS:  And this vehicle here, more or less.

10    That's more or less.

11    BY MR. MICHELEN:

12    Q.  And you were facing this direction (Indicating)?  You

13    were facing the house?

14    A.  Looking towards here (Indicating), because they were in

15    the area of the sidewalk.

16    Q.  So for the record, you have marked a red line and a red

17    dot, and you are saying you were somewhere in between those

18    two points?

19    A.  More or less.

20          MR. MICHELEN:  So I would ask at this time if we

21    can print this out.

22          MS. FERNANDEZ:  No, Your Honor, we are objecting

23    to that.  The witness has consistently said more or less.

24          MR. MICHELEN:  It's an approximation.

25          THE COURT:  We can't use it for anything else.

1            MR. MICHELEN:  We can use it for an approximation.

2            THE COURT:  You may copy it.

3            MS. FERNANDEZ:  We are objecting that it be marked

4       as an exhibit because the witness said it is an

5       approximation.

6            THE COURT:  Counsel, I will be resolving the issue

7       here, the issues.  I am aware of what his testimony was, and

8       I am aware of the fact that this is an approximation.  It

9       could be on this side of the tree and the red car; it could

10      be further on down.

11           MS. FERNANDEZ:  Yes, Your Honor.

12           MR. MICHELEN:  So at this time we would move this

13      into evidence as Exhibit B1, the printout.

14           THE COURT:  It shall be marked.

15           MR. MICHELEN:  If we can have this printed.

16      BY MR. MICHELEN:

17      Q.  Agent, while we do that, you mentioned that the color of

18      the house was different that day.

19      A.  Well, according to my appreciation of the photograph,

20      because I don't know if when the photograph was taken the

21      tone of the color changed or, when printed, the color

22      changed.  According to my appreciation, the color has

23      changed.

24      Q.  Okay.  How would you describe the color you remember the

25      house being?

1      A.  It was a beige -- peach, and the columns were in a

2      clearer peach or lighter peach.  And in my appreciation, the

3      house there looks like it is a tone of pink.

4      Q.  And you mentioned that that day, the red jeep was parked

5      in front of it.

6      A.  Yes, there was a red jeep.

7      Q.  The red jeep was approximately where that blue sedan is,

8      the one I am pointing at?

9      A.  It could be a bit farther back.

10     Q.  A little farther back, like by where the tree is, right?

11          MR. MICHELEN:  Did we print this out already?

12     Thank you.

13          THE COURT:  It's more towards the alley; is that

14     what you are saying?

15          THE WITNESS:  Yes, a bit more towards the alley.

16     A little bit farther back.

17     BY MR. MICHELEN:

18     Q.  And it was facing the same direction that that blue

19     sedan is facing, right?

20     A.  Yes, correct.

21     Q.  And you mentioned in front of that red jeep, there was a

22     pickup truck?

23     A.  Yes.  Correct.

24     Q.  It was a dark-colored pickup truck, right?

25     A.  It was, like, grayish.

```
 1    Q.  Agent, maybe -- can you clear the screen there?  I can't

 2    clear the screen.

 3            So Agent -- and you were in a white, unmarked

 4    vehicle, you said, right?

 5    A.  Yes.  Correct.

 6    Q.  So I am going to show you, Agent, what's been marked as

 7    Defense Exhibit E.  Agent, do you recognize this vehicle?

 8    A.  The jeep is a similar one.  The jeep is one that is

 9    similar to the one that I saw that day.

10    Q.  Let's start with the house.  Is that the house that Juan

11    Carlos Bodon was arrested at?

12    A.  Yes.  It was in front of the house.  Not in the house;

13    in front of the house.

14    Q.  And the color of the house, that's a peach color?

15    A.  The tone that I see there is like a cream color.  I

16    don't know if that is how the printer prints it.

17    Q.  And so let's start with the red Suzuki jeep.  That's

18    where the jeep was parked that day, right?

19    A.  Approximately, yes.

20    Q.  And that's the dark-colored gray pickup truck you

21    mentioned?

22    A.  Well, you can see a pickup truck there, but the only

23    thing that I see there is part of the cargo space.

24    Q.  Well, you can see the color of the vehicle, right?

25    A.  As I told you, I don't know if it is the printer or the
```

```
 1    camera that it was taken with, but there is sort of, like, a
 2    contrast with the colors.
 3    Q.  What color would you call that pickup truck that's --
 4             THE COURT:  Move on.  Next question.
 5    BY MR. MICHELEN:
 6    Q.  And the white vehicle, that's the vehicle you and --
 7             MS. FERNANDEZ:  Objection, Your Honor.
 8             THE COURT:  Sustained.
 9             MR. MICHELEN:  If he recognizes it, Your Honor.
10    BY MR. MICHELEN:
11    Q.  Is that the vehicle you were in?
12             MS. FERNANDEZ:  Your Honor, we object.  We object
13    to this question because, first of all, Counsel in no way
14    has indicated that this is a photograph -- is there a good
15    faith basis to believe that this is the vehicle?
16             MR. MICHELEN:  Yes, there is.  Yes, there is.
17             MS. FERNANDEZ:  What is that good faith basis,
18    Your Honor?
19             MR. MICHELEN:  These pictures were taken that day.
20    So the agent could just answer yes or no, if he recognizes
21    that to be the vehicle he was in.  It's a simple question.
22             THE COURT:  You say the pictures were taken that
23    same day?
24             MR. MICHELEN:  Yes, that's our understanding, Your
25    Honor.
```

