1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF PUERTO RICO
2

3

    UNITED STATES OF AMERICA,        )
4                                    )
                    Plaintiff,       )
5                                    )
    vs.                              ) Case No: 07-290(PG)
6                                    )
    JUAN CARLOS BODON-LESPIER,       )
7                                    )
                    Defendant.       )
8

9   _____

10
              TRANSCRIPT OF FURTHER REVOCATION HEARING
11                        HELD BEFORE
          THE HONORABLE JUDGE JUAN M. PEREZ-GIMENEZ
12                  Monday, April 3, 2017

13  _____

14

15                    A P P E A R A N C E S

16

17  For the Plaintiff:

18          Myriam Fernandez-Gonzalez, AUSA

19

20  For the Defendant:

21          Andrew McCutcheon, AFPD
            Juan Michelen, AFPD
22

23

24

25

1
                              I N D E X
2

3
     WITNESS                                              PAGE
4

5    ANGEL ORTIZ-RODRIGUEZ

6    Cross Examination By Mr. Michelen (Cont'd)            4

7
     ARIANA FIGUEROA-ALVARADO
8
     Direct Examination By Mr. McCutcheon                 62
9    Cross Examination By Ms. Fernandez                    76

10
     JULIO GARCIA
11
     Direct Examination By Mr. Michelen                    79
12   Cross Examination By Ms. Fernandez                    86

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (PROCEEDINGS COMMENCED AT 10:34 A.M.)

2

3              DEPUTY CLERK:  Criminal Case 07-290, United States

4     of America versus Juan Carlos Bodon-Lespier.  Case called

5     for further revocation hearing.  On behalf of the

6     Government, Assistant U.S. Attorney Myriam Fernandez.  On

7     behalf of the defendant, Assistant Federal Public Defenders

8     Andrew McCutcheon and Juan Michelen.  The defendant is

9     present and he will be assisted by the official court

10    interpreter.

11             THE COURT:  Parties ready?

12             MS. FERNANDEZ:  Yes, Your Honor, the United States

13    is ready to proceed.

14             THE COURT:  Your witness.

15             MR. MICHELEN:  Good morning, Your Honor.

16             THE COURT:  Mr. Ortiz, you will continue

17    testifying under the same oath that you took last Thursday.

18             THE WITNESS:  Yes, sir.

19             MR. MICHELEN:  May I proceed, Your Honor?

20             THE COURT:  Yes.

21             MR. MICHELEN:  Thank you.

22                      ANGEL ORTIZ-RODRIGUEZ,

23    called as a witness herein, having been previously duly

24    sworn and having testified, was examined and testified

25    further as follows:

```
 1                    CROSS EXAMINATION (Resumed)

 2    BY MR. MICHELEN:

 3    Q.  Agent, good morning.  Nice to see you again.

 4    A.  Good morning.  Good morning to everyone here in this

 5    courtroom.

 6    Q.  Agent, did you have a chance over the weekend to look at

 7    the pictures that you took on your phone regarding this

 8    case?

 9    A.  Yes, that's correct.

10              MR. MICHELEN:  Your Honor, at this time we would

11    renew our motion to see the pictures, considering that the

12    agent did look at them to refresh his recollection for his

13    testimony.  We would ask for those pictures.

14              MS. FERNANDEZ:  Your Honor, we object to brother

15    counsel's characterization of the testimony that we just

16    heard, and we renew our objection to the photographs.  This

17    witness has already stated that those photographs were taken

18    after the intervention had been completed, so they have no

19    bearing on the matter before the Court.

20              THE COURT:  Where do you have the pictures?

21              THE WITNESS:  The pictures are in my cell phone.

22              THE COURT:  Where is your cell phone?

23              THE WITNESS:  It was taken from me downstairs; the

24    officer on duty downstairs.

25              THE COURT:  In the meantime, next question.
```

1    BY MR. MICHELEN:

2    Q.  Agent, I am going to show you what's been marked as

3    Defense Exhibit B1.  We went over this last week.

4            Agent, these are the markings -- you will see two

5    red markings that you made last week.  Do you remember that?

6    A.  Yes, that is correct.

7    Q.  And you created these markings, right?

8    A.  I beg your pardon?

9    Q.  You created these markings?

10   A.  Yes.  Yes.

11   Q.  And these markings indicate where you remember being

12   parked between those markings the day of the surveillance,

13   correct?

14   A.  Yes.  I indicated that I may have been there between the

15   two markings, but I am more inclined to say it's the farther

16   one, the one to the left.

17   Q.  The marking farther away from the house, Juan Bodon's

18   father's house, correct?

19   A.  Yes, that is correct.  Yes.

20   Q.  And your testimony was that you were parked somewhere

21   between those, but closer to the back?

22   A.  Yes.  Yes.

23   Q.  Now, Agent, I am going to show you -- considering the

24   position you indicated in Exhibit B1, Defense Exhibit B1, I

25   am going to ask you to please take a look at Defendant's

1    Exhibit C.  And based on the testimony about Defense Exhibit

2    B1, please indicate where you were parked in terms of that

3    picture.

4    A.  Well, looking in the direction of where I was more or

5    less parked, it could be, like, over here; a little bit

6    farther back.

7    Q.  If I can ask you, Agent, if you can please use the

8    monitor like you did last week to mark where you are

9    indicating.

10   A.  Well, approximately -- I mean, you could say that I was

11   approximately located there (Indicating).

12           THE COURT:  Mr. Ortiz, do you recognize what that

13   is, C1?

14           THE WITNESS:  Yes.  Yes, Your Honor.

15           THE COURT:  And where is the house that belongs to

16   Defendant's father in that photograph?

17           THE WITNESS:  I am going to mark it now (Drawing).

18   Right here.

19   BY MR. MICHELEN:

20   Q.  For the record, you created a green arrow and a marking.

21   A.  Yes.  I am pointing to the residence where -- the

22   residence is located where the mark is.

23           THE COURT:  That's by the tree?  Is that by the

24   tree, the mark that you made?

25           THE WITNESS:  No, because after that tree there is

1     another tree, which is located right in front of his

2     residence.

3              THE COURT:  All right.  Do you want to show me the

4     photos that you took?

5              THE WITNESS:  Yes, Your Honor.  It was off.  It's

6     starting to turn on now.

7              (WHEREUPON, the cell phone was tendered to the

8              Judge.)

9              THE COURT:  Counsel, approach the bench.

10             (WHEREUPON, the following further proceedings

11             were had at sidebar:)

12             THE COURT:  This is the first one.

13             MR. MCCUTCHEON:  We would definitely renew our

14     motion for the photographs.  They show several things.  One,

15     they show the jeep with the hood open, being worked on.  I

16     would also like to closer inspect some of the other

17     photographs to see who is depicted in them.  It's hard for

18     me to tell.

19             So, Your Honor, we would ask that those be printed

20     and provided to the defense.  And I would also like to see

21     the photographs of the materials that were seized.

22             THE COURT:  Of the what?

23             MR. MCCUTCHEON:  The materials that were seized,

24     the drugs.  Perhaps you can e-mail them to your courtroom

25     deputy to be printed out, and they can be provided to the

1    defense.

2              MS. FERNANDEZ:  Your Honor, we think they are

3    irrelevant.  They were taken after the events happened.

4    They don't present anything new other than what the Court

5    already heard from the witnesses.

6              THE COURT:  They put them in the record.

7              MS. FERNANDEZ:  That's fine.

8              THE COURT:  But they are not going to be

9    admissible at the hearing.

10             MR. MCCUTCHEON:  They are not admissible during

11   the hearing, sir?

12             THE COURT:  They are not admissible.  They are

13   after the fact.

14             MR. MCCUTCHEON:  First of all, it shows the drugs

15   as they were seized in the black bag.  Secondly, it shows

16   the scene as it was at the time of the arrest, which I think

17   is important because, one, it establishes the jeep was being

18   worked on.

19             THE COURT:  The jeep was open, yes.

20             MR. MCCUTCHEON:  So I think that's important

21   because that's consistent with the position of the defense.

22             THE COURT:  It may be important to you.  To me,

23   it's irrelevant.  The events already happened.

24             MR. MCCUTCHEON:  But it's showing the scene as it

25   was at the time the events happened, Your Honor, so that's

1    why we believe it's important.

2              MS. FERNANDEZ:  They were taken after the events

3    happened, Your Honor, so I don't see how counsel can say it

4    was taken of the scene as it was.

5              MR. MCCUTCHEON:  It's memorializing the scene as

6    it was that day.  I mean, nobody is taking pictures

7    simultaneously with --

8              THE COURT:  Why does that make it relevant, how

9    the scene was?

10             MR. MCCUTCHEON:  Well, Your, Honor, it proves the

11   defense's point that the jeep was being worked on, which is

12   consistent with Milford Martinez-Martinez's statement.

13             THE COURT:  The hood was open.

14             MR. MCCUTCHEON:  Absolutely, Your Honor.  So that

15   explains exactly what Milford Martinez-Martinez stated,

16   which was that he was working on the jeep --

17             THE COURT:  He stated in this case?

18             MR. MCCUTCHEON:  He did in the statement that was

19   introduced into evidence.

20             MS. FERNANDEZ:  It wasn't introduced for the truth

21   of the matter.

22             MR. MCCUTCHEON:  Absolutely, it was.

23             MS. FERNANDEZ:  No, it wasn't, Your Honor.  And we

24   objected to it because he was not going to be here.

25             THE COURT:  What exhibit is that?

1              MS. FERNANDEZ:  They provided a statement.

2              MR. MICHELEN:   A sworn statement taken by the

3    police.

4              THE COURT:  Was it his statement?

5              MS. FERNANDEZ:  It wasn't the witness' statement;

6    it was Milford's statement.

7              THE COURT:  Under the Rules of Evidence, we don't

8    know if Mr. Martinez adopted that statement or not.

9              MR. MCCUTCHEON:  He wrote it, Your Honor.

10             MR. MICHELEN:  He wrote it.

11             MR. MCCUTCHEON:  He wrote it and signed it.

12             THE COURT:  Okay.

13             MR. MCCUTCHEON:  So he is obviously adopting its

14   contents if he is the one who actually wrote -- and it was

15   actually witnessed by the agent, Your Honor.

16             THE COURT:  I know, but --

17             MR. MCCUTCHEON:  Both agents.

18             THE COURT:  Anyway --

19             MS. FERNANDEZ:  Your Honor, the defense can bring

20   that witness.  They have the right to bring witnesses.  They

21   can bring Milford Martinez-Martinez without having a piece

22   of paper testify for him.

23             MR. MCCUTCHEON:  His statement is admissible even

24   under the Rules of Evidence, even assuming they apply in

25   this type of proceeding, Your Honor.  But the document

1    speaks for itself.  It was a statement against penal

2    interest, written by an individual and signed by that

3    individual, and then also testified to and sworn to by the

4    agent.

5              MR. MICHELEN:  Both agents.

6              MR. MCCUTCHEON:  Both agents.

7              THE COURT:  As to whom?

8              MR. MCCUTCHEON:  Milford Martinez-Martinez.

9              THE COURT:  Was he involved in --

10             MR. MCCUTCHEON:  Absolutely.  He was arrested and

11   he was charged in this case.

12             MS. FERNANDEZ:  That case didn't proceed at the

13   local level.

14             MR. MCCUTCHEON:  That has no bearing on whether or

15   not the statement is admissible.

16             MS. FERNANDEZ:  Yes, it does.  Apparently not

17   believable to the local court, Your Honor.

18             MR. MCCUTCHEON:  Well --

19             THE COURT:  Yes.  Sustained.  It will not be

20   admitted.

21             MR. MCCUTCHEON:  Note our objection for the

22   record, please.

23             THE COURT:  Yes.

24             MR. MICHELEN:  Your Honor, also as to the

25   pictures, they go to show the pictures we have introduced

1    are more likely than not from the same day if all the cars

2    are positioned in exactly the same position, which is what,

3    from briefly looking at the pictures on the phone, they seem

4    to indicate.  The pictures are obviously relevant.  If this

5    officer just testified that over the weekend he looked at

6    them, obviously, it was for a reason.

7              THE COURT:  So what does that -- so what?  So he

8    looked at them.

9              MR. MICHELEN:  And it makes it relevant also as to

10   the pictures -- the color of the house, which he was in

11   doubt of on Thursday.

12             THE COURT:  He testified that as it was seen in

13   that picture.

14             MR. MICHELEN:  Right.  So the pictures he took are

15   an accurate depiction of what the house looked like on that

16   date.

17             THE COURT:  If he can tell what the color was.

18             MR. MICHELEN:  You can.  They are in color.

19             Your Honor, I think whether or not they are

20   admissible and relevant is going to be up to the witnesses

21   who testify to them.  If -- he obviously thought they were

22   relevant because they were crime scene pictures.  How are

23   crime scene pictures not relevant to a case?