1          MS. FERNANDEZ:  Your Honor, we would ask to know

2    who --

3          THE COURT:  How would that happen if the matter

4    was at 5:00 o'clock in April, and this is broad daylight,

5    according to what I see there?  That's not the same day,

6    Counsel.

7          MR. MICHELEN:  Well, Your Honor --

8          THE COURT:  Besides, the car is facing the other

9    way.

10          MR. MICHELEN:  That's exactly why I am asking the

11    question.

12          THE COURT:  But don't say that's the car that they

13    were driving.  You don't know.

14          MR. MICHELEN:  I am asking the agent to just -- he

15    can answer if that is the car or not, or if he recognizes

16    it.  He can answer it in whatever way he wants.

17          MS. FERNANDEZ:  Your Honor, he is offering to the

18    Court something he indicated that he thought was taken the

19    same day.  I am concerned about this line of questioning.

20    Who took that photograph?  Why are they proffering it?

21    What's the good faith basis of this questioning?

22          THE COURT:  You may answer.

23    BY THE WITNESS:

24    A.  That white car there?

25    BY MR. MICHELEN:

1    Q.  Yes.

2    A.  Well, it looks like a Toyota, but it being the car that

3    I used as such --

4    Q.  Let me ask the question this way:  Is there anything

5    about the car that would help you rule out if that is the

6    car?  Let me rephrase that.  I apologize.

7            Is there anything about your car, your white

8    Toyota Corolla, unique, that would help you rule out this

9    being the car or not?

10           THE COURT:  Do you understand the question?

11           THE WITNESS:  Yes.

12           THE COURT:  Can you tell us for sure if that's the

13   car you were driving that day or not?

14           THE WITNESS:  Well, it's somewhat similar.

15           THE COURT:  But you can't tell us if it was or it

16   wasn't?

17           THE WITNESS:  I can't tell you.  It's somewhat

18   similar, but I can't tell you.

19           THE COURT:  All right.

20   BY MR. MICHELEN:

21   Q.  Let's talk about when the black Toyota Corolla --

22           THE COURT:  We will talk about that next Monday at

23   10:00 o'clock.  Court will recess in this case until Monday

24   at 10:00 o'clock.

25               (PROCEEDINGS ADJOURNED AT 5:18 P.M.)

```
1    UNITED STATES DISTRICT COURT )
                                  )  ss.
2    OF PUERTO RICO               )

3

4

5                      REPORTER'S CERTIFICATE

6

7

8            I, LISA O'BRIEN, do hereby certify that the above

9    and foregoing, consisting of the preceding 111 pages,

10   constitutes a true and accurate transcript of my

11   stenographic notes and is a true and complete transcript of

12   the proceedings to the best of my ability.

13           Dated this 23rd day of August, 2017.

14

15                           S/Lisa O'Brien
                           Lisa O'Brien
16                         USDC Court Reporter
                           708-284-0021
17

18

19

20

21

22

23

24

25
```