24             THE COURT:  He is not the one who determines

25   whether they are relevant or not.

```
 1                    MR. MCCUTCHEON:  He also testified to them.

 2                    THE COURT:  He testified to them.  So what?

 3                    MR. MICHELEN:  Both agents testified --

 4                    THE COURT:  That doesn't make it admissible.

 5                    MR. MICHELEN:  Your Honor, how are pictures taken

 6       of a crime scene not relevant?  They were taken by the

 7       agent --

 8                    THE COURT:  The crime scene as it was --

 9                    MR. MICHELEN:  He can testify to whatever

10       differences there were from the moment he took the picture

11       and the moment the arrest happened.  He is more than

12       welcome.  And the Government has every right to redirect him

13       and ask him what the differences were, and point out the

14       differences in the pictures to the moment of the arrest.

15       But unless the Court is saying the only pictures admissible

16       are pictures taken of the moment of the arrest, and that's

17       the only thing that's relevant -- I mean, the whole thing is

18       relevant.

19                    The whole thing -- if pictures during the

20       surveillance, if -- those would be relevant.  Pictures of

21       the actual arrest, those would be relevant.  Pictures after

22       the arrest, those have to be relevant.

23                    THE COURT:  They don't have to be.

24                    MR. MICHELEN:  Is the Court saying the only

25       pictures that are relevant are the drugs --
```

1              THE COURT:  I am not saying that.  Don't put words

2      in my mouth.

3              MR. MICHELEN:  I know you are not saying that.

4      But the pictures of the drugs, surely those are relevant.

5              THE COURT:  I am saying anything that happened

6      after the arrest is irrelevant for purposes of this hearing.

7              MR. MICHELEN:  Your Honor, I believe if the

8      pictures go to show any inconsistencies in terms of how --

9      the appearance of the street that day and the appearance of

10     the house that day, of course they are relevant.

11             THE COURT:  No, because if you are going to use

12     them as impeachment, which is what it would be, it would be

13     marked as identification but would not be admitted into

14     evidence if they are for impeachment of the witnesses.  They

15     are not admissible.

16             MR. MICHELEN:  That all depends --

17             THE COURT:  It depends if you are going to use

18     them to impeach him --

19             MR. MICHELEN:  I would like to ask -- we would

20     both like to ask the agents questions about the pictures.

21             THE COURT:  Go ahead and ask them.

22             MR. MICHELEN:  We need the pictures.  Are those

23     going to be printed out and provided to the defense, the

24     photographs?

25             THE COURT:  Yes.  That doesn't make them relevant,

1    that you get a copy of them.

2              MR. MICHELEN:  No, I understand.

3              MR. MCCUTCHEON:  Can we have a brief break to

4    review the photographs, Your Honor?

5              THE COURT:  How do we do that?  I don't know.

6              MS. FERNANDEZ:  Your Honor, I would ask then that

7    the Court Clerk provide instructions to the witness as to

8    where he can send them so that they can be printed out, if

9    that is appropriate to the Court.

10             THE COURT:  Omar.

11             DEPUTY CLERK:  Yes, sir.

12             THE COURT:  Tell them how they can get the

13   pictures.

14             We will wait until you get them.

15             (WHEREUPON, discussion was had off the record.)

16             (WHEREUPON, the following further proceedings

17             were had in open court:)

18             THE COURT:  Let's stop that for a minute.  You may

19   continue with your cross.  We are wasting a lot of time with

20   this.  Next question.

21   BY MR. MICHELEN:

22   Q.  So Agent, going back to exhibit -- Defense Exhibit C.

23   You marked with a green arrow a part of the picture, and you

24   were saying -- what did you mark there?

25   A.  Well, the honorable judge asked me where Bodon's

1      father's house was, and with that mark I am pointing out

2      where the residence is, which you can see sideways.

3      Q.  Are you saying -- well, the residence is not directly

4      where the arrow is and that tree is, correct?

5      A.  No, the residence is farther back, but the mark, I have

6      to place it right here because I am seeing it between the

7      tree and the other residences that are there on the

8      sidewalk.

9      Q.  Do you see -- you see the car that is parked right

10     behind the arrow that you marked, where you can see the

11     trunk of the car?  Do you see that car?

12     A.  Yes.

13     Q.  You would agree that the house is next to that car?

14     A.  More or less.

15     Q.  In this picture, can you please mark where your car was

16     parked.

17     A.  Again, I repeat -- I am parked in the area where, more

18     or less, that green dot is.

19     Q.  So for the record, you put a small dot at the very

20     edge -- bottom of the exhibit, correct?

21     A.  Yes, that's a dot that I put there, but that's an

22     approximate.

23              THE COURT:  Where is the dot?  Is it next to the

24     lamppost?  Okay.  I saw it now.

25     BY MR. MICHELEN:

1    Q.  Now there is an arrow there, correct?

2    A.  Yes, that's the arrow that I am -- I drew there to

3    demonstrate, more or less, where I was parked.

4    Q.  And the tree that is next to the first arrow you marked,

5    that tree was there on the day of the surveillance?

6    A.  Yes.  Yes.

7    Q.  And the leaves were also on the tree?

8    A.  I don't remember that detail.  I mean, of course, it

9    must have had leaves, but I don't remember if it was -- they

10   had all bloomed the way you can see them there.

11   Q.  Are you saying -- is it possible that the day of the

12   surveillance, this tree was barren?

13           THE COURT:  Counsel, next question.  It's

14   irrelevant.  Next question.

15           MR. MICHELEN:  Your Honor, it goes directly --

16           THE COURT:  Counsel, we are wasting time.  I am

17   going to start cutting you off because this is way over what

18   really needs to be --

19           MR. MICHELEN:  If the courtroom deputy -- if we

20   can have this marked and printed as Defense Exhibit C1,

21   please.

22           THE COURT:  Yes.  Go ahead.

23           DEPUTY CLERK:  Okay.  Got it.

24   BY MR. MICHELEN:

25   Q.  Now, Agent, you were driving your vehicle that day,

1    right?

2    A.  Yes.  Correct.

3    Q.  And at some point, you saw a black Toyota Corolla

4    approach the alley next to Mr. Bodon's father's house?

5    A.  Not in an alley, but a car that was coming in this

6    direction, and parked on this side of the street

7    (Indicating).

8    Q.  The car was driving toward you?

9    A.  That is correct.

10    Q.  And the car parked parallel to the alley next to

11    Mr. Bodon's father's house?

12    A.  Approximately.

13    Q.  And you mentioned then you saw two individuals get out

14    of that vehicle, right?

15    A.  Yes.  Correct.

16    Q.  And at that point, you lost visibility?

17    A.  The thing is that the car parked here --

18    Q.  I'm sorry, can you mark -- can you, maybe, change the

19    color and mark?

20    A.  How do you change it?

21    Q.  Or just mark an X.  Why don't you mark an X, Agent.

22    A.  It's, like, closer to this side here (Drawing).

23    Q.  So an arrow -- would you agree, it's an arrow that's on

24    the street?

25    A.  No, no, but that's just pointing to where he parked.  He

1   parked right next to the sidewalk.

2   Q.  Okay.  And you mentioned you lost visibility at some

3   point?

4   A.  Yes, because there was -- a white vehicle prevented my

5   looking straight ahead because they had already moved from

6   where they were parked in front of the residence, and they

7   had walked toward the vehicle that had just arrived.

8   Q.  Okay.  So because of the white -- this is the white

9   Mitsubishi Mirage?

10  A.  Yes, it was like a Mitsubishi.  Yes, it was like a

11  Mitsubishi.

12  Q.  So because of that car and the tree, you lost

13  visibility; is that fair?

14  A.  No, not the tree as such, but the vehicle that was

15  between here.

16  Q.  So because you lost visibility, you decided to drive

17  toward the house?

18  A.  No, not toward the residence as such.  I was going to

19  look for another place to place myself in order to have

20  better visibility.

21  Q.  Okay.  So at that point you put the binoculars down?

22  A.  Yes, I put them down.

23  Q.  And you begin to drive?

24  A.  That's right.

25  Q.  And at this point, all you had seen was two people get

1     out of a car and approach two other people?

2     A.  No, I saw Juan Carlos Bodon and the other two persons

3     who were with him approach the persons who were in the

4     vehicle.

5     Q.  Okay.  So at this point, all you have seen when you

6     start driving is Juan Carlos Bodon and the other gentleman

7     that was with him approach two people that have gotten out

8     of a vehicle?

9     A.  No, I saw that before I moved.

10    Q.  Right.  Okay.  So you start moving, and when you start

11    moving, all you have seen was Juan Carlos Bodon and the

12    other gentleman approach two other gentlemen that had just

13    exited a vehicle?

14    A.  Yes, that's right.

15    Q.  At that point -- standing on a street, for example,

16    that's not a crime?

17         THE INTERPRETER:  Could you repeat the question.

18    BY MR. MICHELEN:

19    Q.  Standing on the street --

20         MS. FERNANDEZ:  Objection, Your Honor.

21    BY MR. MICHELEN:

22    Q.  -- two people standing on the street is not a crime?

23         MS. FERNANDEZ:  Objection, Your Honor.  What's the

24    point of the question?  It seems to be argument.

25         THE COURT:  Sustained.

1    BY MR. MICHELEN:

2    Q.  At that point, had you seen any crime being committed?

3    A.  No, not up to that point.

4    Q.  Is there anything, based on your training and

5    experience, that is suspicious about someone standing on the

6    street near their house?

7    A.  Well, at that moment, that was not suspicious to me, but

8    yes, I went there because of information that I was given.

9    When I went to verify that information, I continued

10   conducting surveillance in that place.

11   Q.  Is there anything suspicious about someone working on a

12   car?

13            MS. FERNANDEZ:  Objection, Your Honor; it's

14   argument, and the witness has already asked and answered

15   what he is trying to get.

16            THE COURT:  You may answer.

17   BY THE WITNESS:

18   A.  No.

19   BY MR. MICHELEN:

20   Q.  At this point -- by "this point", I mean the moment you

21   start driving -- you haven't seen anything that looks like

22   the sale of any drug, right?

23   A.  At the moment that I began, no.

24   Q.  And when you start driving, you tell your partner,

25   Mr. Perez, that you are going to approach and get closer to

```
 1    the residence to get better visibility?
 2           THE INTERPRETER:  Excuse me, could you repeat it?
 3    I didn't get the verb you said.
 4    BY MR. MICHELEN:
 5    Q.  When you start driving, you tell your partner, Agent
 6    Perez, that you are getting closer to the residence to get
 7    better visibility?
 8    A.  Yes, that I wanted to move from the place to another
 9    place.  I wanted to move from there to another place where I
10    would have better visibility.
11    Q.  And Agent, my question is, did Agent Perez know what you
12    were doing?
13    A.  Correct.
14    Q.  And then you approach and you get closer to the house,
15    right?
16    A.  Yes, that's right.
17    Q.  And the plan was to find another place to park to
18    surveil from?
19    A.  That is correct, to corroborate the information, to see
20    if it was true that a crime was being committed in that
21    place.
22    Q.  And where were you going to park?
23    A.  That place was going to be determined by the way in
24    which I was moving and where I could find a place where I
25    could park where I would not be detected.
```

1    Q.  And I don't want to misrepresent what you are saying.

2    Are you saying you were looking for the next closest spot

3    you could find?

4    A.  Not the closest place, but the most convenient, most

5    strategic place that I could park.

6    Q.  And from the place where you were parked to right before

7    you got to Mr. Bodon's father's house, you didn't see any

8    spots where you could strategically park to continue the

9    surveillance?

10   A.  Well, not on that street as such.  The most convenient

11   place that I located when I got there at the beginning was

12   the place where I parked because I had visibility to where

13   they were.

14   Q.  Okay.  So you say that at one point you are about

15   15 meters from Mr. Bodon's house, and perpendicular to it,

16   right?

17   A.  No, not Bodon's house.  I was ten, 15 meters away from

18   where they were standing.

19   Q.  Which is next to the back of the Toyota?

20   A.  Yes, the back of the Toyota, on the driver's side.

21   Q.  Which is parked on the sidewalk next to Mr. Bodon's

22   house?

23   A.  Not next to Bodon's house; a little farther down.

24   Q.  Farther down as closer to you or farther away from you?

25   A.  Closer to me.

1   Q.  And the four individuals were meeting by the driver's

2   side door?

3   A.  There were two -- where the back -- rear guard is, there

4   were two there --

5   Q.  Who were those --

6   A.  -- and two behind the vehicle.

7   Q.  I'm sorry.

8   A.  Okay.  There was Juan Carlos Bodon and the young man who

9   got out from the driver's side next to the rear guard of the

10  vehicle on the driver's side, and there were two other

11  persons there next to them who was the young man who was

12  with him there, who turned out to be named Milford

13  Martinez-Martinez, and the other individual who got out of

14  the vehicle from the passenger side.  He was much closer to

15  the car, and Milford was, like, next to him.

16  Q.  So the passenger that got out of the vehicle was by the

17  back of that vehicle?

18  A.  You see, but the thing is that the four of them were

19  practically together.  I am just trying to locate or

20  describe the positions that each one had.

21  Q.  Okay.  So is it fair to say all four gentlemen were by

22  the back of the black Toyota?

23  A.  Yes, the back, but more towards the side of the car --

24  Q.  Can you use another word?  Can you use another word so

25  our interpreter -- an easier word for the interpreter that's

1    not "guardalodo"?

2    A.  I could describe it as the back part on the driver's

3    side, the back -- which would be the left side, but toward

4    the back of the vehicle.  The left side of the vehicle, but

5    towards the back.

6    Q.  But they were not behind the car?

7    A.  I repeat --

8    Q.  Here is what we are going to do, Agent.  Agent, I am

9    going to show you --

10   A.  Yes, they were next to the rear guard.

11   Q.  I am going to show you what's been marked as Defense

12   Exhibit F.

13          Agent, without -- and for the record, this

14   question has nothing to do with what white -- can we erase

15   that?  Sorry, Defense Exhibit E.

16          Agent, do you know how to erase that from the

17   screen?

18          Okay.  Agent, for purposes only of identifying

19   what you would describe as the "guardalodo" or the rear

20   guard, for the record, and saying nothing else about this

21   car -- don't worry -- can you please mark what you refer to

22   as the "guardalodo."

23   A.  (Witness complies.)

24   Q.  So you drew a circle around it.

25          MR. MICHELEN:  Deputy Clerk, if we can mark this

```
 1    as Defense Exhibit E1, just for purposes of identifying what

 2    part of a car they were meeting at, not this car.

 3              MS. FERNANDEZ:  Objection, Your Honor; if it's for

 4    purposes of understanding what the witness testified, I

 5    don't think we need the exhibit.  I think the witness'

 6    testimony is enough.

 7              THE COURT:  We do not, correct.

 8              MR. MICHELEN:  My concern is that I don't know if

 9    we found the correct word to translate for the record.

10              THE COURT:  That's all right.  I understand what

11    it is.

12    BY MR. MICHELEN:

13    Q.  Okay.  So you are identifying, for the record -- correct

14    me if I am wrong -- the rear left brake light of the car

15    area; the left side, right?

16    A.  Yes.

17    Q.  Okay.  So all four gentlemen -- I will put -- if you can

18    clear that screen, please.  I will go back to -- we will

19    just put Defense Exhibit C up again.

20              Agent, they meet at the -- all four gentlemen are

21    toward the back left of the vehicle, correct?

22    A.  Yes.  Yes.

23    Q.  And would it be fair to say all four gentlemen are

24    standing on the street?

25    A.  Yes.
```

1    Q.  And at that point, you drive by?

2    A.  I was driving, yes.

3    Q.  And from looking at the street, it seems like -- you

4    would have been how far away from the gentlemen when you

5    drive by; the closest point?

6    A.  Well, I said before that at the moment that I saw them,

7    when he pulls the bag that he has and he takes something out

8    with his right hand, I am moving, but I am about ten or

9    15 meters away, but I am still moving.

10   Q.  Okay.  So when you start driving, this is now around

11   4:50 p.m.; fair to say?

12   A.  We could say so, yeah.

13   Q.  Do you have a better estimate of what time it was when

14   you started driving?

15   A.  Yeah, we could say 4:50.  Yes.

16   Q.  Okay.  And Pete El Conde Street, that's a main street,

17   you would say?

18   A.  Of that place, yes, it is the main street.

19   Q.  And it's a heavily trafficked street?

20   A.  Yes, vehicles pass by there.  Yeah.

21   Q.  Would you say -- just for example, in comparison to

22   Exhibit C, were there more cars that day or less cars than

23   what you see in Exhibit C?

24              THE COURT:  Wait a minute.  Exhibit C, we don't

25   see any cars going by.  There are only three cars there

1   because it's a photo.

2              MR. MICHELEN:  Right.

3   BY MR. MICHELEN:

4   Q.  I am just saying -- do you know how many cars there were

5   that day on the street?

6              THE COURT:  That's irrelevant.  Next question.

7   BY MR. MICHELEN:

8   Q.  When you were driving, was there a car in front of you?

9   A.  Yes, there was a car in front of me, but he was a little

10  bit far away from me.

11  Q.  Okay.  Was there a car behind you, waiting for you to

12  move?

13  A.  Behind me, I didn't notice if there was a vehicle.

14             THE COURT:  I didn't notice if there was a vehicle

15  or not.

16             THE INTERPRETER:  I thought I said it.  I'm sorry,

17  Your Honor.

18             THE COURT:  That's all right.

19  BY MR. MICHELEN:

20  Q.  At what speed would you say --

21             THE COURT:  Irrelevant, Counsel.  It's irrelevant.

22  Move on.

23             MR. MICHELEN:  Your Honor, it goes to his ability

24  to see.

25             THE COURT:  Move on.  Move on.

1    BY MR. MICHELEN:

2    Q.  Which way was Mr. Bodon facing -- let me ask you this:

3    When you saw Mr. Bodon allegedly reach into his bag, had you

4    already passed the house or were you still approaching the

5    house, or were you right next to the house?

6    A.  I was moving.  Before I passed by them -- right in front

7    of them, he's already moving his -- the bag with his right

8    hand.  I continued driving slowly, and then practically when

9    I am right there where they are, that's when he takes a

10   little bag and hands it to someone else; to the driver of

11   the Toyota who had arrived there.

12   Q.  So at the very moment that your car is next to the four

13   gentlemen, directly parallel to them, that's when the drug

14   transaction happens?

15   A.  It was a little bit before then.  The thing is that I

16   just kept on going.  It's like saying my vehicle is here, he

17   is there, and the other gentleman is right there

18   (Indicating).

19          THE COURT:  Pointing to the courtroom deputy,

20   where he is sitting.

21   BY THE WITNESS:

22   A.  Once I observed that, what I did was just continue

23   driving.

24   BY MR. MICHELEN:

25   Q.  You are saying that was the distance; between where you

1    are and where the courtroom deputy is?

2    A.   Practically, yes.   Practically, yes, at the moment that

3    he gave that to the other person.

4            MR. MICHELEN:   Okay.   And would the Court take

5    notice that that's approximately 20 feet?   Unless the Court

6    has a better estimate of the distance.

7            THE COURT:   I think it's about ten.

8    BY MR. MICHELEN:

9    Q.   Okay.   So I just want to be clear, Agent.   The moment

10   when the hand-to-hand transaction happens, are you still

11   approaching the house, right next to the house, or past the

12   house?

13           MS. FERNANDEZ:   Objection; asked and answered.

14           THE COURT:   Approaching the house.   He is not yet

15   parallel to the house nor has he passed the house yet.

16   Approaching the house.

17   BY MR. MICHELEN:

18   Q.   So at the point where you are right next to the house,

19   what is happening?   Better yet, the moment when you are

20   right next to the four gentlemen.

21   A.   In front of the four gentlemen?

22   Q.   Yes, the moment when you are right next to the four

23   gentlemen.

24   A.   Well, the delivery of the small plastic, transparent bag

25   had already been made with -- allegedly with some marijuana

1    shavings in it.  And what I did was continue driving toward

2    the La Lula development.

3    Q.  So when the drug transaction happened, it is to your

4    front and left, right?

5    A.  Like I said before, where the gentleman is, yes, to my

6    left.

7    Q.  And you don't have to turn your head fully to the left

8    to see the transaction happen, correct?

9    A.  No, no.

10   Q.  You saw the transaction happen through the front

11   windshield or the door window -- or the driver door window?

12   A.  Between both things, because I kept on driving.  But

13   once I see that, you know, I sort of turned to the left, but

14   I can see what's going on, but I keep on driving straight.

15   I saw him through the front windshield.

16   Q.  But the actual hand to hand you saw through the front

17   windshield?

18   A.  Yes.  This was fast, you know.  I continued driving.  I

19   looked and I -- because once I focused on the delivery, you

20   know, I looked to the left like that, but then I continued

21   driving, and through the side window.  Remember, I am not

22   stopped there; I am in movement.

23   Q.  And the transaction takes place in a matter of, what,

24   one or two seconds?

25   A.  Yes.  It was fast.

1    Q.  And how fast are you going?

2    A.  I was driving slowly.  I mean, I can't tell you how fast

3    I was driving.  Maybe ten miles.  I was slow.

4    Q.  You say ten miles per hour?

5    A.  I wasn't looking at the mileage, but more or less.  I

6    was driving slowly.  At that moment I wasn't looking at the

7    mileage because I am focused on the gentlemen.

8    Q.  Okay.  Now, going back to -- I know you mentioned that

9    the four gentlemen were standing toward the back left of the

10   black Toyota.

11            Now my question is, starting, for example, with

12   Mr. Bodon, which way was his chest facing?

13   A.  Well, if we are going to put it that way, he is in a

14   position like where the gentleman is here, sort of, like,

15   sideways.  The other gentleman who arrived --

16   Q.  Let's stay on Mr. Bodon for a second.  His chest is

17   facing which direction?

18   A.  Practically -- a little bit more turned than you are.

19   Q.  Okay.  Agent, we need to make it clear for the record.

20            Based on the street, is his chest facing south,

21   facing north, facing west, facing east?

22            MS. FERNANDEZ:  Your Honor, we are going to object

23   to this line of questioning.  The witness has said he saw

24   the chest of Juan Carlos Bodon.  Is it really relevant where

25   it was facing; south, north, west, east?

```
 1                   THE COURT:  It is --

 2                   MR. MICHELEN:  It's the whole case.

 3                   THE COURT:  That's not the whole case.

 4          BY MR. MICHELEN:

 5          Q.  Go ahead, Agent.

 6                   THE COURT:  Next question.

 7                   MR. MICHELEN:  Are you sustaining the objection?

 8                   THE COURT:  I did sustain it.  He already

 9          stated -- he's already stated where he was looking toward.

10          Next question.

11          BY MR. MICHELEN:

12          Q.  The bag --

13                   THE COURT:  Irrelevant.  Move on.

14                   MR. MICHELEN:  Where the bag was is irrelevant?

15                   THE COURT:  His back?

16                   MR. MICHELEN:  The bag.

17                   THE COURT:  I understood "back."

18          BY MR. MICHELEN:

19          Q.  The bag that you said he was wearing, where was it?

20          A.  He took the little bag from the big bag he had.

21          Q.  That's what I mean, the big bag.  Where was it?

22          A.  Yes, the black bag he had.  Yes.

23          Q.  Where was that bag?

24          A.  It's right in his chest area.

25          Q.  Across his chest?
```

1    A.  Yes, it's in his chest area.

2    Q.  And the driver of the black Toyota that you said the

3    hand-to-hand transaction happened with, was his back facing

4    you, his chest facing you?  How was he positioned?

5    A.  Yes, like I said before, he was very close to the mud

6    guard of the car, his back facing me.  His back was facing

7    me while I was driving, but very close to the car.

8    Q.  So, for example, his left hand could have touched the

9    car?

10   A.  I didn't notice the left hand, but --

11   Q.  What I am getting at is, you are saying he was so close.

12   He could have touched the car; is that how close he was?

13   A.  Yes.

14   Q.  And you couldn't see that person's chest?

15   A.  Not in the position that he was in.

16   Q.  And he was standing directly in front of Juan Carlos

17   Bodon?

18   A.  Practically.

19   Q.  And that person was how tall, more or less?

20   A.  He must be about five-nine.

21           THE COURT:  Agent, if you don't know, don't guess.

22   BY THE WITNESS:

23   A.  He was somewhat tall, but I don't really know exactly

24   how tall he was.

25   BY MR. MICHELEN:

1    Q.  Would you say he was as tall as Mr. Bodon?

2    A.  No, a little bit shorter than him.

3    Q.  Was he heavyset, thin, medium?

4    A.  No, he was thin.  He was thin.

5    Q.  And so we have established that the driver of the black

6    Toyota and Mr. Bodon are facing each other, correct?

7    A.  Sideways, yeah.  Sideways but, yeah, facing each other.

8    Q.  What do you mean by "sideways"?

9    A.  Well, face to face to each other, but sideways as to me.

10         THE COURT:  Agent, if the courtroom deputy is

11   Mr. Bodon, where would be the driver of the black Toyota?

12   Where would he be standing next to the clerk at the time of

13   the transaction?

14         THE WITNESS:  He would be standing right here

15   (Indicating).  Right here.  And the gentleman sitting there

16   would be slightly turned over this way.

17         THE COURT:  To his right?

18         THE WITNESS:  Yes, to his right.

19   BY MR. MICHELEN:

20   Q.  Agent, the driver of the Toyota and Mr. Bodon were face

21   to face, yes or no?

22   A.  No, the thing is that they are not, like, face to face

23   like this exactly.  Yes, they can see each other, but they

24   are not like this (Demonstrating).  This gentleman, Bodon,

25   this is the other gentleman.  Bodon is, like, standing in

1    this direction, and the gentleman is like this

2    (Demonstrating).

3    Q.  Okay.  I think I understand now.

4         So are you saying Mr. Bodon is in an open stance,

5    facing the street or facing -- closer facing the street or

6    closer facing to his house?

7    A.  The thing is that that detail like that, I mean -- well,

8    if you want it like that, I would say he is standing in,

9    like, a southeasterly direction.  He is looking more toward

10   the street than to the house.

11   Q.  Okay.

12   A.  The house is practically --

13        THE COURT:  His back is facing the house.

14   BY THE WITNESS:

15   A.  His back is practically facing the house, yes.

16   BY MR. MICHELEN:

17   Q.  Now, the other gentleman, the one that was the driver of

18   the Toyota --

19   A.  Like I said before, the driver of the Toyota is very

20   close to the car, near the mud guard area, and you could see

21   his back and his right side.

22   Q.  So would it be fair to say he was facing north?

23        MS. FERNANDEZ:  Objection, Your Honor.

24        THE COURT:  Sustained.

25        MS. FERNANDEZ:  This is irrelevant.

1    BY MR. MICHELEN:

2    Q.  Was his stance also facing the street -- more of the

3    street --

4              THE COURT:  Sustained.  We already have -- the

5    Court already has a very clear idea where they were

6    standing.

7    BY MR. MICHELEN:

8    Q.  And the other two gentlemen, where were they?

9    A.  The passenger was behind the vehicle, next to the

10   driver, and Milford, the one who turned out to be Milford,

11   is standing -- he was standing a little farther away from

12   the car, but next to Bodon.  And I will explain this better.

13             THE COURT:  That's all right.  Understood.

14   BY MR. MICHELEN:

15   Q.  So the passenger of the Toyota is to the right of the

16   driver of the Toyota?

17   A.  If I am going up -- no, he is to the left.  The driver

18   is first, and the driver is to the left.

19   Q.  But I thought --

20   A.  In the direction that I was driving.

21   Q.  I thought you said the driver, who was the buyer, was

22   extremely close to the car.

23             THE INTERPRETER:  What's the question again?

24   BY MR. MICHELEN:

25   Q.  Earlier you said the driver, who was also the buyer, was

1    so close to the car -- he was extremely close to the car --

2    that he could touch the car.

3    A.  Yes, he was right next to the vehicle that he arrived

4    in, the Toyota, but in the back part.

5    Q.  But now you are saying the passenger was between the

6    driver and the car?

7    A.  The passenger is in the back of the car.  What he does

8    is -- when he got out from the vehicle, he walked, and he

9    walks, like, around the back of the car, and he approaches

10   the driver, who was on the side that I indicated to you

11   before.  The only thing is that the driver was more on the

12   street, and the passenger was, like, closer to the sidewalk.

13   Q.  Agent, what I am trying to understand is -- the car is

14   to the left of the driver, right?

15            THE COURT:  No, that's not his testimony.  The car

16   is to the right of the driver.

17   BY MR. MICHELEN:

18   Q.  From your point of view, if you are driving

19   straightforward, Agent --

20   A.  I am in that direction, yes.

21   Q.  -- the buyer, who was also the driver of the Toyota --

22   A.  Correct.

23   Q.  -- the black Toyota is to his left or to his right?

24            THE COURT:  To his right.  That was his testimony.

25   BY THE WITNESS:

1   A.  From the vehicle -- you have to think about that

2   question, because if it's the vehicle -- the vehicle is to

3   the left of the driver, however, if it's the driver, the

4   driver is to the right of the vehicle.

5   BY MR. MICHELEN:

6   Q.  But I was specific in my question.  My question was --

7              MS. FERNANDEZ:  Your Honor --

8              THE COURT:  Sustained.  You are arguing with the

9   witness.  Next question, Counsel.

10             MR. MICHELEN:  Your Honor, we need to clear this

11  up.

12             THE COURT:  I have it very clear.  I am going to

13  be the one to decide, and I have it very clear.  You are

14  wasting time; that's what you are doing.  And I am going to

15  cut you off.  I am not going to be here -- I have a

16  suppression at 2:00 o'clock, so you better move along if you

17  want to get your evidence in.

18  BY MR. MICHELEN:

19  Q.  You mentioned the car is to the left of the driver.

20  Now, where is the passenger?

21             THE COURT:  Next question.  We have all been

22  through that already.

23             MR. MICHELEN:  He answered it, Your Honor.

24             THE COURT:  We have been through that.  I know

25  he's already answered that question to you.

```
 1                MR. MICHELEN:  I don't think so.

 2                THE COURT:  You don't think so.  I think so.  Move

 3      on.

 4                MR. MICHELEN:  Okay.

 5                THE COURT:  Next question.  That is, if you have

 6      any other questions.

 7                MR. MICHELEN:  I have many more.  We still need

 8      the pictures from the cell phone.

 9                THE COURT:  I am going to cut you off soon.  You

10      have been at it now for many hours.

11      BY MR. MICHELEN:

12      Q.  Agent, you see Mr. Bodon reach in with which hand?

13                MS. FERNANDEZ:  Objection, Your Honor; he has

14      answered that.

15      BY THE WITNESS:

16      A.  Left.

17      BY MR. MICHELEN:

18      Q.  And you said he pulls out what you saw was a violet

19      plastic baggie?

20      A.  A little bag.  A little violet bag about this size

21      (Indicating), of a violet tone.

22      Q.  And this is a -- you made an indication with your

23      finger.  Is that about an inch by one inch?

24      A.  It could be, or maybe a little more.

25      Q.  Have you ever seen a smaller bag than that?
```

1    A.   Yes.

2    Q.   Okay.  And you are saying he pulls out this baggie.  Is

3    it a fist that comes out of the bag?  Is it two fingers

4    holding the bag like this (Demonstrating)?

5         How does he pull the baggie out of the bag?

6    A.   He grabbed the bag from the front.  He stuck his left

7    hand in the bag.  He took out the little bag, and he gave it

8    to the gentleman who was next to him.

9    Q.   So for the record, with what you did with your hand, he

10   held the bag with a few fingers?  It wasn't hidden in his

11   fist?

12   A.   This way.  This way (Demonstrating).

13   Q.   Okay.  So you are using three fingers, for the record?

14   A.   Practically, yes.

15   Q.   You are also indicating that he put the baggie up in the

16   air and brought it back down?

17   A.   No.  No.  The thing is that I just raised it a little

18   bit more, but it was more or less the level of the chest

19   area.  I raised it like that so the prosecutor could see it

20   and everybody else.  But it was more or less at the level of

21   your chest and everything.

22   Q.   So it didn't seem like -- according to your testimony,

23   it didn't seem like he was trying to hide anything he was

24   doing?

25   A.   Well, at that moment I didn't see that he was hiding

1      anything.  At that moment what I noticed, based on my

2      experience as a drug agent, that a delivery had just taken

3      place of, supposedly, some marijuana shavings.

4      Q.  Because even though it was a violet colored baggie, you

5      could see through it?

6      A.  Yes, that's right.  You can see it.

7      Q.  And where did the buyer put the baggie?

8      A.  No, I only saw when he grabbed it with his right hand.

9      And since I had to keep on driving, I was practically

10     passing right by where they were.  I didn't notice if he put

11     it away in his pocket or -- I just observed when he received

12     it.

13     Q.  Okay.  And you didn't see any money, for example, being

14     exchanged?

15     A.  No, not at that moment.  I didn't see any money.

16     Q.  At any moment did you see money exchanged?

17     A.  Oh, no, no, no.

18     Q.  At that point what is Agent Perez doing?

19     A.  Well, I don't know because he too was looking for a

20     place to park.  And I am not looking at him; I am looking at

21     the persons.

22     Q.  Okay.  And at that point you didn't arrest the buyers?

23     A.  No, not at that moment.

24     Q.  You didn't stop to look at the tag, the license plate of

25     the car they were driving, the buyers?

1    A.  No.  I couldn't stop because I couldn't take the risk of

2    their realizing that I was a police officer.

3    Q.  What would have made them realize you were a police

4    officer?

5            THE COURT:  That's irrelevant.

6    BY MR. MICHELEN:

7    Q.  Okay.  So you didn't end up parking anywhere nearby and

8    continue watching?

9    A.  No, no.

10   Q.  You didn't continue any surveillance?

11   A.  No.  No, we didn't continue with the surveillance.  We

12   just made arrangements to pass by and arrest the people.

13   Q.  And you decided to just go to La Lula?  You went to

14   La Lula at that point?

15   A.  Yes, at La Lula.  It's a place where -- it's practically

16   located near that place.

17   Q.  And you decided right at that moment that you were going

18   to La Lula?

19   A.  At that moment we continued driving, and we parked there

20   because it was the closest place.

21   Q.  Why did you change your mind from continuing the

22   surveillance to now you are going to leave the area

23   altogether and plan an arrest?

24           THE COURT:  Irrelevant.  Next question.

25   BY MR. MICHELEN:

1     Q.  And you didn't radio any other officers to go and arrest

2     the buyers?

3     A.  Yes, efforts were made in that respect.  Yes.

4     Q.  To arrest the buyers?

5     A.  We were going to arrest all the persons who were there

6     at the time that we got there.  The thing is that in the

7     planning, it took several minutes, and when we returned to

8     do the arrest, the ones in relation to the vehicle, they

9     weren't there anymore, the ones of the black vehicle.

10    Because, believe me -- because if they had been there, they

11    would have been arrested.

12    Q.  Okay.  And you mentioned the baggie was purple, correct?

13              THE COURT:  No.

14    BY MR. MICHELEN:

15    Q.  It was a purple tone -- a violet tone --

16              THE COURT:  No, violet.

17    BY MR. MICHELEN:

18    Q.  -- right?  Violet?

19    A.  Yes, of a violet tone.  Yes.

20    Q.  Officer, I am going to show you one of the pictures from

21    your phone.  We will call it Defense ID F.  Do you recognize

22    this, Officer?  Do you recognize this?

23              If we can clear the green.

24              Officer, do you recognize this picture?

25    A.  Yes, correct.

1    Q.  What is this?

2    A.  That's the evidence that was seized from Juan Carlos

3    Bodon inside the black bag that he had on his chest.

4    Q.  And does this evidence fairly and accurately depict the

5    way the evidence that you collected looked on that day?

6    A.  I didn't seize it.

7    Q.  The evidence that was recovered by --

8    A.  The evidence was recovered by Agent Wilfredo Perez.  He

9    is the one who did the field test on the evidence.

10   Q.  And --

11   A.  However, I was present, and this is the evidence.  This

12   is the substance that was seized from Mr. Bodon.

13   Q.  And this picture was taken by you?

14   A.  That's right.

15   Q.  On the date of the arrest?

16   A.  That's right.

17   Q.  At the police station?

18   A.  That's right.

19           MR. MICHELEN:  Your Honor, at this time we would

20   move Defense Exhibit F into evidence -- Defense ID F into

21   evidence.

22           THE COURT:  It shall be marked.

23   BY MR. MICHELEN:

24   Q.  Agent, now I am going to put back on the screen Defense

25   Exhibit F that's already been marked into evidence.

1          When you say you saw a hand-to-hand transaction of

2     violet Ziploc baggies, these are the ones you said you saw;

3     one of these?  The baggie looked like one of these?

4     A.  Yes.

5     Q.  And what you are saying is, through your car that is

6     tinted -- correct --

7     A.  Tinted, yes.  I did say they were tinted, but not black.

8     Q.  I didn't say black either.

9     A.  They were slightly tinted but not, you know, like,

10    really dark.

11    Q.  I didn't say they were really dark.  But they had tints,

12    correct?

13    A.  Yes, a little bit of tint.

14    Q.  And you were able to see, about 15 feet away, a baggie

15    that looked like one of these, correct?

16    A.  That's right.

17    Q.  Now, Agent, how many pictures did you take that day?

18    A.  I think about five.  I think about five, yeah.

19          MR. MICHELEN:  Your Honor, I would just -- I

20    thought it was about five too, but we have only received

21    four.  Is there an extra picture we haven't received,

22    perhaps?  I don't know if the deputy clerk can check.

23    BY MR. MICHELEN:

24    Q.  Did you send all five pictures to the clerk, Agent?

25    A.  Yes, I marked the five photos.

 1                  MR. MICHELEN:  Your Honor, I believe we only have

 2        four.

 3                  THE COURT:  We got four.

 4        BY MR. MICHELEN:

 5        Q.  Agent, can you double check if it was four or five

 6        pictures that you took, please.

 7        A.  I have five photographs that I took that day.  I can

 8        show you.

 9                  THE COURT:  That's all right.

10                  THE WITNESS:  I have this one --

11                  MR. MICHELEN:  Your Honor, can we check which

12        picture it is we are missing?

13                  THE COURT:  I think we are missing the short one.

14        Right?

15                  MR. MICHELEN:  Which one is that?

16                  THE COURT:  Were there individuals there on the

17        street?

18                  THE WITNESS:  That one?

19                  THE COURT:  No, the last one you have of that

20        group.

21                  THE WITNESS:  This one.

22                  THE COURT:  Let me see.  No.  Let me see it.

23                  THE WITNESS:  That's the place -- that's the area

24        that we walked through when we were going to do the arrests.

25                  No, no.  That's not an intervention from there.

1    That's something that took place at a public housing

2    project.

3              MR. MICHELEN:  Okay.

4    BY MR. MICHELEN:

5    Q.  So Agent, to be clear, were there four or five pictures

6    that you took?

7    A.  I have five photos in my cell phone.  I touched the five

8    of them awhile ago to send them.

9              THE COURT:  Let me see it.

10             THE WITNESS:  One, two, three, four --

11             THE COURT:  I think I know the one missing.  I

12   know which is the one we are missing.

13             That's the one we are missing.

14             THE WITNESS:  That's the area we walked through to

15   do the arrests.

16             THE COURT:  Let me see.

17             THE WITNESS:  Should I send it?

18             THE COURT:  Yes, that's the one we are missing.

19             All right.  Let's move on.  We will get it soon.

20   BY MR. MICHELEN:

21   Q.  Agent, I am going to show you what I will mark as

22   Defense ID G.  Do you recognize this picture?

23   A.  Yes.

24   Q.  What is it?

25   A.  That's part of the residence of Juan Carlos Bodon's

 1    father.  That's the place where the intervention as such

 2    took place.  Some of my coworkers are there.  There is a

 3    pickup type -- a Ford pickup type vehicle, grayish color.

 4    And you can see part of the jeep -- of the red Suzuki.

 5    Q.  And you took this picture?

 6    A.  That is correct.

 7    Q.  Minutes after the arrest?

 8    A.  Yes, after the arrest.

 9    Q.  And does it fairly and accurately depict what minutes

10    after the arrest looked like of that house?

11    A.  Yes, that's right.

12              MR. MICHELEN:  Your Honor, at this time we would

13    move Defense Identification G into evidence.

14              MS. FERNANDEZ:  Your Honor, we would ask -- we

15    would object as to the relevance of this picture.

16              THE COURT:  Sustained.  Irrelevant.

17    BY MR. MICHELEN:

18    Q.  You mentioned these people are -- the people that are

19    sitting around the -- standing around the pickup truck are

20    other police officers?

21    A.  Yes, that's right.

22    Q.  And they participated in the arrest?

23    A.  Yes, that's right.

24    Q.  And at any point after the arrest, was the red jeep

25    that's there -- did it move, or was that the way it was

```
 1      during the arrest?

 2      A.  After the arrest, no, I didn't see any movement of any

 3      jeep there.

 4      Q.  And same for the pickup truck?  That's the way -- you

 5      never saw it moved?

 6      A.  No.

 7              MR. MICHELEN:  Your Honor, I believe -- I would

 8      move again -- move the picture into evidence.  It is

 9      relevant because it depicts the positioning of all the

10      vehicles right next to the place of arrest.

11              THE COURT:  Sustained.

12              MR. MICHELEN:  That's denied, Your Honor?

13              THE COURT:  Sustain the objection.

14      BY MR. MICHELEN:

15      Q.  So Agent, I am going to show you again what was marked

16      as Defense Exhibit E last Thursday.  Now that you can see

17      this picture and that you were reminded of the pictures you

18      took, specifically Defense Identification G, that pickup

19      truck, the black pickup truck with the white railing or

20      white doors in the trunk of it, you would agree that's the

21      same pickup truck?

22              MS. FERNANDEZ:  Objection, Your Honor.  What is

23      the -- we object.  This is not relevant.

24              THE COURT:  Sustained.  It's there.

25      BY MR. MICHELEN:
```

1   Q.  Okay.  Agent, last week we spoke about this picture, and

2   I asked you if you knew if the white car depicted in the

3   picture was the vehicle you and your partner were in.

4          MS. FERNANDEZ:  Objection, Your Honor; it was

5   asked and answered.

6          MR. MICHELEN:  I haven't asked the question yet.

7          MS. FERNANDEZ:  He asked questions about the same

8   picture and the same vehicle during the last hearing, Your

9   Honor, and the witness responded.  This is asked and

10  answered, material already covered by cross.

11         THE COURT:  He is just fighting against himself

12  because I am going to cut him off fairly soon.

13         MR. MICHELEN:  I haven't asked the question.

14         THE COURT:  Ask the question.

15  BY MR. MICHELEN:

16  Q.  Now that you have had the weekend to look over pictures

17  and perhaps refresh your recollection, do you now know

18  whether or not that white vehicle was the vehicle you were

19  driving on the day of the arrest?

20         THE COURT:  Asked and answered.

21         MR. MICHELEN:  Your Honor, he hasn't answered it

22  now, which is the question; now that he has had time to

23  reflect.

24         MS. FERNANDEZ:  Your Honor, we continue --

25         THE COURT:  Reflect what?  None of the pictures

1     that he took from his phone -- cell phone contained that

2     same photo --

3               MR. MICHELEN:  Right.  But, Your Honor, the whole

4     point of why he took the pictures, according to him last

5     week, was because it helped him remember the way places

6     looked during interventions and arrests --

7               THE COURT:  After the arrest.

8               MR. MICHELEN:  So --

9               THE COURT:  Those are the ones.

10              MR. MICHELEN:  So what I am thinking is if now

11    that he saw the pictures, maybe he remembered something over

12    the weekend that he didn't remember last week.

13              So my question remains, now that you have had the

14    weekend to think -- he can answer the question however he

15    wants -- do you have any better or different answer as to

16    whether or not that white car was the car you were in?

17              MS. FERNANDEZ:  Your Honor, we continue our

18    objection.  Not only that; this is a picture that defense

19    counsel has not provided a good faith basis to be asking

20    this question.  There is no license plate on this vehicle.

21    The witness has already answered that he does not -- that

22    it's similar, but he doesn't know.  He doesn't know.  It's

23    been answered.

24              THE COURT:  Sustained.

25              MR. MICHELEN:  Your Honor, I would just say the

1    answer he gave last week was, it looks very similar to the

2    car --

3              THE COURT:  I know the answer he gave last week.

4              MR. MICHELEN:  And now the pictures he's provided

5    show exactly similar cars -- shows a pickup truck with the

6    same things in the trunk.

7              THE COURT:  So what?

8              MR. MICHELEN:  It adds to the idea that this

9    picture is from that day.  It adds more credibility.

10             THE COURT:  And he is on surveillance, and he is

11   on the roof of a house taking a picture of the car he is

12   driving?

13             Sustain the objection.  Next question.

14   BY MR. MICHELEN:

15   Q.  When you came back from La Lula -- Agent, when you came

16   back from La Lula, the black Toyota was gone?

17             THE COURT:  Asked and answered.

18   BY MR. MICHELEN:

19   Q.  And where did you park?

20   A.  The black Toyota?

21   Q.  No, you.

22   A.  At La Lula?

23   Q.  When you came back.

24   A.  Way before the house.

25   Q.  And, I guess -- do we have the picture yet that you sent

1     the clerk?  I don't know if the deputy clerk has the

2     picture.

3               MR. MICHELEN:  Mr. Deputy Clerk, do we have the

4     picture yet?

5               DEPUTY CLERK:  Let me get another one.

6     BY MR. MICHELEN:

7     Q.  Please tell me, Agent, what you did when you got back to

8     Pete El Conde Road.

9     A.  When I came back from La Lula?

10              THE COURT:  Yes.

11    BY THE WITNESS:

12    A.  I parked on the right-hand side, before Bodon's father's

13    house.  The ones who were following me also parked there.

14    Fellow Agent Wilfredo Perez got out of the vehicle, went to

15    the persons in order to arrest them, while I put my vehicle

16    in drive, and I turned it off, and I locked it and walked

17    over there.

18    BY MR. MICHELEN:

19    Q.  So Agent Wilfredo Perez got out of the car before you

20    did?

21    A.  Yes, that's right.

22    Q.  From the passenger side?

23    A.  Correct.

24    Q.  And he walks down the sidewalk?

25    A.  Yes, he was walking down the sidewalk.

1    Q.  And you still have to turn the car off?

2              THE COURT:  Next question, Counsel.  You are

3    wasting time.

4    BY MR. MICHELEN:

5    Q.  You have to take your seatbelt off, right?

6              THE COURT:  You are wasting time, Counsel.

7    BY MR. MICHELEN:

8    Q.  How long does it take for you to get out of the car?

9              THE COURT:  You are wasting time, Counsel.

10             MR. MICHELEN:  Your Honor --

11   BY MR. MICHELEN:

12   Q.  Agent, when you got out of the car, how far away from

13   you was Agent Perez?

14             THE COURT:  You are wasting time, Counsel.

15   BY MR. MICHELEN:

16   Q.  Agent, when you got out of your car, can you see Juan

17   Bodon?

18   A.  From where we were?

19   Q.  Right.  Before you start walking, just when you get out

20   of the car, can you see him?

21   A.  Once I get on the sidewalk, yeah, you can see.

22   Q.  Okay.  So the moment you get on the sidewalk, what do

23   you see?

24   A.  I see my fellow officer walking, and you can see that on

25   the -- on that side of the sidewalk, Bodon was there.  Next

1    to Bodon was the other person that was also arrested, who

2    turned out to be Milford Martinez-Martinez.

3    Q.  So when you start walking toward the house, towards

4    Bodon's father's house, Mr. Bodon has not been arrested yet?

5    A.  No.

6    Q.  And what do you do next?

7    A.  I continued walking to give support to my fellow police

8    officer in case an eventuality occurred.

9    Q.  How far were you -- did you park from where Mr. Bodon's

10   house was?

11   A.  I would say, more or less, like, from here to where his

12   father is, more or less.  More or less.

13   Q.  What distance is that, Agent, more or less?

14   A.  I would say some 15, 20 meters, maybe.

15   Q.  And you start walking toward Mr. Bodon's house.  What do

16   you do next?

17   A.  I arrive to where they were at, right in front of the

18   residence.  There Agent Wilfredo Perez conducts his

19   intervention.  At one point Juan Carlos Bodon, the gentleman

20   present here, tried to climb up something to access the

21   porch, like, trying to escape.  And then the guys grabbed

22   him at that point, and not allowing him to escape, and they

23   brought him down and placed him under arrest.

24   Q.  And when that happens, are you already in front of the

25   house or are you still walking toward the house?

1    A.  No, at the moment of the arrest, I am already there.

2    Q.  And you don't get involved in Mr. Bodon's arrest?

3    A.  As far as I recall, I think I tried to grab onto him to

4    try to prevent his escaping.  But my participation was

5    minimal, because I think I just grabbed him by one of his

6    feet and tried to pull him down.

7    Q.  How many people were grabbing at him?

8    A.  I can't tell you precisely, but I know Samer Collazo was

9    there.  I, indeed, saw him because, you know, I am focused

10   also on that.  Wilfredo Perez, he was the one who placed him

11   under arrest.  And if my memory doesn't fail me, Sergeant

12   Matos tried to go through the side so he wouldn't be able to

13   reach the top.

14   Q.  Agent Collazo, where did he grab --

15          THE COURT:  That's irrelevant.

16   BY MR. MICHELEN:

17   Q.  This balcony that you said he was trying to climb over

18   leads into the house?

19   A.  He was on this side over here (Indicating).  But if he

20   managed to get on the porch there, yes, he would be able to

21   go into the house.

22   Q.  You arrested Milford Martinez-Martinez?

23   A.  No, Fellow Officer Wilfredo Perez is the one who

24   arrested him.

25   Q.  So you didn't arrest anyone that day?

1    A.  You mean to put the handcuffs on any of them?

2    Q.  Right.

3    A.  I assisted in the arrest, but --

4    Q.  At some point when you were on scene, Milford

5    Martinez-Martinez says that the drugs and the bag was his?

6    A.  As far as I recall, yes, he did comment that over there.

7    Q.  And he also mentioned that the -- that he was working on

8    the red jeep that day?

9    A.  Yes.  I think he mentioned it, yes, but I had seen him

10   tinkering with the jeep.

11   Q.  Okay.  And then he ends up at the station, signing a

12   sworn statement saying the same thing, right?

13   A.  Yes, he did that.  I mean, he prepared a written

14   statement for Wilfredo Perez, but I was there.  Yes.  Yes.

15   But it's not to me that he admits that.

16   Q.  Sure.  But you saw him --

17   A.  Yes, I was there.

18   Q.  And he wasn't coerced?  It didn't seem that he was under

19   any kind of duress --

20           MS. FERNANDEZ:  Objection; relevance.

21           THE COURT:  Sustained; irrelevant.  Wasting time,

22   Counsel.  You have, maybe, five or ten more minutes for your

23   cross.

24           MR. MICHELEN:  Your Honor --

25   BY MR. MICHELEN:

1    Q.  Agent, when you left the scene, were there still other

2    police officers on scene or were you the last officer to

3    leave?

4              MS. FERNANDEZ:  Objection, Your Honor; relevance.

5              THE COURT:  Sustained.

6    BY MR. MICHELEN:

7    Q.  Do you know in which car Mr. Bodon was transported to

8    the station?

9    A.  I don't remember.  I think it was --

10             THE COURT:  If you don't remember, don't guess.

11             THE WITNESS:  At least I didn't transport him.

12             MR. MICHELEN:  And, Your Honor, aside from the

13   missing picture that I don't know if I have any questions

14   on --

15             THE COURT:  The picture should be --

16             MR. MICHELEN:  At this moment I don't have any

17   other questions, but I would like to see the missing

18   picture.

19             (WHEREUPON, the document was tendered to counsel.)

20             THE COURT:  Any redirect?

21             MS. FERNANDEZ:  No, Your Honor.

22             MR. MICHELEN:  Your Honor, I'm sorry; if I could

23   have just one second.

24   BY MR. MICHELEN:

25   Q.  Agent, if I can just ask you -- I will show you this

1     last picture.  I will mark it Exhibit H.

2              What is this picture of, Agent?

3     A.  It's the photograph of the place where we walked to

4     reach the residence of Juan Carlos Bodon, which is the one

5     you can see at the very end, to the left, and where we did

6     the intervention in front of his father's house.

7     Q.  And you took this picture?

8     A.  That's right.

9     Q.  On the day of the incident?

10    A.  That's right.

11    Q.  Minutes after the arrest?

12    A.  That's right.

13    Q.  Of the scene of the arrest?

14    A.  Yes, that's right.

15             MR. MICHELEN:  And Your Honor, the last thing I

16    would say is I would once again ask to move all the pictures

17    that Agent Ortiz took into evidence as relevant, as pictures

18    that the agent himself took of the scene as part of an

19    investigation minutes after an arrest.  They are relevant to

20    show what the scene looked like on that day, and they were

21    taken -- they were pictures taken by a police officer of the

22    scene of an incident --

23             THE COURT:  That doesn't make them relevant,

24    Counsel, the fact that he took of the scene.  The issue here

25    is not the scene.

 1              MR. MICHELEN:  Your Honor, what I would say is

 2     what the scene looked like and how the alleged hand-to-hand

 3     transaction occurred is --

 4              THE COURT:  These pictures don't show anything of

 5     that.

 6              MR. MICHELEN:  But it does, Your Honor, show the

 7     positioning of different landmarks and different objects

 8     that could better help the Court understand what the scene

 9     looked like that day.  It reflects the balcony, for example,

10     of the house, what the house looked like, the cars that were

11     parked in front of the house.  I think it's very relevant.

12              THE COURT:  We have that in other pictures.  Thank

13     you.

14              MR. MICHELEN:  Regardless, I would just move

15     to move them into evidence.

16              THE COURT:  Request is denied.

17              MR. MICHELEN:  Over our objection, Your Honor.

18              THE COURT:  Thank you.  You may step down.

19              Any other witness?

20              MS. FERNANDEZ:  No, Your Honor.  The United States

21     rests.

22              THE COURT:  Any witness from Defendant?

23              MR. MCCUTCHEON:  Yes, Your Honor.  Defense calls

24     Ariana Alvarado.

25              THE COURT:  Can you make a proffer of what her

1    testimony would be.

2              MR. MCCUTCHEON:  This is the defendant's wife.

3    She was there on the day of the incident, Your Honor, and

4    would testify to what happened before --

5              THE COURT:  What would be the proffer of her

6    testimony?

7              MR. MCCUTCHEON:  She would tell the Court that she

8    arrived with Mr. Bodon after 4:10 in the afternoon.  She

9    would tell you that Mr. Bodon was in the back yard of

10   Mr. Bodon's father's residence.  They were working because

11   there was a faucet that was overflowing.  He was back there

12   for a large portion of the time until 4:50.  He left at some

13   point to go get a cigarette, but that was for a mere matter

14   of minutes.  And when her daughter went to the front to go

15   find her father, Mr. Bodon, she saw the incident unfold.

16             THE COURT:  All right.  The interpreter needs a

17   short rest, so we will take a short rest.  Five minutes.

18             (WHEREUPON, a recess was had.)

19                     ARIANA FIGUEROA ALVARADO,

20   called as a witness herein, having been first duly sworn,

21   was examined and testified as follows:

22                       DIRECT EXAMINATION

23   BY MR. MCCUTCHEON:

24   Q.  Good afternoon, ma'am.  Please state your name for the

25   record.

1      A.  Ariana Figueroa Alvarado.

2      Q.  What is your relationship to Mr. Juan Carlos

3   Bodon-Lespier?

4      A.  My husband.

5      Q.  And on April 8, 2016, were you living with Mr. Bodon?

6      A.  Correct.  Yes.

7      Q.  And where is your residence located?

8      A.  On Jazmin Street, 135, in Cuesta Blanca, Lajas, Puerto

9   Rico.

10     Q.  And did Mr. Bodon live there at that residence with you?

11     A.  Yes.

12     Q.  How long had he been residing at that residence with

13  you?

14     A.  Around two, three years.

15     Q.  Now, are you familiar generally with the southwest of

16  Puerto Rico and the location of your residence?

17     A.  Yes.

18     Q.  Okay.  Now, on April 8, 2016, did you have occasion to

19  travel from your house to Ponce, Puerto Rico?

20     A.  Yes.

21     Q.  And what were you going to do on that day?

22     A.  Well, on Saturday mornings at dawn, we set up, like, a

23  flee market.  Persons that have used things that they want

24  to sell go there.  What we do is we go on Friday.  We do it

25  to load the vehicle with everything, and at around 2:30 in

1     the morning we go over there.

2     Q.  Okay.  How were you going to get to Ponce?

3     A.  A friend of mine was going to take us.

4     Q.  Just to be clear, we are talking about on April 8th of

5     2016, right?

6     A.  Correct.

7     Q.  Now, where were you going from your house when you left?

8     A.  I first went to school to pick up the girl at school.

9     Q.  About what time did you leave your house?

10    A.  2:30.

11    Q.  Okay.  What time does your daughter get out of school?

12    A.  At 3:00.

13    Q.  Okay.  And just to be clear, you were traveling from

14    your house to her school?

15    A.  Yes.

16    Q.  What's the name of her school?

17            MS. FERNANDEZ:  Objection, Your Honor.  What's the

18    relevance of the name of the school of the child?

19            THE COURT:  Sustained.

20            MR. MCCUTCHEON:  Your Honor, I am just laying some

21    groundwork for the timeline that we are going to be

22    establishing.  I will try to move through it as quickly as

23    possible.  It's relevant because I have to establish where

24    she went and at what time, which she will testify she

25    remembers.

```
 1                   THE COURT:  What does the name of the school have
 2      to do with it?
 3                   MR. MCCUTCHEON:  That's how she knows at 3:00 p.m.
 4      where she was, Your Honor.
 5                   THE COURT:  Sustained.
 6      BY MR. MCCUTCHEON:
 7      Q.  Where is your daughter's school located?
 8      A.  The address or name?
 9      Q.  The town.
10      A.  In Ensenada, Guanica.
11      Q.  Okay.  So you traveled from your house to Ensenada to
12      pick up your daughter, correct?
13      A.  Correct.
14      Q.  And at what time did you end up picking up your daughter
15      from school in Ensenada?
16      A.  The bell rings at about 3:00, so around 3:05.
17      Q.  And what happened once you picked your daughter up from
18      school?
19      A.  I took her over to her grandma's house.
20      Q.  And where is her grandmother's house located?
21      A.  G-10 in Ensenada, Puerto Rico.  Baco is the subdivision.
22      Q.  How long did it take you to travel from the daughter's
23      school to the grandmother's house?
24      A.  A little bit, because at that time there is traffic.
25      All the parents are picking up their kids.  Around ten
```

1    minutes.

2    Q.  And just to be clear, Mr. Bodon was with you this entire

3    time?

4    A.  Yes.

5    Q.  He was riding in the same vehicle as you and your friend

6    who was driving?

7    A.  Yes.

8    Q.  Was anybody else with you?

9    A.  My baby.

10   Q.  Who is your youngest daughter?

11   A.  Yes, the three-year-old.

12   Q.  Okay.  And you were picking up the -- an older daughter

13   from school?

14   A.  Yes.  She is eight.

15   Q.  Okay.  And you dropped the eight-year-old daughter at

16   the grandmother's house?

17   A.  Yes.

18   Q.  What time did you end up dropping her off at there?

19   A.  At the grandma's, around 3:15.

20   Q.  Now, where did you go once you dropped off your

21   eight-year-old daughter at her grandmother's house?

22   A.  Towards Ponce.

23   Q.  Okay.  Now, at what time did you arrive in Ponce?

24   A.  From 4:15 to 4:20.

25   Q.  Now, did you have the opportunity to observe the street

1    as you got out of the car; the street near Mr. Bodon's

2    father's house?

3    A.  Yes.  It was well traveled.

4    Q.  And I should clarify.  What is the exact location of

5    Mr. Bodon's father's residence?

6    A.  In the main street of Mayor Cantera.

7    Q.  And so the last leg of your journey was from your

8    daughter's grandmother's house to the residence of

9    Mr. Bodon's father?

10   A.  Correct.

11   Q.  And what happened when you arrived?  Can you describe

12   what happened when you arrived at Mr. Bodon's father's

13   residence?

14   A.  Well, my friend, she dropped us off.  I took down my

15   stuff and I took my girl out, and we greeted my in-laws.

16   And he told my husband that the goat was in the location of

17   the business, downward a little bit.

18   Q.  Who is "he"?

19   A.  My husband.

20   Q.  Who was telling him something?

21   A.  My father-in-law; his dad.

22   Q.  Now, did you see Milford Martinez-Martinez when you

23   arrived?

24   A.  Yes.

25   Q.  Was he already there by the time you arrived?

1     A.  Yes.

2     Q.  He didn't ride to Ponce with you?

3     A.  No.

4     Q.  Okay.  Now, did you hear Mr. Bodon communicate with

5     Milford Martinez via telephone at any point prior to his

6     arrival in Ponce?

7     A.  No.

8     Q.  Did you hear him planning a drug transaction?

9     A.  No.

10    Q.  Did you see him with a black fanny pack style bag

11    strapped across his chest?

12    A.  No.

13    Q.  And you had plenty of opportunity to observe him

14    while --

15              THE COURT:  That's argumentative, Counsel.  Plus,

16    you have been leading all the way.

17    BY MR. MCCUTCHEON:

18    Q.  Did you have an opportunity to observe Mr. Bodon?

19    A.  Yes.

20    Q.  Where was he in relation to you during this period of

21    time that we are speaking about?

22    A.  In which period of time?

23    Q.  When you are driving from the grandmother's residence.

24    A.  With me.

25    Q.  Okay.  And as you are exiting the vehicle?

1     A.  As I got out, he was with me.

2     Q.  Now, describe to me what happened after you exited the

3     vehicle.

4     A.  Well, we greeted my father-in-law.  He told us that

5     Puruca, the goat, was down below the business; for us to go

6     get her.

7          THE COURT:  That's already been asked and

8     answered.

9     BY MR. MCCUTCHEON:

10    Q.  And after that, ma'am?

11    A.  Well, I went inside the house to drop off my stuff and

12    the baby's stuff, and he came with Puruca, and we went into

13    the corral where the goats are kept because the faucet --

14         THE COURT:  Irrelevant what happened in the

15    corral.

16         MR. MCCUTCHEON:  Your Honor, she is describing

17    immediately what happened during the period of time between

18    4:15 and 4:20 --

19         THE COURT:  That's irrelevant, Counsel.

20         MR. MCCUTCHEON:  -- and 4:45, Your Honor.

21         THE COURT:  It's irrelevant, Counsel.  It's

22    irrelevant what happened in the corral.

23         Remember, I have a suppression at 2:00 o'clock.

24         MR. MCCUTCHEON:  I understand.  We have several

25    witnesses we need to present, and if it's an issue, we would

1    move for a continuance at this point.

2              THE COURT:  Wait a minute.  I am not going to

3    continue the case.  You are going to end up not later than

4    1:30, so you better move along.  Don't ask questions which

5    are really unnecessary.

6              MR. MCCUTCHEON:  Your Honor, she is establishing

7    that Mr. Bodon --

8              THE COURT:  You are wasting time arguing with the

9    Court.  Keep on wasting time.  You are doing it to yourself.

10   BY MR. MCCUTCHEON:

11   Q.  Now, you mentioned that Mr. Bodon was with you in the

12   back of the residence.

13   A.  Yes.

14   Q.  About what time was that at?

15   A.  After we arrived.

16   Q.  Okay.  Do you know exactly or approximately about what

17   time it was?

18   A.  4:30, 4:45.

19   Q.  Okay.

20             MR. MCCUTCHEON:  Your Honor, may I approach the

21   witness?

22             THE COURT:  Go ahead.

23   BY MR. MCCUTCHEON:

24   Q.  Ma'am, I am showing you what's been previously marked

25   for identification as --

1          DEPUTY CLERK:  I'm sorry to interrupt, but I need

2     to mark the documents, because the Court rejected several

3     pictures that -- they were not marked, and should be

4     Defendant's ID G, H, I, J, K.

5     BY MR. MCCUTCHEON:

6     Q.  I correct myself.  I am showing you what's been

7     previously marked for identification as Defense Composite

8     Exhibit K.  Can you review those photographs.

9     A.  Yes.  These are the items that we take to the flee

10    market to sell.

11    Q.  Just review the photographs first.

12    A.  Okay.  Done.

13    Q.  Now, do you recognize the location depicted in those

14    photographs?

15    A.  Yes.

16    Q.  Okay.  And does it fairly and accurately depict the area

17    in and around the residence of Mr. Bodon's father on

18    April 8, 2016?

19    A.  Yes.

20    Q.  And --

21          THE COURT:  Which part of the house?

22          THE WITNESS:  The rear part.

23          THE COURT:  I am not going to allow it to be

24    marked.  It's irrelevant, the back of the house.

25          MR. MCCUTCHEON:  Your Honor, that's -- just to be

1    clear, she was going to testify that that's where Mr. Bodon

2    was for the --

3             THE COURT:  She can testify as to that without

4    having all those photos in evidence.

5             MR. MCCUTCHEON:  We note our objection for the

6    record, Your Honor.

7    BY MR. MCCUTCHEON:

8    Q.  Now, about how long was Mr. Bodon in the back yard with

9    you for?

10   A.  From the time we arrived?

11   Q.  Well, explain what happened again.

12   A.  Okay.

13             THE COURT:  It's been asked and answered.

14   BY MR. MCCUTCHEON:

15   Q.  From the point in time that he returned to the back yard

16   with the goat.

17   A.  Okay.  We started -- tried to fix the water trough.

18   Q.  What had happened with the water trough?

19             THE COURT:  Irrelevant.  All this is irrelevant.

20             MR. MCCUTCHEON:  Your Honor, it's explaining why

21   Mr. Bodon is with her in the back of the residence.

22             THE COURT:  She can testify, He was with me there

23   until 5:00, 6:00 o'clock, 7:00 o'clock.  That's it.  It's

24   all irrelevant what he was doing back there.

25   BY MR. MCCUTCHEON:

1    Q.  How long was Mr. Bodon in the back of the residence with
2    you for?
3    A.  Around 15 minutes.
4    Q.  Okay.  And at some point he leaves?
5    A.  Yes.
6    Q.  And how long is he out of your eyesight for?
7    A.  Not much, because the little girl went after him.
8    Q.  Okay.  And what happens when the little girl goes after
9    him?
10   A.  I went after her.
11   Q.  Okay.  Can you give us an approximate period of time
12   that he was out of your eyesight for?
13   A.  He was on the street, the alley, and I was in the yard.
14   The little girl went after him, and I went after her.  So
15   it -- in reality, it wasn't much.
16   Q.  Are we talking about a matter of minutes?
17   A.  No.
18   Q.  Less or more?
19   A.  Less.
20   Q.  So a period of seconds?
21   A.  Yes.
22   Q.  Now, what happened when you went to the front of the
23   residence?
24   A.  They pushed him against the wall of the house.
25   Q.  When you say they pushed him against the wall of the

1    house, what do you mean?

2    A.   There were many agents there, and they had pushed him.

3    They had pinned him against the front wall of the house.

4    Q.   And when you arrived, did you see him in possession of a

5    black bag?

6    A.   No.

7    Q.   Okay.  Did you recognize any of the officers who were

8    there?

9    A.   Yes.

10   Q.   How did you recognize them?

11   A.   Because back in the year 2013, I had been at the house,

12   and there was a search performed, and that Agent Wilfredo,

13   he was the one that --

14          MS. FERNANDEZ:  Your Honor, we are going to object

15   to the narrative that we are hearing now.  This has no

16   relevance to the events.

17          THE COURT:  Sustained.

18          MR. MCCUTCHEON:  It goes to motive and bias, Your

19   Honor.

20          THE COURT:  She knew him.

21   BY MR. MCCUTCHEON:

22   Q.   And based upon your prior interactions with this agent,

23   was it your understanding that --

24          THE COURT:  You are testifying.

25   BY MR. MCCUTCHEON:

1    Q.  What is your understanding of this agent's relationship

2    with your husband, Mr. Bodon?

3              MS. FERNANDEZ:  Objection, Your Honor.  The

4    relevance?

5              THE COURT:  Sustained.

6              MR. MCCUTCHEON:  It goes to motive and bias, Your

7    Honor.

8              THE COURT:  Sustained.

9    BY MR. MCCUTCHEON:

10   Q.  Now, does Mr. Bodon have his own cellular telephone?

11   A.  No.

12   Q.  And was he using your cellular telephone around the time

13   between 4:15 and 5:00 o'clock p.m. on April 8, 2016?

14             THE COURT:  You are testifying.

15             MR. MCCUTCHEON:  It's a question, Your Honor.

16             THE COURT:  No, it is not.  It's completely

17   leading, Counsel.  You are in direct.

18   BY MR. MCCUTCHEON:

19   Q.  Do you have a cellular telephone?

20   A.  Yes.

21   Q.  Was Mr. Bodon using it between the period of time

22   between 4:30 and 5:00 p.m.?

23   A.  No.

24   Q.  And you at no time saw him planning a drug transaction?

25   A.  No.

1    Q.  And you at no time saw him with a black fanny pack style

2    bag?

3              THE COURT:  You are testifying.

4    BY MR. MCCUTCHEON:

5    Q.  Did you at anytime see your husband with a black fanny

6    pack style bag?

7    A.  No.  He had his wallet in his pocket.

8              MR. MCCUTCHEON:  I have no further questions at

9    this time, Your Honor.

10             THE COURT:  Thank you.  You may cross.

11             MS. FERNANDEZ:  Yes, Your Honor.

12                        CROSS EXAMINATION

13   BY MS. FERNANDEZ:

14   Q.  Did any of the police officers see you when you

15   allegedly went to the front of the house on April 8, 2016?

16   A.  Yes.

17             MR. MCCUTCHEON:  Objection, Your Honor; calls for

18   speculation.  How would she know whether or not the agents

19   saw her?

20             THE COURT:  Sustained.

21   BY MS. FERNANDEZ:

22   Q.  Did you speak or make any utterances when you saw --

23   when you went to the front of the house on April 8th of

24   2016?

25   A.  No.

1    Q.  Did you interact with any of the agents on April 8,

2    2016, at the time of the arrest of your husband?

3              MR. MCCUTCHEON:  Objection; relevance.

4              THE COURT:  Denied.

5    BY THE WITNESS:

6    A.  Yes.  I asked why was it that they were arresting him.

7    BY MS. FERNANDEZ:

8    Q.  And were you advised why he was being arrested?

9    A.  No.

10   Q.  Do you remember who you asked this question of?

11   A.  Yes.

12   Q.  Who?

13   A.  Wilfredo.

14   Q.  And that's your testimony under oath?

15   A.  Yes.

16   Q.  And you understand that false testimony could have

17   consequences of criminal nature?

18             MR. MCCUTCHEON:  Objection, Your Honor; this is

19   argumentative.  It's essentially threatening the witness.

20             MS. FERNANDEZ:  No, we are not threatening the

21   witness, Your Honor.  We are asking her if she understands

22   her obligations to the Court to tell the truth.

23             THE COURT:  She knows she is under oath.

24   BY MS. FERNANDEZ:

25   Q.  And do you persist in that testimony?

```
 1                MR. MCCUTCHEON:  Objection, Your Honor; asked and

 2      answered.

 3                THE COURT:  Denied.

 4      BY THE WITNESS:

 5      A.  Yes.

 6      BY MS. FERNANDEZ:

 7      Q.  Now, since when have you been with Juan Carlos

 8      Bodon-Lespier?

 9      A.  2012.

10      Q.  And does he financially maintain you?

11                MR. McCUTCHEON:  Objection, Your Honor; relevance.

12                MS. FERNANDEZ:  Bias, Your Honor.

13                THE COURT:  Sustained.

14                MS. FERNANDEZ:  No further questions, Your Honor.

15                THE COURT:  All right.  Thank you.  You may step

16      down.

17                Is that it?

18                MR. MICHELEN:  We have one more witness.

19                THE COURT:  Who is the witness?

20                MR. MICHELEN:  Julio --

21                THE COURT:  Who is your next witness?

22                MR. MCCUTCHEON:  It is an individual that was

23      present on the day of the incident and could observe, from

24      my understanding, the vast majority, if not all, of the

25      incident as it unfolded.
```

```
 1                    THE COURT:  Who is your next witness?

 2                    MR. MICHELEN:  Your Honor, his name is Julio

 3      Garcia.

 4                         JULIO GARCIA,

 5      called as a witness herein, having been first duly sworn,

 6      was examined and testified as follows:

 7                         DIRECT EXAMINATION

 8      BY MR. MICHELEN:

 9      Q.  Good afternoon, sir.  What is your name?

10      A.  Julio Garcia Zayas.

11      Q.  And what is your relationship to Mr. Juan Carlos Bodon?

12      A.  A friend.

13      Q.  How long have you known Mr. Juan Carlos Bodon?

14      A.  29 years.

15      Q.  Are you closer to him or anyone else in his family?

16      A.  Friend.

17      Q.  Are you closer to him or are you closer to someone else

18      in his family?

19      A.  With the dad.

20      Q.  And did you have an opportunity to travel to Pete El

21      Conde Street on April 8, 2016?

22      A.  Yes.

23      Q.  And how did you get there?

24      A.  In my car.

25      Q.  And what kind of car is that?
```

```
 1    A.  Black.  A Toyota Corolla.

 2    Q.  More or less, what year?

 3    A.  2008.

 4    Q.  And when did you originally get that car?

 5              MS. FERNANDEZ:  Objection, Your Honor; relevance.

 6              THE COURT:  Sustained.

 7    BY MR. MICHELEN:

 8    Q.  Do you still have that car?

 9    A.  Yes.

10              MS. FERNANDEZ:  Objection, Your Honor; again,

11    relevance.

12              THE COURT:  Sustained.

13    BY MR. MICHELEN:

14    Q.  Okay.  You had that car on April 8, 2016?

15    A.  Yes.

16    Q.  And you drove in that car to Pete El Conde Street?

17    A.  Exactly.

18    Q.  At what time, if you know?

19    A.  4:30.

20    Q.  And what was the purpose of you going to that street

21    that day, at that time?

22    A.  To eat pinchos.

23    Q.  Where were you going to eat pinchos?

24              MS. FERNANDEZ:  Objection, Your Honor; relevance.

25              THE COURT:  Sustained.
```

1               MR. MICHELEN:  Your Honor, the relevance is where

2       he was when the incident happened.  The pincho cart is near

3       the incident of the arrest.  So, of course, it's relevant

4       where the pincho cart was.

5               MS. FERNANDEZ:  Your Honor, this is the first time

6       we heard of such a cart.

7               MR. MICHELEN:  You are hearing about it now.

8               THE COURT:  The question was, why did you go

9       there?  He said to eat pinchos.

10              MR. MICHELEN:  And I said, where were you going to

11      eat the pinchos?

12              THE COURT:  Okay.  You may answer.

13      BY THE WITNESS:

14      A.  On that same street, Pete El Conde.

15      BY MR. MICHELEN:

16      Q.  Where on the street is the pincho cart?

17      A.  At Mayor Cantera.

18      Q.  How far -- let's start with, when you arrived on Pete El

19      Conde Street, where did you park your car?

20      A.  On the left as when you travel upward towards the

21      fields.

22      Q.  Now, sir, I am going to show you what's been marked as

23      Defense Exhibit B.  Do you recognize this street?

24      A.  Yes.

25      Q.  Do you recognize Mr. Bodon's father's house?

1    A.   Yes.

2    Q.   Do you see there the spot where you parked your black

3    Toyota Corolla?

4    A.   Exactly.

5    Q.   Can you please mark on the screen.

6    A.   Between the pump and the alley (Drawing).

7    Q.   So I see you have made a green arrow and two green dots.

8    Is that correct?

9    A.   Yes.

10   Q.   At what time do you think you arrived and parked your

11   car there?

12   A.   Around 4:30.

13   Q.   Okay.  And can you mark also if you see on this street

14   where the pincho cart is.

15   A.   Can you repeat?

16   Q.   Can you please mark with an X where the pincho cart is.

17   A.   Okay.  Here (Drawing).

18   Q.   So you put another arrow closer to the tree.  Are you

19   saying that's where the pincho cart is?

20   A.   Exactly.

21   Q.   Sir, when you arrived, why did you park your car in

22   front of Mr. Bodon's house?

23   A.   Well, I parked it there so I could have the pinchos and

24   so that I could say hello to them.

25   Q.   Was there anyone else in the vehicle with you?

1    A.  No.

2    Q.  What did you do once you parked the car?

3    A.  Excuse me?

4    Q.  What did you do after you parked the car?

5    A.  After or before?

6    Q.  What did you do after you parked your car?

7    A.  Well, I came out of the car.  I said hello to Bodon, and

8    then I went over to eat pinchos.

9    Q.  Where was Mr. Bodon when you said hi to him?

10   A.  In front of the house.

11   Q.  On the sidewalk or on the street?

12   A.  On the sidewalk.

13   Q.  Was he alone or was he with someone else?

14   A.  He was with his friend.

15        THE COURT:  When you say "Bodon," are you

16   referring to the son or the father?

17        THE WITNESS:  The son.

18   BY MR. MICHELEN:

19   Q.  And about how long were you greeting Mr. Bodon?

20   A.  Two minutes, five minutes.

21   Q.  And then you went to eat the pinchos down the block?

22   A.  Exactly.

23   Q.  Did you see anything else happen while you were eating

24   the pinchos?

25   A.  Yes.

1    Q.  What did you see?

2    A.  The policemen arresting him.

3    Q.  Did you see how the arrest happened?

4    A.  They just threw themselves on him right away.

5    Q.  Did you see Mr. Juan Carlos Bodon at any point run or

6    try to run from police officers?

7    A.  No.

8    Q.  At any point did you see Mr. Juan Carlos Bodon try to

9    climb a balcony or the balcony that's on his house, on his

10   front porch?

11   A.  No.

12   Q.  At any point did you see Mr. Juan Carlos Bodon carrying

13   a black bag?

14   A.  No.

15   Q.  At any point did you see Mr. Juan Carlos Bodon, while

16   you were there, speak to anyone else?

17   A.  With his friend.

18   Q.  Did you see any other car approach them and people get

19   out and speak to him?

20   A.  The policemen.

21   Q.  And during -- while the arrest is happening, your car,

22   where is it parked?

23   A.  On the left, between the pump and the alley.

24           THE COURT:  What is the pump?

25   BY MR. MICHELEN:

1    Q.  The fire hydrant?

2    A.  Exactly.

3    Q.  Okay.  And at which point that day did you move your

4    car?

5            MS. FERNANDEZ:  Objection, Your Honor.

6    BY MR. MICHELEN:

7    Q.  At which point that day did you move your car from that

8    parking spot?

9            MS. FERNANDEZ:  Objection, Your Honor; relevance.

10           THE COURT:  Sustained.

11           MR. MICHELEN:  I apologize; it's completely

12   relevant where a black car that is very similar to the car

13   the police officers saw was still parked there during the

14   arrest and was, indeed, in front of the house.  And it goes

15   to show that it didn't belong to people that were doing a

16   drug transaction.  Whether the Court -- it is relevant when

17   he moved his car from --

18           THE COURT:  He may answer.  Go ahead.

19   BY MR. MICHELEN:

20   Q.  When did you move your car from that parking spot, sir?

21   A.  After everyone left.

22           MR. MICHELEN:  I would ask the deputy clerk if we

23   could introduce as Exhibit B2, I think it would be.

24   BY MR. MICHELEN:

25   Q.  Sir, the last question.  Would you lie for Mr. Juan

1     Carlos Bodon?

2     A.  No.

3               MR. MICHELEN:  No further questions.  Thank you.

4               THE COURT:  You may cross.

5                         CROSS EXAMINATION

6     BY MS. FERNANDEZ:

7     Q.  Sir, have you ever lived at Pete El Conde Street?

8     A.  Excuse me?

9     Q.  Have you ever lived at Pete El Conde Street?

10    A.  Always.

11    Q.  You have always resided there?

12    A.  Exactly.

13    Q.  And you still live there?

14    A.  No, not now.

15    Q.  And since when don't you live there?

16    A.  A year and a half.

17    Q.  Now, when -- you first went to say hello to Juan Carlos

18    Bodon-Lespier before going to the pincho and getting the

19    pincho, right?

20    A.  Exactly.

21    Q.  And you were able to say hello?

22    A.  Yes.

23    Q.  And you did not see -- you saw him with his friend?

24    A.  Exactly.

25    Q.  Did you see his wife, Juan Carlos Bodon-Lespier's wife?

1    A.   No.

2    Q.   And then you went to the pincho cart?

3    A.   Exactly.

4    Q.   And you bought your pincho?

5    A.   Yes.

6    Q.   Did you ever see Juan Carlos Bodon-Lespier's wife while

7    you were eating your pincho?

8    A.   No.

9              MS. FERNANDEZ:  No further questions, Your Honor.

10             THE COURT:  What day of the week was April

11   the 8th?

12             THE WITNESS:  Excuse me?

13             THE COURT:  What day of the week was April

14   the 8th, 2016?

15             THE WITNESS:  That I recall, Friday.

16             THE COURT:  Were you working that day?

17             THE WITNESS:  No.

18             THE COURT:  Were you working at that time?

19             THE WITNESS:  No.

20             THE COURT:  And you say you were eating pinchos

21   around 4:30 in the afternoon?

22             THE WITNESS:  4:30, 5:00.

23             THE COURT:  Is that your usual dinner time?

24             THE WITNESS:  No.  When the pinchero gets there, I

25   get there.

```
1                  THE COURT:  And you have some pinchos?

2                  THE WITNESS:  Exactly.

3                  THE COURT:  And that's your dinner?

4                  THE WITNESS:  Well, excuse me.  Not every day.

5                  THE COURT:  But some days?

6                  THE WITNESS:  Exactly.

7                  THE COURT:  So that's your dinner some days?

8                  THE WITNESS:  Exactly.

9                  THE COURT:  Is the alley that is shown there, is

10     that a dead end alley or is it a thoroughfare?

11                 THE WITNESS:  It's a dead end.

12                 THE COURT:  Okay.  And what color is the house of

13     Mr. Bodon?

14                 THE WITNESS:  It seems to me that it's pink.

15                 THE COURT:  That's from what you can see in the

16     photo?

17                 THE WITNESS:  Yes.

18                 THE COURT:  But in reality, when you are standing

19     in front of the house, what color do you see?

20                 THE WITNESS:  In real life?

21                 THE COURT:  Yes.  When you are standing in front

22     of the house, what color do you see?

23                 THE WITNESS:  Well, pink.  I would say pink.

24                 MR. MICHELEN:  I would just state for the record

25     that I would object to that line of questioning.  It is a
```

1    bit misleading considering the two tones we have of a house

2    come from two different cameras, and there has been no

3    testimony and no evidence of the house ever being painted,

4    so the difference in tonality can only be attributed to --

5            THE COURT:  More to my favor.  More to my favor,

6    because, precisely, the witnesses for the Government were

7    testifying to different shades of color because of what the

8    photographs showed.

9            MR. MICHELEN:  Correct.

10           THE COURT:  Right.

11           MR. MICHELEN:  The color of the house has never

12   been an issue in this case.

13           THE COURT:  I am sure.  But you made an issue of

14   it, so that's why I asked the question.

15           MR. MICHELEN:  The reason I brought it up is

16   because the officer said --

17           THE COURT:  Counsel, I don't need to know.

18           MR. MICHELEN:  He took pictures of it --

19           THE COURT:  I don't need to know why you brought

20   it up.

21           MR. MICHELEN:  The officer was the one who --

22           THE COURT:  I don't care why you brought it up.

23           You keep on like that, you are going to have a

24   hard time with this Court.

25           Anyway, that's your last witness, right?

```
1              MR. MCCUTCHEON:  No, Your Honor.  We have two

2      other witnesses.

3              THE COURT:  No, no.  You turn them over to the

4      Government.  I am not going to hear any more witnesses.  I

5      have a clear picture of what this is about.

6              MR. MCCUTCHEON:  For the record, if the Court

7      would let me proffer their testimony.

8              THE COURT:  Yes.

9              MR. MCCUTCHEON:  Okay.  I would call United States

10     Probation Officer Yarixa Vazquez.  She would testify that --

11     just one moment -- that Mr. Bodon was, indeed, living in

12     Lajas with his wife around the period of time during which

13     this incident took place.  So --

14             THE COURT:  That's not an issue.

15             MR. MCCUTCHEON:  Okay.

16             THE COURT:  What else?

17             MR. MCCUTCHEON:  The officer testified that

18     Mr. Bodon lived with his father at that residence; Wilfredo

19     Perez did.  So that would go to that.

20             I would also inquire as to the telephone number of

21     Mr. Bodon or whether or not she had to communicate with him

22     through his wife.  I would also have her testify --

23             THE COURT:  That's not an issue either.

24             MR. MCCUTCHEON:  I would have her testify that he

25     had attended all monthly treatments in the month of March
```

1    2016, and that in April of 2016 -- on April 7, 2016, he

2    attended a 90-minute group therapy; and on April 15, 2016,

3    he tested negative to any sort of narcotics, with the

4    exception of prescribed Suboxone.

5           I would also elicit from her that she has had no

6    cause, other than this alleged incident, to violate him, and

7    that for the past year, he has been responding positively to

8    treatment and attending, unless excused, all prior

9    appointments with mental health providers and drug treatment

10   providers, Your Honor.

11          THE COURT:  Thank you.  And the other witness?

12          MR. MCCUTCHEON:  Your Honor, I would also elicit

13   from Ms. Vazquez that Mr. Bodon has had problems in the past

14   with cocaine and marijuana, and that he was previously a

15   user of both cocaine and marijuana, which goes -- and we

16   believe it's relevant because they are alleging -- the

17   police in this case are alleging that Mr. Bodon was found

18   with a bag full of marijuana and cocaine, which would be

19   akin to presenting, you know, candy to a baby, and yet he

20   didn't seem to test positive on April 15th, and had attended

21   all drug counseling events that were scheduled.

22          We would next present the testimony of Federal

23   Public Defender's Office Investigator Angel Sanchez.  He

24   would testify that he retraced the steps described by Ariana

25   Alvarado, Mr. Bodon's wife, and that the time frames

 1     attributable to each of those steps correspond to the time

 2     period that actually it takes, because it was reenacted by

 3     Mr. Sanchez.

 4              He would say if somebody picked up a child from

 5     around 3:10 from the school in Ensenada and went to the

 6     grandmother's address, which was put on the record by

 7     Ms. Alvarado, that it takes, at a time of intense traffic,

 8     between 45 and 55 minutes to travel from that location.

 9              THE COURT:  I'm sorry, that's not correct, and I

10     am glad he is not here to testify because he would be in

11     problems with the Court if he were to testify to that.

12              Counsel, I know that area, and Ensenada is

13     Ensenada, and the school is Ensenada, and the grandmother's

14     house is Ensenada.  Not 45 minutes, Counsel.

15              MR. MCCUTCHEON:  To the northeast, actually, Your

16     Honor -- actually, to the northwest, Your Honor, is the

17     location of the grandmother's house.  And to that point, I

18     would introduce Google Maps showing the exact locations of

19     all these --

20              THE COURT:  It took Ms. Alvarado ten minutes.

21              MR. MCCUTCHEON:  To what, Your Honor?

22              THE COURT:  To pick up the daughter and take her

23     to Grandmother's.

24              MR. MCCUTCHEON:  Right.  I am talking about from

25     the grandmother's house to Ponce.  That's the period of time

 1    that it would take, between 45 and 55 --

 2            THE COURT:   I thought you said between the picking

 3    up of the granddaughter and --

 4            MR. MCCUTCHEON:   No.  If I did, I apologize.   The

 5    point I was trying to make was that it takes between 45 and

 6    55 minutes to go from the grandmother's residence to 223

 7    Pete El Conde in Ponce.  And he had retraced those steps and

 8    had generated Google Maps, pinpointing each of those

 9    locations, and also Google Maps with the time period

10    attributed by Google Maps for the travel and distance

11    between those locations, Your Honor.

12            And we would also introduce photographs taken of

13    the scene showing, in addition to the photographs that were

14    introduced, the viewpoint of the agents, allegedly, on

15    April 8, 2016, and the items that would be blocking their

16    alleged view from the areas that were noted on the

17    photographs that were introduced.

18            We would also introduce photographs from Google

19    Maps generated that show the area to the north of

20    Mr. Bodon's father's residence, that indicate that there was

21    a large amount of areas where the agents could have stopped

22    to continue their surveillance of this drug transaction, and

23    the black Camry that was allegedly in the area and two

24    individuals that were in, along with Mr. Bodon, this alleged

25    drug transaction.

```
 1              So all that testimony would be presented, and the

 2     evidence, documents, photographs mentioned would have all

 3     been presented if given an opportunity by this Court.  And

 4     for the record, we would object to the due process violation

 5     on Mr. Bodon's behalf for the Court preventing us,

 6     respectfully, from introducing that testimony.

 7              THE COURT:  You made a proffer of it, which I

 8     think is sufficient.

 9              Thank you.  You may step down.  The matter stands

10     submitted.

11              MR. MCCUTCHEON:  Yes, Your Honor.

12              MS. FERNANDEZ:  Does the Court wish to hear

13     argument from the United States?

14              THE COURT:  No, thank you.

15              MR. MCCUTCHEON:  Respectfully, Your Honor, I would

16     like to offer argument on behalf of Mr. Bodon prior to the

17     Court --

18              THE COURT:  I don't want argument.  I don't need

19     it.  Thank you.

20              MR. MCCUTCHEON:  Yes, Your Honor.  We renew all

21     prior motions and objections at this time.

22              THE COURT:  All right.

23              (PROCEEDINGS ADJOURNED AT 1:44 P.M.)

24

25
```

1    UNITED STATES DISTRICT COURT )
                                  )  ss.
2    OF PUERTO RICO               )

3

4

5                      **REPORTER'S CERTIFICATE**

6

7

8         I, LISA O'BRIEN, do hereby certify that the above

9    and foregoing, consisting of the preceding 94 pages,

10   constitutes a true and accurate transcript of my

11   stenographic notes and is a true and complete transcript of

12   the proceedings to the best of my ability.

13         Dated this 24th day of August, 2017.

14

15                          S/Lisa O'Brien
                            Lisa O'Brien
16                          USDC Court Reporter
                            708-284-0021
17

18

19

20

21

22

23

24

25